FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 5 2019

JAMES N. HATTEN, Clerk
By: ~~~~ Deputy Clerk

# UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA ex rel. [UNDER SEAL], | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| [UNDER SEAL], | ) |
| Defendants. | ) ) ) ) ) / |

Civil Action File No.

**1  19-CV-4316**

QUI TAM COMPLAINT

JURY TRIAL DEMANDED

## DOCUMENT TO BE KEPT UNDER SEAL
## DO NOT ENTER ON PACER

UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and ) | |
| THE STATE OF GEORGIA ) | Civil Action File No. |
| ex rel. BETTY RINER, ) | |
| ) | _____ |
| Plaintiff, ) | |
| v. ) | QUI TAM COMPLAINT |
| COMMUNITY HEALTH SERVICES ) | |
| OF GEORGIA, LLC (a/k/a Ga ) | JURY TRIAL DEMANDED |
| MedGroup); COMMUNITY PRIMARY ) | |
| CARE OF GEORGIA, LLC (a/k/a Ga ) | |
| MedGroup); INTEGRA ) | |
| REHABILITATION AGENCY, LLC; ) | |
| AFFINIS HOSPICE, LLC; and ) | |
| ELDERCARE PHARMACY, LLC, ) | |
| / | |

Defendants.

## **COMPLAINT**

Plaintiff-Relator Betty Riner, through her attorneys and on behalf of the

United States of America and the State of Georgia, files this complaint against

Defendants Community Health Services of Georgia, LLC (a/k/a Ga MedGroup);

Community Primary Care of Georgia, LLC (a/k/a Ga MedGroup); Integra

Rehabilitation Agency, LLC; Affinis Hospice, LLC; and Eldercare Pharmacy, LLC

(collectively, "Defendants").

## I.  **INTRODUCTION**

1.     This is an action to recover damages and civil penalties on behalf of

the United States and the State of Georgia arising from the false and/or fraudulent

records, statements, and claims for payment made or caused to be made by

Defendants and/or their agents and employees, in violation of the federal False

Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"), Stark Statute, 42 U.S.C. 1395nn

("*Stark*"), and the Georgia False Medicaid Claims Act ("Georgia FCA"), O.C.G.A.

§ 49-4-168, *et seq*.

2.     Defendants have engaged in a corporate-led scheme to fraudulently

obtain millions of dollars in unlawful reimbursements from Medicare and

Medicaid, thereby increasing their corporate revenue at the expense of taxpayers.

3.     The purpose of Defendants' fraudulent scheme is to obtain

significantly higher reimbursements from the United States, and unlawfully

increase their corporate revenue at the expense of taxpayers.

4.     Defendants' fraudulent practices include intentionally understaffing

their facilities and thereby falling below required reimbursement standards,

overbilling and billing for physician services never performed, directing and billing

for contract nurse practitioners to perform services outside of the required

supervision of a physician, pushing and billing for patient visits to meet internally

set quotas without required medical necessity, directing and billing for specialist referrals without required medical necessity, billing for prescriptions under one patient with higher reimbursement rates and using those prescriptions for other patients to avoid prescriptions at a lower reimbursement rates, automatically sending patients to Hospice without required medical necessity, and administrative classification and recertification of patients for continued billing without required medical necessity.

5.     Plaintiff-Relator Betty Riner seeks to recover all available damages, civil penalties, and other relief arising from the FCA, *Stark*, and Georgia FCE violations alleged herein.

## II.   PARTIES

### A.   Defendants

6.     Defendant Community Health Services of Georgia, LLC ("CHS-Ga") is a Georgia limited liability company.  CHS-Ga is also known as and does business as Ga MedGroup.

7.     In addition to also doing business as Ga MedGroup, CHS-Ga also owns, operates, and controls several entities that provide various healthcare services, including Integra Rehabilitation Agency, LLC; Affinis Hospice, LLC; and Eldercare Pharmacy, LLC.

8.     Ga MedGroup manages all physician services at the facilities where

CHS-Ga and its related entities provide or refer healthcare services, including

Traditions Health & Rehabilitation in Lithonia, Georgia, DeKalb County.   CHS-

Ga owns, operates, and controls Ga MedGroup.

9.     Ga MedGroup was previously known as Community Primary Care of

Georgia, LLC ("CPC").   CPC is a Georgia limited liability company located in

Gray, Jones County, Georgia.   At all relevant times, CHS-Ga owned, operated, and

controlled CPC.

10.     Defendant Integra Rehabilitation Agency, LLC ("Integra") is a

Georgia limited liability company located in Macon, Bibb County, Georgia.   At all

relevant times, CHS-Ga owned, operated, and controlled Integra.

11.     Defendant Affinis Hospice, LLC ("Affinis") is a Georgia limited

liability company located in Gray, Jones County, Georgia.   At all relevant times,

CHS-Ga owned, operated, and controlled Affinis.

12.     Defendant Eldercare Pharmacy, LLC ("Eldercare") is a Georgia

limited liability company located in Macon, Bibb County, Georgia.   At all relevant

times, CHS-Ga owned, operated, and controlled Eldercare.

### B.    Plaintiff

13.    Plaintiff-Relator Betty Riner is a citizen of the United States and a resident of Chatham County, Georgia.

14.    Relator Riner is and has been a Registered Nurse since 1999.  In 2011, she became an Advanced Practice Registered Nurse ("APRN").

15.    Relator Riner is a clinical nurse specialist, and as a result may diagnose patients, prescribe medication under the supervision of a physician, and enter records resulting in the billing of medical services, products, and prescriptions by health care facilities.  As a result of her long and accomplished experience as a nurse, Relator Riner is well-versed in the standards of care and the regulations governing the field of medicine.

16.    Relator Riner currently works for Ga MedGroup/CPC as an APRN, a position she has held since October 2015.  In her role as an APRN for Ga MedGroup, Relator Riner is intimately familiar with Defendants' violations of the FCA alleged herein, including, but not limited to, Defendants' corporate practice of submitting false and fraudulent charges for medical services to Medicare.

### III.    JURISDICTION AND VENUE

17.    Defendants are subject to the jurisdiction of this Court with proper venue.

6

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

19.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.

20.     This action is filed in the appropriate venue because one or more of the Defendants can be found in and/or transacts business in the Northern District of Georgia.

21.     This Court has jurisdiction to entertain a *qui tam* action.

22.     Relator Riner has made appropriate voluntary disclosures to the United States as required by 31 U.S.C. § 3730(b)(2).

23.     Relator Riner is the "original source" of the material information set forth herein and brings this action in the name of the United States as contemplated by the False Claims Act.

24.     To Relator Riner's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" alleged in this Complaint. 31 U.S.C. § 3730(e).  Regardless of whether such a disclosure has occurred, Relator

Riner qualifies as an "original source" of the information on which the allegations or transactions in this Complaint are based. Additionally, Relator Riner has direct and independent knowledge of the misconduct alleged herein as a result of her work with Defendants and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to her claims.

## IV.   STATUTORY AND REGULATORY BACKGROUND

### A.   False Claims Act

25.    The FCA imposes civil liability on any person who, *inter alia*: (a) knowingly presents, or causes to be presented, to an officer or employee of the USA a false or fraudulent claim for payment or approval; (b) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the USA; (c) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the USA; or (4) conspires to violate the FCA. 31 U.S.C. §§ 3729(a)(l)(A), (B), (C), and (G).

26.    The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or

other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest ...." *Id*. at §3729(b)(2).

27.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id*. at § 729(b)(l)(A).  The FCA does not require proof of specific intent to defraud. *Id.* at § 729(b)(1)(B).

28.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

29.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the United States. *Id*. at §3729(a)(1).

**B.    *Stark* Statute**

30.     *Stark* prohibits any entity providing healthcare services from submitting Medicare claims for payment based on patient referrals from physicians having a financial relationship with the entity.

31.   Physicians with a financial relationship with an entity providing healthcare

services may not refer patients to that entity for health services and the entity may

not bill for claims resulting from such a referral.

32.   *Stark* is a strict liability statute.

33.   *Stark* provides for certain exceptions, but if the physician and entity

relationship does not meet one of those exceptions, then all referrals by the

physician to the entity are violations.

### C.   Georgia False Medicaid Claims Act

34.   The Georgia False Medicaid Claims Act imposes civil liability on any

person who, *inter alia*, (a) knowingly presents, or causes to be presented, to the

Georgia Medicaid program a false or fraudulent claim for payment or approval; (b)

knowingly makes, uses, or causes to be made or used a false record or statement

material to a false or fraudulent claim; (c) knowingly makes, uses, or causes to be

made or used a false record or statement material to an obligation to pay or

transmit property or money to the Georgia Medicaid program.  O.C.G.A. § 49-4-

168.1.

### D.   Medicare

35.   In 1965, Congress enacted Title XVIII of the Social Security Act, 42

U.S.C. § 1395 et seq., known as the Medicare Program.  Entitlement to Medicare is

based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.  Medicare is administered by the Center for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS").  The Medicare Program is funded by taxpayer revenue.

36.     Providers such as Defendants submit claims for payment on CMS form UB-04, which contains an express certification that all information provided in the claim form is true and correct.

37.     Submission of the forms is required for payments by the government. Furthermore, the party submitting the forms verifies that the information contained on the forms is true, accurate, and complete and that the services for which payment is requested was actually provided, was medically necessary, and was performed pursuant to applicable medical standards.

38.     As detailed below, Defendants provided false data in these forms. Defendants never disclosed to the government that they were billing for services and products that were not reasonable and necessary and that were not provided pursuant to applicable medical standards.

39.     Defendants are also required to submit an annual cost report to Medicare.

40.    The cost report includes express certification of adherence to federal laws and regulations.

41.    The tender of the cost report is a condition of coverage.

42.    Defendants provided false data in their cost reports as to the reasonable and necessary nature and standard of care of the services and products they provided and for which they sought reimbursement.

43.    Upon information and belief, Defendants submitted all claims to Medicare under their tax identification numbers and Medicare directly deposited payments for these claims into Defendants' designated bank accounts.

**E.    Medicaid**

44.    The Medicaid Program is a health insurance program administered by the United States that is funded by state and federal taxpayer revenue.  It is overseen by HHS.  The Medicaid Program was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to qualifying individuals.

45.    A provider enrolled in Georgia Medicaid is permitted to submit a claim for payment or reimbursement only for those services rendered to a Georgia Medicaid beneficiary that are medically necessary in accordance with accepted standards of medical care in the community.

46.     The provider's patient chart documentation is used to ascertain the medical necessity for the services rendered. To be reimbursed for services, the provider must properly document in the patient's records the service that was provided, the reasons for said service, who performed the service, and the diagnoses that support the services or procedures.

47.     CMS typically pays 80% of healthcare costs for Medicare patients, and those patients or their secondary government payors or private insurance carriers pay the remaining 20%. In many instances, the 20% co-pay is paid by Medicaid as the secondary payor. Thus, in many instances, when providers submit fraudulent claims for reimbursement, losses are incurred by the government as both the primary and secondary payor, and 100% of the loss caused by the fraud is passed directly to the taxpayers of the United States.

48.     Defendants have knowingly, in reckless disregard and/or in deliberate ignorance of the truth or the falsity of the information involved, made or used false or fraudulent records and statements in order to get false or fraudulent Medicaid claims paid or approved, in violation of the False Claims Act.

49.     Upon information and belief, Defendants submitted their false claims for Medicaid reimbursement and Defendants received state and federal funds through Medicaid.

**F.     Only "reasonable and necessary" services and products are eligible for reimbursement**

50.     By statute and regulation, Medicare is prohibited from paying for provider services that are "unreasonable" and "unnecessary."  42 U.S.C. §1395y(a)(1)(A).

51.     Under the Social Security Act, 42 U.S.C. § 1395y(a)(1)(A), Medicare is only authorized to pay for items that are "reasonable and necessary."

52.     Section 1395y(a)(1)(A) states that "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which…are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  Because this section contains an express condition of payment—that is, "no payment may be made"—it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."

53.     Federal regulations reiterate the requirement that medical care be reasonable and necessary.  For example, 42 C.F.R. § 411.15(k) excludes from coverage medical services that are "not reasonable and necessary."

54.     42 U.S.C. § 1320c-5(a)(1) provides that the practitioner shall assure that the service "will be provided economically and only when, and to the extent, medically necessary."

**G.** **Only services meeting minimum standards of quality are eligible for reimbursement**

55.     Government payors must maintain minimum standards of quality in order to be eligible for reimbursement for medical services.

56.     Compliance with all "applicable Federal, state, and local laws and regulations pertaining to licensure and any other relevant health and safety requirements" is a condition of the government's payment for medical care.  42 C.F.R. § 494.20.

57.     "A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."  42 U.S.C. § 1396r(b)(1)(A).

58.     "A nursing facility must maintain a quality assessment and assurance committee, consisting of the director of nursing services, a physician designated by the facility, and at least 3 other members of the facility's staff, which (i) meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary and (ii) develops and implements appropriate plans of action to correct identified quality deficiencies."  42 U.S.C. § 1396r(b)(1)(B).

## H.     Fiscal intermediaries

59.     Government payors reimburse providers for the "reasonable costs" of services provided to Medicare beneficiaries through private organizations known as "fiscal intermediaries." The intermediaries serve as administrators of the Medicare program by reviewing claims for reimbursement, making disbursements to providers, auditing records of providers to ensure proper payments, and recording overpayments made to providers. See 42 C.F.R. §§ 421.100.

60.     Intermediaries reimburse Medicare providers in accordance with standards established by the reimbursement statutes, accompanying regulations, and interpretative manuals.

61.     Fiscal intermediaries must only pay claims for services that are covered by Medicare; this responsibility includes the contractual obligation to Medicare to make coverage determinations in accordance with (i) the Medicare statutes, (ii) formal agency regulations and rulings, and (iii) less formal agency instructions such as instruction manuals and intermediary letters. See 42 C.F.R. § 421.100(a).

## V.    GENERAL ALLEGATIONS

### A.    Background

62.    Defendants treat primarily two types of patients: skilled and long-term. Skilled patients are patients who are engaging in rehabilitation in the hopes that they will be able to live and thrive outside of a medical care facility or maintain a higher quality of life even if inside a medical care facility. Long-term patients are patients who need care and supervision 24-hours a day, but would not be expected to benefit from rehabilitative services, such as physical therapy services.

63.    Defendants typically make more money treating skilled patients than long-term patients. Defendants regularly categorized patients as skilled even though they had no real hope to live and thrive outside of a medical care facility or to maintain a higher quality of life even if inside a medical care facility.

64.    Defendants regularly "shop" for patients at hospitals that they can admit and treat as skilled patients and provide them with ancillary services that they do not need.

65.    Defendants' administrative staff regularly reviews the patients admitted as long-term patients and converts them to skilled patients without the required medical necessity to make such a conversion.

66.     The only time that the Relator can remember Defendants refusing to admit a patient as a skilled patient was if there was no payment source for the patient or if Medicare had refused coverage for the patient as a skilled patient.

67.     Defendants' administrative staff regularly overrides medical personnel in making decisions about the admission of patients and the categorization of those patients.

68.     It is not unusual for Defendants to admit a patient and for that patient stay in the facility for more than 30 days, never see a physician, but undergo clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services. Defendants bill the government for all these services.

69.     Defendants impose arbitrary quotas for patient encounters on their physicians, nurses, and physician assistants.  These quotas are not based on medical necessity, but rather on revenue enhancement.  If healthcare professionals do not meet their quotas, they are subject to discipline, including termination.

## B.     Defendants' understaffing and overbilling practices

70.     Since at least 2015, Defendants have intentionally understaffed the number of physicians needed for their nursing facilities.

71.    Defendants had only one physician from 2015 to 2018, and only two physicians thereafter, to cover their nine facilities in the Southeast region. This is an insufficient number of physicians to provide the care required for Medicare reimbursement.

72.    Medicare regulations require that a physician visit and examine patients within thirty days of their admission to a nursing facility. 42 C.F.R. § 483.30(c). Medicare regulations also require that a physician see each patient in a nursing facility at least once every sixty days after the initial visit. *Id.*

73.    As a direct result of the shortage of physicians at their nursing facilities, Defendants' physicians are unable to comply with this Medicare regulation.

74.    Instead, and in order to continue receiving reimbursement from Medicare, Defendants' physicians falsify the date of their patient visits so that they appear to be compliant with this Medicare regulation.

75.    To make matters worse, Defendants' physicians misrepresent to Medicare the services rendered when they do visit patients in order to obtain higher reimbursements from Medicare. In this regard, Defendants' physicians routinely charge Medicare with a 99309 billing code (for a 25-minute doctor visit, with 5 system reviews and 3 diagnoses) when they should charge Medicare, at most, with

a lower and less remunerative 99308 billing code (for a 15-minute doctor visit).
Defendants direct providers that they should conduct these visits monthly for long-term patients and weekly for skilled patients.

76.     Worse yet, Defendants' physicians typically do not actually conduct the required and medically necessary examinations of the patients in their nursing facilities.  Instead, Defendants' physicians routinely give their patients only cursory examinations lasting about two to three minutes, and instead rely upon and copy notes from the examinations of patients conducted by physician assistants and nurse practitioners, who see the patient first.

77.     Defendants direct their physicians to falsify the dates of their patient visits and direct their nursing personnel not to object when physicians copy nurse notes instead of conducting their own examinations.  As a direct result of their misconduct, Defendants have fraudulently obtained government reimbursements.

78.     Defendants are aware of this practice.  Individuals who work in the corporate compliance department for Defendant CHS-Ga interviewed certain nurse practitioners, including Relator Riner, and specifically asked if physicians were copying nurse practitioner and physician assistant notes.  Relator Riner was the only one interviewed who told the truth that yes, physicians were copying nurse practitioner and physician assistant notes.

79.     A few weeks later, Relator Riner was disciplined for a detailed patient note that included information that revealed a physician's misconduct. Others working with this physician wrote similar notes, but they were not disciplined.

80.     To compound their fraud, Defendants bill Medicare for both the patient examination conducted by the physician assistant or nurse practitioner, and then also for the patient "examination" by the physician, which if conducted on the same date is deliberately falsified in the notes as occurring on a different date. If the examinations of the patient were conducted on the same date, Medicare would only permit reimbursement for one of those examinations.

81.     For example, Dr. Paul Hawkins made his first visit of Patient D.J. in Defendants' facility Eagle Health & Rehabilitation, on or around January of 2016, but in his computerized notes, he dated his visit as if it had occurred the day after. By falsifying the date of the visit, Defendants were able to charge both for Dr. Hawkins' visit and for the examination of the patient by Relator Riner. Had Defendants properly dated the request, they could not have been paid for both examinations.

82.     Moreover, for this particular visit, Dr. Hawkins did not conduct a comprehensive 45-minute examination of the patient and chart, but rather conducted only a cursory examination and spent less than 15 minutes with the

patient. Dr. Hawkins nevertheless used billing code 99306 to charge Medicare for this visit, instead of billing code 99308, so that Defendants would receive a higher reimbursement from Medicare.

83.    Dr. Hawkins also charted this patient visit by copying from the nurse practitioner's earlier notes of her examination of the patient and did not conduct his own assessment.

84.    For example, in or about December 2018, Dr. Ralph Warnock falsely charted a patient for Medicare reimbursement for a visit at Defendants' nursing facility Eagle Health & Rehabilitation, when in fact that patient was in the shower at the time Dr. Warnock claims he examined her. Dr. Warnock was not even close enough to the patient to listen to the patient's heartbeat or conduct any physical examination of the patient. Medicare was nevertheless billed for this "examination."

85.    In an effort to meet the patient visit quotas set by Defendants without regard for medical necessity, Defendants' physicians have also billed Medicare for patient examinations that never took place.

86.    For example, in or about September 2017, at Defendants' facility Azalea Health & Rehabilitation, Dr. Ronald Summers falsely charted a patient visit for reimbursement by Medicare for a patient who was already deceased.

87.     For example, in or about September 2017, Dr. Ronald Summers falsely charted a patient who was not then at Defendants' nursing facility (Azalea Health & Rehabilitation), but instead was in the hospital.  Defendants nevertheless billed Medicare as if its physician had actually visited and examined this patient.

88.     For example, in or about February 2019, Dr. Christen Weber falsely charted a patient who was not then at Defendants' nursing facility (Azalea Health & Rehabilitation), but instead was in the hospital.  Defendants nevertheless billed Medicare as if its physician had actually visited and examined this patient.

89.     Defendants are also understaffing nurses in their facilities.

90.     A facility must have a registered nurse providing services for at least eight consecutive hours a day, seven days a week.  42 C.F.R. § 483.35(b). Defendants do not adhere to this rule.

91.     Each facility "must provide services by sufficient numbers of…licensed nurses[] and …other nursing personnel."  42 C.F.R. § 483.35(a)(i) and (ii).  Defendants do not adhere to this rule.

92.     For example, since at least 2015, there is no registered nurse on duty for any part of the day during weekends at Defendants' facility Eagle Health & Rehabilitation or Azalea Health & Rehabilitation.

93.     For example, since at least 2015, the Director of Nursing has served as

the "registered nurse" at Defendants' facilities Eagle Health & Rehabilitation and

Azalea Health & Rehabilitation during the weekdays even though she is not

providing services to patients, but she is rather serving in a supervisory and

administrative role.

94.     Defendants have falsely certified compliance with Medicare

regulations regarding staffing, when in fact they are understaffing.

### C.     Defendants engaged Optum, Inc. to treat patients without required physician oversight to obtain fraudulently increased Medicare reimbursements

95.     Defendants utilize nurse practitioners from a third-party company,

Optum, Inc. ("Optum"), to issue prescriptions and order laboratory and

radiological tests.

96.     Defendants could legally utilize Optum's nurse practitioners' services

in this manner, but only if the Optum nurse practitioners had a protocol on file at

the Georgia Medical Composite Board.  (Board's Rule 260-32-.03).

97.     But no such protocol was on file because Georgia limits the number of

nurse practitioners with whom a physician can enter into a nurse protocol

agreement or supervise (O.C.G.A. § 43-34-25(g)) and Defendants' physicians did

not have any space available to enter into nurse protocol agreements or supervise additional nurse practitioners.

98.     Nevertheless, Defendants certified to Medicare that prescriptions issued by and laboratory and radiological tests ordered by Optum personnel were legally approved.

99.     Defendants allowed Optum nurse practitioners to function independently, issuing prescriptions and ordering laboratory and radiological tests at Defendants' facilities in violation of Medicare regulations and Georgia state law.

100.    At a minimum, the Optum nurse practitioners treating patients at Defendants' facilities Riverview Health & Rehabilitation, Scott Health & Rehabilitation, Azalea Rehabilitation & Rehabilitation, and Orchard Health & Rehabilitation do not have collaborative agreements with any of Defendants' physicians.

101.    When Defendants seek reimbursement for these prescribed medications, laboratory tests and radiological tests, they certified to Medicare that these charges were incurred in accordance with the law, including Georgia state law which governs the practice of medicine.  Accordingly, Defendants falsely certify to Medicare that the medications, laboratory tests, and radiological tests

ordered by Optum nurse practitioners comply with all legal requirements, and as a result, fraudulently obtain reimbursement from Medicare for these charges.

102.   Medicare would not reimburse Defendants for these prescription medications, laboratory tests, or radiological tests ordered by Optum nurse practitioners if Medicare was informed of the truth; namely, that these prescriptions, laboratory tests, and radiological tests are not ordered in compliance with the law.

103.   For example, on or about May 30, 2019, at Defendants' facility Riverview Health & Rehabilitation, an Optum nurse practitioner with no collaborative agreement with an on-staff physician prescribed Lasix for a patient, for which Defendants billed Medicare for reimbursement.  Medicare would not have reimbursed Defendants for this prescription had it had known that it was unlawfully made.

**D.      Defendants put pressure on physicians, nurse practitioners, and physician assistants to meet patient visit quotas without regard to medical necessity**

104.   Defendants direct and manage the fraudulent practices in their facilities by imposing monthly and annual patient visit quotas on physicians, nurse practitioners, and physician assistants.   If these health care professionals fail to

meet their patient visit quotas, they are subject to discipline, including but not limited to the termination of their employment.

105. Defendants' physicians also direct nurse practitioners and physician assistants to have daily patient encounters even when not medically necessary.

106. For example, in or about June of 2019, Dr. Blake directed a nurse practitioner at Defendants' facility Scott Health & Rehabilitation to visit patients who are under daily "skilled services" care to meet her monthly quota, even though these patients did not require such care.

107. For example, in or about June of 2017, Defendants, through Dr. Swati Gaur, directed nurse practitioners and physician assistants to conduct monthly visits in months when annual visits are performed. This means Defendants are charging for a duplicate visit (monthly). No additional medical benefit is obtained from this practice.

108. For example, since 2015, Relator was directed by her superiors to conduct the extra visits even though they were not medically necessary and provided no additional benefit above the annual visit.

109. As a result of Defendants' quotas, chronic understaffing, and pressure to increase revenues, Defendants' physicians, nurse practitioners, and physician assistants regularly perform patient visits that are not medically necessary. As a

result, Defendants falsely and fraudulently overbill for Medicare reimbursements.

Defendants' thus intentionally value their own profit over patient care.

## E.     At Defendants' direction, Defendants' physicians allow automatic patient referrals to specialists without examinations or medical necessity

110.   Specialists, such as podiatrists and optometrists, routinely visit

Defendants' facilities and provide services to patients throughout the facilities.

This is true even though physicians have not examined the patients and determined

any medical necessity for such specialist services.

111.   The physicians sign orders for these specialist visits in bulk and after-

the-fact.

112.   Defendants bill Medicare for these referrals of specialist services for

their long-term patients.  These services are not medically necessary or required

and are provided solely for fraudulent purposes.

113.   For example, on or about June 26, 2019, at Defendants' facility

Heritage Inn Health & Rehabilitation, podiatry services (evaluation and treatment

of painful digital nail deformities) were ordered for a patient without a physician

referral or a patient request (the patient could not make such a request because of

impaired mental cognition).  Defendants submitted fraudulent claims associated

with the referral for these services.

114.   For example, in or about November 2017, and later on or about

January 15, 2018, at Defendants' facility Heritage Inn Health & Rehabilitation,

optometrist services (follow up bacterial conjunctivitis and evaluation of eye

crusting) were ordered for a patient without a physician referral or a patient request

(the patient could not make such a request because she is nonverbal and has

impaired mental cognition).  Defendants billed these services to Medicare.

Defendants submitted fraudulent claims associated with the referral for these

services.

115.   Defendants fraudulently billed Medicare in relation to these specialist

services.

116.   Defendant CHS-Ga also ordered special genetic testing for

Defendants' patients.  Medical staff did not direct or utilize the tests.

117.   Upon information and belief, Defendant CHS-Ga received kickback

payments from the genetic testing company for these tests.

118.   Defendant CHS-Ga fraudulently billed Medicare for these special

genetic tests.

**F.     Defendants order medications for some patients, yet utilize them
         with other patients to maximize reimbursements**

119.   Medicare pays for a 30-day supply of certain medications (ie.

metoprolol, oxycodone, amiodarone, OxyContin).  When Defendants order those

29

types of medications, they order a full 30-day supply. But Defendants only give their patients a 7-day supply. Upon discharge, Defendants only give their patients whatever supply is remaining of the 7-days earlier provided to the patients—even though the patients were prescribed, and Defendants were reimbursed for a 30-day supply. Defendants retain the remaining medications and reuse them for other patients.

120. When Defendants order certain medications, each dose of medication is billed individually. Upon information and belief, Defendants are billing Medicare for medications for some patients, but not actually using additional medications. They are instead using medications stored from other patients; prescriptions (fully paid by Medicare). Thus, they bill for an expense they do not incur.

121. Medicare reimburses at a bulk rate for certain treatments, inclusive of the required medications. In other words, the medication is not billed separately from the service. Defendants regularly used leftover medication from other patients instead of purchasing additional medication for patients receiving services that are reimbursed at a bulk rate. Thus, if Defendants bill for the service, but do not have to purchase additional medication, they obtain a reimbursement for an expense they do not incur.

122.    For example, patient D.J. at Defendants' facility Heritage Health &

Rehabilitation was discharged home in or around the first week of July 2019.  She

was only given the remaining medications from the 7-day supply she was recently

given (to include Ativan and Percocet).  She was not supplied the remaining

portion of her original 30-day supply even though she was prescribed, and

Defendants were previously reimbursed for a 30-day supply.

123.    Defendants fraudulently billed Medicare on behalf of patients who did not

receive all medications prescribed for them.

124.    Defendants fraudulent billed Medicare for expenses they did not incur.

**G. Defendants send patients to Hospice without physician evaluations**

125.    On a regular basis, Defendants automatically sends patients to Affinis for

Hospice services without a physician evaluation.

126.    For example, Patient F.A., who was receiving services at Defendants'

facility Heritage Health & Rehabilitation, was automatically ordered to be placed

at Affinis's in or around March of 2019, without a physician evaluation for such

placement.

127.    Affinis's administrative staff also regularly "shops" for additional patients at

Defendants' facilities.  In these circumstances, Affinis's administrative staff asks

for patients without physician referrals.

128.   Defendant CHS-Ga owns, operates, and controls Affinis.  Thus, transferring

the patients creates more unnecessary patient services for which Defendants can

fraudulently bill to Medicare.  Defendants did so bill for such services.

## H.    Defendants classify and recertify patients as skilled patients without a physician evaluation

129.   Defendants regularly allowed administrators (who were not medically

trained) to make decisions about whether patients should be admitted upon initial

entry, continue at the facilities, or be re-admitted after treatment at a hospital.

130.   Defendants regularly instruct nurse practitioners and physician

assistants to classify and recertify patients as skilled patients when those patients

do not meet the criteria to do so.

131.   Some patients are in the Defendants' facilities for lengthy periods of

time without having seen a physician.  Nevertheless, those patients receive the full

gamut of treatments and medications so that the Defendants could bill the

government for them.  Those patients typically undergo clinical laboratory

services, physical therapy services, occupational therapy services, speech therapy

services, radiology services, and dietician services.

132.   For example, Patient S.L. was admitted for skilled services at

Defendants' facility Eagle Health & Rehabilitation in or around November of

2016.  No physician saw this patient until November 14, 2017, yet the patient

received clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services prior to that date.

133.   For example, Patient C.B. was hospitalized and then admitted for skilled services at Defendants' facility Eagle Health & Rehabilitation in August of 2019 without any physician referral.   Despite not seeing a physician, the patient received clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services since then.

134.   For example, Patient C.H. was admitted for skilled services at Defendants' facility Orchard Health & Rehabilitation on June 3, 2016, did not see a physician until November 20, 2017, but received clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services during the interim time period.

135.   For example, Patient M.S. was admitted for skilled services at Defendants' facility Eagle Health & Rehabilitation in or around December of 2018.   This patient was discharged in or around February of 2019.   This patient was never seen by a physician during this time, yet the patient received clinical laboratory services, physical therapy services, occupational therapy services,

33

speech therapy services, radiology services, and dietician services during that entire time period.

136. For example, Patient P.H. was hospitalized and re-hospitalized several times from February to July of 2019. Patient P.H. was automatically ordered onto skilled services after his hospital admissions. He did not see a physician from at least November 21, 2018 until July 31, 2019.

137. The physicians sign orders for these treatments in bulk and after-the-fact, again, regularly without having seen the patients at all.

138. Upon information and belief, physicians are awarded lucrative salaries for going along with this scheme for increased treatments. If physicians do not submit to the Defendants' scheme, they are terminated.

139. Dr. Warnock is a founder of Ga MedGroup and has a financial stake in Defendant CHS-Ga. Thus, when he signs orders for the treatments discussed above, he stands to gain financially because Defendant CHS-Ga benefits from funds received by Ga MedGroup and the other healthcare service providers operating under Defendant CHS-Ga's umbrella.

140. The service companies that provided some of these services are owned, operated, and controlled by the same individuals who own and operate

Defendants: including Integra, which provided physical, speech and occupational therapy services.

141.   Defendants fraudulently billed Medicare for these services that were not medically necessary.

142.   Defendants had prohibited financial relationships with physicians who signed off on referrals to Defendants and their sister entities for designated health services.

143.   Defendants presented or caused to be presented claims for payment or approval for those designated health services.

144.   The government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

## COUNT ONE

### (Violation of the False Claims Act –
### 31 U.S.C. § 3729 *et seq.*)

145.   Relator Riner realleges and incorporates by this reference the allegations alleged hereinabove.

146.   By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth presented or caused to be presented to the government false or fraudulent claims for payment or approval.

147.    By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the government.

148.    By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government.

149.    By virtue of the acts alleged above, Defendants conspired to (a) present to the government false or fraudulent claims for payment or approval; (b) make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the government; and (c) make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government.

150.    The United States government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

151.    By reason of Defendants' acts, the United States government and the taxpayers of the United States have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## COUNT TWO

### (Violation of the Georgia False Medicaid Claims Act – O.C.G.A. § 49-4-168 *et seq.*)

152.    Relator Riner realleges and incorporates by this reference the allegations alleged hereinabove.

153.    By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth presented or caused to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval.

154.    By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim.

155.    By virtue of the acts alleged above, Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired to make, use, or cause to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program.

156.   By virtue of the acts alleged above, Defendants conspired to (a) present or cause to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval; (b) make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim; and (c) make, use, or cause to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program.

157.   The government of the State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

158.   By reason of Defendants' acts, the government of the State of Georgia and the taxpayers of the State of Georgia have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator Riner, acting on behalf of an in the name of the United States and the State of Georgia, demands

1. Trial by jury;

2. That Defendants cease and desist from violations of 31 U.S.C. § 3729 *et seq*. and 42 U.S.C. § 1395nn *et seq.*;

3. That Defendants cease and desist from violations of O.C.G.A. § 49-4-168 *et seq.*;

4. That judgement be entered against Defendants in the amount of the government's damages in an amount to be proven at trial;

5. That judgement be entered against Defendants in an amount equal to three times the amount of the government's damages;

6. That this Court assess civil monetary penalties against Defendants for the maximum amount allowed by law for each false claim submitted;

7. That Relator Riner be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

8. That Relator Riner be awarded all costs of this action, including attorney's fees and expenses; and

9. That Relator Riner recovers such other and further relief as the Court deems just and proper.

**SIGNATURES ON FOLLOWING PAGE**

Respectfully submitted this 25th day of September 2019.

**WARGO & FRENCH, LLP**

*/s/ Stacey Godfrey Evans*
Stacey Godfrey Evans
Georgia Bar No. 298555
sevans@wargofrench.com
David M. Pernini
Georgia Bar No. 572399
dpernini@wargofrench.com
999 Peachtree Street, NE
26th Floor
Atlanta, GA 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501

**THE CLAIBORNE FIRM P.C.**

*/s/ William R. Claiborne*
William R. Claiborne
Georgia Bar No. 126363
will@claibornefirm.com
410 E. Bay Street
Savannah, GA 31401
Telephone:  (912) 236-9559
Facsimile:  (912) 236-1884

**WOOLF LAW**

*/s/ S. Wesley Woolf*
S. Wesley Woolf
woolf@woolflawfirm.com
Georgia Bar No. 776175
408 East Bay Street
Savannah, GA 31401
Telephone:  (912) 201-3696
Facsimile:  (912) 236-1884

*Counsel for Plaintiff*