UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA ex rel. BETTY RINER,<br><br>　　　　Plaintiff,<br><br>v.<br><br>COMMUNITY PRIMARY CARE OF GEORGIA, LLC (a/k/a Ga MedGroup),<br><br>　　　　Defendant. | ）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>） |

Civil Action File No.
1:19-cv-4316-MLB

QUI TAM COMPLAINT

JURY TRIAL DEMANDED

## **SECOND AMENDED COMPLAINT**

Plaintiff-Relator Betty Riner, through her attorneys and on behalf of the

United States of America and the State of Georgia, files this second amended

complaint against Community Primary Care of Georgia, LLC (a/k/a Ga

MedGroup) ("CPC-Ga" or "Defendant").[1]

---

[1] The Court dismissed and ordered that Relator not replead her retaliation claims. Doc. 65 at 27.  The Court also granted in part Defendant's motion to strike certain paragraphs of the Complaint (Paragraphs 12-14, 73-84, 86-89). *Id*. at 26-27. Relator is complying with the Court's order, but disagrees with the Court's rulings and reserves her right to appeal the dismissal of her retaliation claims and the ruling on the Motion to Strike upon a final order in this case.

## I.   <u>INTRODUCTION</u>

1.     This is an action to recover damages and civil penalties on behalf of the United States and the State of Georgia arising from the false and/or fraudulent records, statements, and claims for payment made or caused to be made by Defendant and/or its agents and employees, in violation of the federal False Claims Act, <u>31 U.S.C. § 3729</u>, *et seq*. ("FCA") and the Georgia False Medicaid Claims Act ("GFMCA"), <u>O.C.G.A. § 49-4-168</u>, *et seq*.

2.     Defendant has engaged in a corporate-led scheme to fraudulently obtain millions of dollars in unlawful reimbursements from Medicare and Medicaid, thereby increasing its corporate revenue at the expense of taxpayers.

3.     This Complaint seeks damages for Defendant's violations of the False Claims Act and Georgia False Medicaid Claims Act by knowingly making false claims for payment to the government and receiving payment for those claims with such false claims being "material" pursuant to the statutes, resulting from the following unlawful practices: (a) Defendant billing the government for services without oversight from a physician to ensure such services were medically necessary and appropriate because physicians did not see patients within 30 days of their admission or periodically thereafter as required; (b) categorizing patients as requiring "skilled" care and billing the government for associated services, when

2

this categorization was inappropriate and therefore such services were not medically necessary and appropriate; and (c) physicians documenting and billing the government for patient visits that never occurred, or occurred in deficient form relative to the claims made to the government for payment, for example, for visits that were shorter periods of time than what was documented, conducted by non-physicians, or double-billed single visits as if they were conducted on different dates.

4.     Relator Betty Riner seeks to recover all available damages, civil penalties, and other relief arising from the FCA and GFMCA violations alleged herein.

## II.  **PARTIES**

### A.  **Defendant**

5.     Defendant Community Primary Care of Georgia, LLC ("CPC-GA") is a Georgia limited liability company.

6.     CPC-GA is also known as and does business as Ga MedGroup.

7.     CPC-GA was formerly known as Community Health Services of Georgia, LLC ("CHS-Ga"), which was also known as Ethica.  CHS-Ga's business status is listed as "terminated" on the Georgia Secretary Georgia Secretary of State Corporations Division business registration website.

8.     Defendant's website, http://www.ga-medgroup.org/ (last visited on June 7, 2022), links to the same website domain that was previously used by CHS-Ga, https://www.chs-ga.org/ (last visited June 7, 2022).

9.     Defendant lists the following "available services" through this website: skilled nursing, hospice, home health, care management, pharmacy services, rehabilitation, transportation, distribution, medical services, emergency response, and foundation, all as part of providing "access to a continuum of care across the healthcare spectrum of Georgia."

10.     Defendant owns, operates, and controls several entities that provide various healthcare services to its patients, including Integra Rehabilitation Agency, LLC ("Integra"), Affinis Hospice, LLC ("Affinis"), and Clinical Services, Inc., which does business as Ethica Health & Retirement Communities ("Ethica").

11.     Defendant owns, operates, and controls at least 56 patient facilities across Georgia, at which patient services are primarily provided, including Heritage Inn Health & Rehabilitation of Statesboro ("Heritage"), Riverview Health & Rehabilitation Center ("Riverview"), Meadows Park Health & Rehabilitation Center ("Meadows Park"), Oxley Park Health & Rehabilitation Center ("Oxley Park"), Azalea Health & Rehabilitation Center ("Azalea"), Camellia Health & Rehabilitation Center ("Camellia"), Eagle Health & Rehabilitation Center

4

("Eagle"), Orchard Health & Rehabilitation Center ("Orchard"), Scott Health & Rehabilitation Center ("Scott"), Traditions Health & Rehabilitation Center ("Traditions"), Ansley Park Health & Rehabilitation Center, Archway Transitional Care Center, Autumn Lane Health & Rehabilitation Center (also known as "Gray Health & Rehabilitation Center"), Avalon Health & Rehabilitation Center, Bolingreen Health & Rehabilitation Center, Brentwood Health & Rehabilitation Center, Brown Health & Rehabilitation Center, Chaplinwood Health & Rehabilitation Center, Chelsey Park Health & Rehabilitation Center, Cherry Blossom Health & Rehabilitation Center, Comer Health & Rehabilitation Center, Dawson Health & Rehabilitation Center, Eatonton Health & Rehabilitation Center, Four County Health & Rehabilitation Center, Gibson Southern Living Center, Gordon Health & Rehabilitation Center, Green Acres Health & Rehabilitation Center, Greene Point Health & Rehabilitation Center, Harrington Park Health & Rehabilitation Center, Hartwell Health & Rehabilitation Center, Heritage Inn of Barnesville Health & Rehabilitation Center, Heritage Inn of Sandersville Health & Rehabilitation Center, High Shoals Health & Rehabilitation Center, Lee County Health & Rehabilitation Center, Legacy Health & Rehabilitation Center, Lillian Carter Health & Rehabilitation Center, Lynn Haven Health & Rehabilitation Center, Montezuma Health & Rehabilitation Center, Newnan Health &

Rehabilitation Center, Northridge Health & Rehabilitation Center, Oak View

Waverly Hall, Oakview Health & Rehabilitation Center, Oconee Health &

Rehabilitation Center, Riverside Health & Rehabilitation Center, Southland Health

& Rehabilitation Center, Sparta Health & Rehabilitation Center, Stevens Park

Health & Rehabilitation Center, Taylor County Health & Rehabilitation Center,

Townsend Park Health & Rehabilitation Center, Treutlen County Health &

Rehabilitation Center, Vista Park Health & Rehabilitation Center, Warrenton

Health & Rehabilitation Center, Waycross Health & Rehabilitation Center,

Winthrop Health & Rehabilitation Center, Wynfield Park Health & Rehabilitation

Center, and Zebulon Park Health & Rehabilitation Center (collectively referred to

herein as "facilities").

    12.    From Defendant's website, clicking "Services" and then "Skilled

Nursing" takes the user to a website for Ethica, with the same website layout and

even the same stock photograph as Defendant's website,

http://www.ethicahealth.org/ (last visited on June 7, 2022).  "Client Centers" on

that page then shows a map of Defendant's facilities,

http://www.ethicahealth.org/?id=2546&sid=94 (last visited on June 7, 2022).  At

the link for each facility is the same website layout and stock photograph.

13.     Integra and Affinis both use this same website layout and stock photograph.  http://www.integrarehab.org/ (last visited on June 7, 2022) and http://www.affinishospice.org/ (last visited on June 7, 2022).

14.     Many of Defendant and Ethica's facilities share principal office addresses, other office addresses, officers, and/or registered agents with each other, Defendant, and Ethica.

15.     For example, Defendant, Clinical Health Services, Inc., and many of the facilities list 1005 Boulder Drive, Gray, GA, 31032, USA as the "principal office address" and Brodie Law Group as the registered agent in the Georgia Secretary of State Corporations Division business registration.

16.     For example, Integra and Affinis list 110 Stone Brooke Drive, Gray, GA, 31032, USA as the "principal office address" and Brodie Law Group as the registered agent in the Georgia Secretary of State Corporations Division business registration.

17.     When Relator Riner was first hired as an employee of Defendant, an administrator from one of Defendant's facilities, Riverview, had to approve of her involvement with patients.

18.     The physician overseeing all of the patients Relator Riner would first treat at Riverview did not have any control over whether she could treat those patients.

19.     Defendant hired all physicians overseeing the patients Relator Riner treated while working for Defendant.

20.     Relator Riner's orientation for employment with Defendant was conducted by an employee of System Administrative Services, which is a member organization of Defendant that lists 110 Stone Brooke Drive, Gray, GA, 31032, USA as the "principal office address" and Brodie Law Group as the registered agent in the Georgia Secretary of State Corporations Division business registration.

21.     The orientation, which was conducted in an office park building near Ethica's management offices, described Defendant as operating an "umbrella" of interrelated companies.

22.     The orientation conveyed to Relator Riner that Defendant was in charge of the facilities and she should do as those in management positions at each facility instructed her to do, as they were acting at the direction of Defendant.

23.     In or around June 2019, at a company-wide meeting, many of Defendant's employees gathered in a conference area.  Representatives of several of the entities under Defendant's umbrella—for example, Affinis and Integra—

spoke about what they were doing and how the others under the umbrella could support them in increasing profits. Defendant's CEO addressed the group and said that he knew the industry and would "drive" Defendant "towards where the money is going."

24.    Relator Riner performed all patient services within the facilities.

25.    Relator Riner's paychecks were issued from Ga MedGroup.

26.    Relator Riner's benefits were managed through Ethica.

27.    When she was employed by Defendant, Relator Riner received an email from the Director of Practice Management for Ga MedGroup, listing "patients in your region that don't have documented visits for more than 60 days," and instructing Relator Riner and other recipients of the email to "document/visit these patients" and then "let [him] know."

28.    Many providers and companies providing services in Defendant's facilities are, in turn, owned, operated, and controlled by the same individuals who own, operate, and control Defendant and its instrumentalities, including Integra.

29.    For example, Dr. Ralph Warnock is a founder of Ga MedGroup and has a financial stake in Defendant, and he provides medical services at Defendant's facilities.

30.     Defendant contracts with Relator Riner's current employer, providing physician, physician extender, and counseling services to facilities including those operated by Defendant.

31.     Defendant has control over whether and at which facilities Relator Riner may treat patients through her current employer.

32.     Defendant manages, submits claims for payment to the government, and receives payment on such claims for all physician and medical services at the facilities where Defendant and its related entities provide or refer healthcare services across Georgia, including Traditions in Lithonia, Georgia, DeKalb County, and the dozens of others.

33.     Defendant is no stranger to entanglement in reimbursement controversies.  In December 2014, a draft investigative report led federal officials to order Georgia's Medicaid agency to immediately cease and desist then-named CHS-Ga's use of development authorities to obtain Medicaid bonus payments, which the Centers for Medicare and Medicaid Services ("CMS") deemed "inappropriate," exposing the state of Georgia to a potential $76 million clawback of money paid from Medicaid to CHS-Ga.

34.     Defendant's CEO has stated publicly that he is not afraid to "push the boundaries" of Medicare and Medicaid reimbursement.

**B.      Plaintiff**

35.     Relator Betty Riner is a citizen of the United States and a resident of Chatham County, Georgia.

36.     Relator Riner is and has been a Registered Nurse since 1999.  In 2012, she became an Advanced Practice Registered Nurse ("APRN").

37.     Relator Riner is a clinical nurse specialist, and as a result may diagnose patients, prescribe medication under the supervision of a physician, and enter records resulting in the billing of medical services, products, and prescriptions by health care facilities.

38.     As a result of her long and accomplished experience as a nurse, Relator Riner is well-versed in the standards of care and the regulations governing the field of medicine.

39.     Relator Riner worked for Defendant as an APRN from October 2014[2] until May 2021.

40.     As a former APRN for Defendant, Relator Riner directly observed Defendant's conduct as to making claims, staffing, and other operations, and she

---

[2] Relator's First Amended Complaint indicated that she began work for Defendant in October 2015.  In preparing her Second Amended Complaint, Relator Riner consulted records and communications from her hiring and realized that she actually began in October 2014.

also participated in conversations with colleagues and superiors about Defendant's

operations at the nine facilities at which she worked, specifically Riverview,

Heritage, Camellia, Azalea, Eagle, Orchard, Meadows Park, Oxley Park, and Scott.

41.    Relator Riner also had occasion to discuss her observations with

physicians and other providers as well as other employees, including about

Defendant submitting and receiving payment for claims to the government.

## III.    **JURISDICTION AND VENUE**

42.    Defendant is subject to the jurisdiction of this Court with proper

venue.

43.    This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically

confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§

3729 and 3730.

44.    This Court has personal jurisdiction over the Defendant pursuant to 31

U.S.C. § 3732(a) because the Defendant transacts business in the Northern District

of Georgia, and that section authorizes nationwide service of process and because

the Defendant has minimum contacts with the United States.

45.    This Court has supplemental jurisdiction over the claims brought

under Georgia law because those claims are "so related to claims in the action

within . . . original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

46.     This Court has jurisdiction to entertain a *qui tam* action.

47.     Relator Riner has made appropriate voluntary disclosures to the United States as required by 31 U.S.C. § 3730(b)(2).

48.     Relator Riner is the "original source" of the material information set forth herein and brings this action in the name of the United States as contemplated by the False Claims Act.

49.     To Relator Riner's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" alleged in this Complaint pursuant to 31 U.S.C. § 3730(e).  Regardless of whether such a disclosure has occurred, Relator Riner qualifies as an "original source" of the information on which the allegations or transactions in this Complaint are based.  Additionally, Relator Riner has direct knowledge of the misconduct alleged herein as a result of her work with Defendant, and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to her claims.

**IV.**     <u>**GOVERNMENT CLAIMS AND PAYMENTS TO DEFENDANT**</u>

    **A.**     **Medicare**

50.     In 1965, Congress enacted Title XVIII of the Social Security Act, <u>42</u> <u>U.S.C. § 1395</u> et seq., known as the Medicare Program.  Entitlement to Medicare is primarily based on age or disability.  <u>42 U.S.C. §§ 426</u>, <u>426A</u>.  Medicare is administered by CMS, which is part of the United States Department of Health and Human Services ("HHS").  The Medicare Program is funded by taxpayer revenue.

51.     Institutional health care providers, including Defendant, submit claims for payment from Medicare on CMS form UB-04, or CMS-1450, a standard claim form, or similar forms.

52.     CMS form UB-04, or CMS-1450, includes 81 fields, including procedure codes that indicate the type of medical procedure and professional service rendered for which Medicare payment is claimed.

53.     Submission of the forms is required for payments by the government.

54.     Further, the party submitting the forms verifies that the information contained on the forms is "true, accurate and complete," and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts," and that the services for which payment is requested were "medically necessary and appropriate for the health of the patient."

14

55.     The party submitting the forms expressly affirms an understanding "that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s)."

56.     As detailed below, Defendant provided false data in these forms. Defendant never disclosed to the government that it was billing for services and products that were not reasonable and necessary and that were not provided pursuant to applicable medical standards or representations.

57.     Defendant submitted all claims to Medicare under the tax identification numbers of it and its controlled entities, and Medicare directly deposited payments for these claims into Defendant's designated bank accounts.

**B.     Medicaid**

58.     The Medicaid Program is a health insurance program administered by the United States that is funded by state and federal taxpayer revenue.  It is overseen by HHS.  The Medicaid Program was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to qualifying individuals.

59.     As with claims for Medicare as discussed above, a provider enrolled in Georgia Medicaid is permitted to submit a claim for payment or reimbursement via form only for those services rendered to a Georgia Medicaid beneficiary that are medically necessary in accordance with accepted standards of medical care in the community.

60.     The provider's patient chart documentation is used to ascertain the medical necessity for the services rendered. To be reimbursed for services, the provider must properly document in the patient's records the service that was provided, the reasons for said service, who performed the service, and the diagnoses that support the services or procedures.

61.     CMS typically pays 80% of healthcare costs for Medicare patients, and those patients or their secondary government payors or private insurance carriers pay the remaining 20%.  In many instances, the 20% co-pay is paid by Medicaid as the secondary payor.  Thus, in many instances, when providers submit fraudulent claims for reimbursement, losses are incurred by the government as both the primary and secondary payor, and 100% of the loss caused by the fraud is passed directly to the taxpayers of the United States.

62.     Defendant has knowingly, in reckless disregard and/or in deliberate ignorance of the truth or the falsity of the information involved, made or used false

16

or fraudulent records and statements in order to get false or fraudulent Medicaid claims paid or approved, in violation of the False Claims Act.

63.     Defendant submitted its false claims for Medicaid reimbursement, and Defendant received state and federal funds through Medicaid.

### C. Only "reasonable and necessary" services and products are eligible for reimbursement

64.     By statute and regulation, Medicare is prohibited from paying for provider services that are unreasonable or unnecessary.  42 U.S.C. § 1395y(a)(1)(A).  The government is only authorized to pay for items that are "reasonable and necessary."

65.     Section 1395y(a)(1)(A) states that "no payment may be made under [the Medicare statute] for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  Because this section contains an express condition of payment—that is, "no payment may be made"—it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."

66.     Federal regulations reiterate the requirement that medical care be reasonable and necessary.  For example, 42 C.F.R. § 411.15(k) excludes from coverage medical services that are "not reasonable and necessary."

67.     42 U.S.C. § 1320c-5(a)(1) provides that the practitioner shall assure

that the service "will be provided economically and only when, and to the extent,

medically necessary."

**D.     Only services meeting minimum standards of quality are eligible
         for reimbursement**

68.     Government payors must maintain minimum standards of quality in

order to be eligible for reimbursement for medical services.

69.     Compliance with all "applicable Federal, state, and local laws and

regulations pertaining to licensure and any other relevant health and safety

requirements" is a condition of an institution's inclusion in a program providing

for the government's payment for medical care.  42 C.F.R. § 494.20.

70.     "A nursing facility must care for its residents in such a manner and in

such an environment as will promote maintenance or enhancement of the quality of

life of each resident."  42 U.S.C. § 1396r(b)(1)(A).

71.     "A nursing facility must maintain a quality assessment and assurance

committee, consisting of the director of nursing services, a physician designated by

the facility, and at least 3 other members of the facility's staff, which (i) meets at

least quarterly to identify issues with respect to which quality assessment and

assurance activities are necessary and (ii) develops and implements appropriate

plans of action to correct identified quality deficiencies." 42 U.S.C. §

1396r(b)(1)(B).

### E.    Fiscal intermediaries

72.    Government payors reimburse providers for the reasonable costs of

services provided to Medicare beneficiaries through private organizations known

as fiscal intermediaries.  The intermediaries serve as administrators of the

Medicare program by reviewing claims for reimbursement, making disbursements

to providers, auditing records of providers to ensure proper payments, and

recording overpayments made to providers.

73.    Intermediaries reimburse Medicare providers in accordance with

standards established by the reimbursement statutes, accompanying regulations,

and interpretative manuals.  Fiscal intermediaries must only pay claims for services

that are covered by Medicare; this responsibility includes the contractual obligation

to Medicare to make coverage determinations in accordance with (i) the Medicare

statutes, (ii) formal agency regulations and rulings, and (iii) less formal agency

instructions such as instruction manuals and intermediary letters.

### F.  Defendant's culture of putting profits over patients

74.    Defendant primarily treats two types of patients: skilled and long-

term.  Skilled patients are patients who are engaging in rehabilitation in the hopes

that they will be able to live and thrive outside of a medical care facility or maintain a higher quality of life even if inside a medical care facility.  Long-term patients are patients who need care and supervision 24-hours a day but would not be expected to benefit from rehabilitative services, such as physical therapy services.

75.     Defendant regularly "shops" for patients at hospitals that it can admit and treat as skilled patients and provide with ancillary services that they do not need.

76.     Defendant's administrative staff regularly reviews the patients admitted as long-term patients and converts them to skilled patients without the required medical necessity to make such a conversion.

77.     Defendant imposes arbitrary quotas for patient encounters on their physicians, nurse practitioners, and physician assistants.  These quotas are not based on medical necessity, but rather on revenue enhancement.  If healthcare professionals do not meet their quotas, they are subject to discipline, including termination.

78.     At numerous meetings, providers argued that these quotas were unreasonable due to the volume of patients, could not be met, and would compromise the quality of patient care, yet they were ignored by Defendant.

79.    Defendant, through its physicians, also directs nurse practitioners and physician assistants to have daily patient encounters even when not medically necessary.

80.    For example, in or about June of 2019, Defendant, through Dr. Blake, directed a nurse practitioner at Scott to visit patients who are under "skilled services" care daily to meet her monthly quota, even though these patients did not require such care.

81.    For example, in or about June of 2017, Defendant, through Dr. Swati Gaur, directed nurse practitioners and physician assistants to conduct monthly visits in months when annual visits are performed.  This means Defendant is charging for a duplicate visit.  No additional medical benefit is obtained from this practice.

82.    For example, since 2014, Relator was directed by her superiors to conduct the extra visits even though they were not medically necessary and provided no additional benefit above the annual visit.

83.    Skimping on actual physician visits with patients allows patients to receive untold amounts of unnecessary services without physician oversight.

84.    During the COVID-19 pandemic, Defendant instructed personnel to limit patient visits to those that were "medically necessary," which is the standard

that should govern all visits, pandemic or not.  This is an admission by Defendant that it instructs its personnel to have visits for the purpose of increasing profits, not providing patient care.

## COUNT ONE:
### (Violation of the FCA and GFMCA by presenting claims and making and using false records for services without oversight to affirm services were medically necessary and appropriate)

85.    Relator Riner realleges and incorporates by this reference the allegations alleged in Paragraphs 1-84.

86.    Since at least 2014, Defendant has intentionally understaffed the number of physicians needed for its facilities throughout Georgia.

87.    From 2014 to 2018, Defendant had only one physician whose employment lasted longer than approximately three months to serve its nine facilities in the Southeast region.  None of the physicians Defendant hired as a second physician during that time worked for longer than 1-3 months before either being fired by Defendant or leaving due to medical reasons, and 1-3 months was not sufficient time for the physicians to become well-oriented.  Thereafter, Defendant had two physicians covering the region.  This is an insufficient number of physicians to provide the care required to ensure that the claims Defendant submits for reimbursement are not false.

88.     Defendant is required by 42 C.F.R. § 483.30 to ensure that a physician visits a patient for an initial visit and "at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter," with such visits deemed timely if they occur within 10 days of this requirement.

89.     Although this regulation provides an exception for alternating required physician visits between "personal visits by the physician and visits by a physician assistant, nurse practitioner, or clinical nurse specialist" after the initial visit under some circumstances when a physician opts to delegate such tasks, requirements of this exception were not met at Defendant's facilities, including because the non-physicians did not conduct the visits at the option of the physicians.

90.     Further, the non-physicians were not "under the supervision of the physician," because the physicians did not provide the non-physicians with oversight, assistance, or any other meaningful supervision, as experienced personally by Relator Riner.

91.     Although 42 C.F.R. § 483.30 also provides an exception for services under some circumstances when completed by "a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician," requirements of the exception were not

met at Defendant's facilities, because the non-physicians were employees of the facilities.

92.   Further, the non-physicians were not working "in collaboration with a physician," because the physicians did not provide the non-physicians with oversight, assistance, or any other meaningful collaboration, as experienced personally by Relator Riner.

93.   Relator Riner observed providers complaining about Defendant's billing for and accepting payment for claims without providing the required physician visits to ensure that the services were actually necessary.

94.   For example, at meetings, non-physician providers discussed Defendant's billing for and accepting payment from the government for "skilled" services when that categorization was not supported, about affirming medical services as necessary without providing the required physician visits to affirm that the services were actually necessary, and about submitting and receiving money for claims to the government.

95.   For another example, Relator Riner attended annual meetings, where physicians and other providers complained to Defendant about affirming medical services as necessary without providing the required physician visits to affirm that the services were actually necessary, and these providers operated throughout

Defendant's facilities, giving her reason to believe that these violations occurred throughout all of Defendant's facilities as a matter of Defendant's policy.

96.     As a direct result of the intentionally-created shortage of physicians at their nursing facilities, Defendant's physicians are unable to comply with this Medicare regulation.

97.     A facility must have a registered nurse providing services for at least eight consecutive hours a day, seven days a week.  42 C.F.R. § 483.35(b).

98.     Defendant is also understaffing nurses in its facilities.

99.     For example, since at least 2014, there is no registered nurse on duty for any part of the day during weekends at Defendant's facilities Eagle and Azalea.

100.   For example, since at least 2014, the Director of Nursing has served as the "registered nurse" at Defendant's facilities Eagle and Azalea during the weekdays even though she is not providing services to patients, but she is rather serving in a supervisory and administrative role.

101.   Defendant has falsely certified compliance with Medicare regulations regarding staffing, when in fact it is understaffing.

102.   Because Defendant fails to conduct the physician examinations required under 42 C.F.R. § 483.30, other staff members regularly conduct a battery

of services on patients, without regard to medical necessity and without physician-oversight.

103.   For example, Patient V.B., a patient treated by Relator Riner, was admitted to Riverview in March 2021 and was discharged several months later without ever seeing a physician.

104.   Patient J.D., a patient treated by Relator Riner, was also admitted to Riverview in March 2021 and was discharged several months later without having seen a physician.

105.   Patient C.J., a patient treated by Relator Riner, was admitted at Camellia and had not seen a physician since August 26, 2016, as of at least the summer of 2021.

106.   Patient M.S., a patient treated by Relator Riner at Camellia went from February 23, 2016, to May 13, 2020 without seeing a physician.

107.   For another example, Patient E.L., a patient treated by Relator Riner, also at Camellia, went from February 23, 2016, to April 30, 2020 without seeing a physician.

108.   Patient S.S., a patient treated by Relator Riner, also at Camellia, was not seen by a physician from January 12, 2016, to June 24, 2020.

109.   Patient S.H., a patient treated by Relator Riner, was admitted to Eagle on March 6, 2019, but still had not seen a physician as of at least the summer of 2021.

110.   Patient O.C., a patient treated by Relator Riner at Camellia had not seen a physician since April 15, 2018, as of at least the summer of 2021.

111.   Patient W.S., a patient treated by Relator Riner at Riverview had not been seen by a physician since September 26, 2018, as of at least the summer of 2021.

112.   Patient W.M., a patient treated by Relator Riner at Riverview had not been seen by a physician since November 28, 2018, as of at least the summer of 2021.

113.   Patient N.T., a patient treated by Relator Riner at Riverview had not been seen by a physician since December 6, 2018, as of at least the summer of 2021.

114.   Patient P.B., a patient treated by Relator Riner, also at Riverview, had not been seen by a physician since October 24, 2018, as of at least the summer of 2021.

115.   For another example, Patient H.B., a patient treated by Relator Riner at Eagle had not been seen by a physician since December 20, 2019, as of at least the summer of 2021.

116.   For another example, Patient C.A., a patient treated by Relator Riner at Heritage was only seen by a physician twice from May 2019 to February 2021 (on February 5 and June 19, 2020), notwithstanding Patient C.A.'s repeated pleas and demands to see a doctor.

117.   Patient S.L., a patient treated by Relator Riner at Eagle had not been seen by a physician since October 16, 2018, as of at least the summer of 2021.

118.   Patient L.R., a patient treated by Relator Riner at Eagle had not been seen by a physician since March 17, 2018, as of at least the summer of 2021.

119.   Patient D.S., a patient treated by Relator Riner at Riverview had not been seen by a physician since September 21, 2018, as of at least the summer of 2021.

120.   Finally, another example, Patient W.O. a patient treated by Relator Riner at Heritage had not been seen by a physician since October 31, 2018, as of at least the summer of 2021.

121.   Defendant falsely asserted that the medical procedures and services provided for these patients and others are medically reasonable and necessary

despite the fact that many of the services were of no help to the patients and so were worthless.

122.   Defendant falsely asserted that the medical procedures and services provided for these patients and others were medically reasonable and necessary despite the absence of required physician oversight to affirm that the services were in fact medically reasonable and necessary.

123.   Defendant sought and received reimbursement for medical services for these patients and others, by timely submitting CMS form UB-04, or CMS-1450, or similar forms, to CMS, and Medicare or Medicaid, through CMS, paid those claims to Defendant based on Defendant's knowingly fraudulent claim that the services were medically necessary despite the fact that many of the services were of no help to the patients and so were worthless, with that false claim being material to CMS's decision to pay the claims.

124.   Defendant sought and received reimbursement for medical services for these patients and others, by timely submitting CMS form UB-04, or CMS-1450, or similar forms, to CMS, and Medicare or Medicaid, through CMS, paid those claims to Defendant based on Defendant's knowingly fraudulent claim that the services were medically necessary, despite the absence of required physician oversight to affirm that the services were in fact medically reasonable and

necessary, with that false claim being material to CMS's decision to pay the claims.

125.   Relator Riner received an email from the Director of Practice Management for Defendant, Ga MedGroup, listing "patients in your region that don't have documented visits for more than 60 days," and instructing Relator Riner and other recipients of the email to "document/visit these patients" and then "let [him] know."

126.   Relator Riner also corresponded with Dr. Christen Weber, regarding three patients who had not been visited for 146, 276, and 287 days.

127.   For example, Patient H.B. (discussed above) was admitted to Eagle, and as of the summer of 2021 had not seen a doctor since December 20, 2019. Patient H.B. received and Medicaid paid for thousands of dollars for physical therapy, speech therapy, and occupational therapy, in addition to other costs of Patient H.B.'s time at Eagle. *See* Exhibit 1 (Medicaid claims paid on behalf of H.B.).

128.   Many of those services were of no help to Patient H.B. and so were worthless and could not have been based on a physician's assessment that the services were medically reasonable and necessary since they took place outside of the time period when a doctor visit was due.

129.   The claims reflected in Exhibit 1 were submitted by Defendant on behalf of Patient H.B. and paid by the government, notwithstanding Defendant's failure to timely provide doctor visits to ensure that such claims were based on medical reasonableness and necessity.  Exhibit 1 (redacted for privacy) is a representative sample of Defendant's actually submitting false claims to the government for payment and receiving such payment and is incorporated by this reference.

130.   For another example, Patient C.A. (discussed above) was admitted to Heritage and only received two physician visits from May 2019 to February 2021 (on February 5 and June 19, 2020).  Patient C.A. received and Medicare paid for thousands of dollars for occupational therapy, in addition to other costs of Patient H.B.'s time at Eagle.  *See* Exhibit 2 (Medicare claims paid on behalf of C.A.).

131.   Many of those services were of no help to Patient C.A. and so were worthless and could not have been based on a physician's assessment that the services were medically reasonable and necessary since they took place outside of the time period when a doctor visit was due.

132.   Exhibit 2 shows Medicare payments of claims for services provided to Patient C.A. at Heritage, including those claimed by Bulloch County Health Care LLC, which shares an address with Heritage and lists a principal office address of

1005 Boulder Drive, Gray, GA, 31032, USA and a registered agent of Brodie Law Group.

133.   The claims reflected in Exhibit 2 were submitted by Defendant on behalf of Patient C.A. and paid by the government, notwithstanding Defendant's failure to timely provide doctor visits to ensure that such claims were based on medical reasonableness and necessity.  Exhibit 2 (redacted for privacy) is a representative sample of Defendant's actually submitting false claims to the government for payment and receiving such payment and is incorporated by this reference.

134.   Through these acts, Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth presented or caused to be presented false or fraudulent claims for payment or approval and received payment for those claims with such false claims being "material," by billing the government for services without oversight from a physician to ensure such services were medically necessary and appropriate because physicians did not see patients within 30 days of their admission or periodically thereafter as required.

135.   Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim with such false records being

"material," by maintaining forms for billing the government for services without oversight from a physician to ensure such services were medically necessary and appropriate because physicians did not see patients within 30 days of their admission or periodically thereafter as required.

136.    Defendant acted knowingly, in reckless disregard, and/or in deliberate ignorance of the truth because it controlled the staffing, services provided, and claims submitted, as well as all forms associated with those roles, and yet Defendant falsely affirmed that the claims it submitted and forms it maintained were for services that were medically reasonable and necessary.

137.   Further, Defendant knew because Relator Riner told Defendant's compliance department about many of the violations, and Defendant terminated the employment of a nurse practitioner who told Defendant that she had received a phone call regarding a potential FBI investigation into Defendant's claims practices.

138.   The United States and Georgia governments, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

139.   These false claims are material pursuant to the FCA and the GFMCA because they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), because payment for such claims is limited to services that are medically reasonable and necessary.

140.   By reason of Defendant's acts, the United States government, the State of Georgia, and the taxpayers of the United States and Georgia have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

141.   Exhibit 1 and 2 constitute representative samples of Defendant's presenting false claims for payment to the government and receiving payment based on materially false claims.

### COUNT TWO:
**(Violation of the FCA and GFMCA by categorizing patients as requiring "skilled" care, billing the government for associated services, and making and using forms, when this categorization was not appropriate)**

142.   Relator Riner realleges and incorporates by this reference the allegations alleged in Paragraphs 1-84.

143.   Defendant typically makes more money treating skilled patients than long-term patients.  Defendant regularly categorized patients as skilled even though they had no real hope to live and thrive outside of a medical care facility, to

maintain a higher quality of life even if inside a medical care facility, or to prevent further deterioration or preserve current capabilities.

144.   Defendant's administrative staff regularly overrides medical personnel in making decisions about the admission of patients and the categorization of those patients, at its facilities across Georgia.

145.   It is not unusual for Defendant to admit a patient and for that patient to stay in the facility for more than 30 days, never see a physician, but undergo clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services. Defendant bills the government for all these services and is paid for such services based on the claim that the services are medically reasonable and necessary.

146.   Defendant regularly allowed administrators (who were not medically trained) to make decisions about whether patients should be admitted upon initial entry, continue at the facilities, or be re-admitted after treatment at a hospital.

147.   Defendant regularly instructs nurse practitioners and physician assistants to classify and recertify patients as skilled patients when those patients do not meet the criteria to do so.

148.   Non-physicians may sign certification and re-certification only when they do not have "a direct or indirect employment relationship with the facility" and they are "working in collaboration with a physician."

149.   The non-physicians Defendant had sign certifications and re-certifications had employment relationships with the facility, because Defendant controlled the facilities and employed them.

150.   The non-physicians Defendant had sign certifications and re-certifications were not working in collaboration with a physician, because they were instructed to simply sign patients as skilled regardless of evaluation by any physician.

151.   Defendant is required by 42 C.F.R. § 483.30 to ensure that a physician visits a patient for an initial visit and "at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter," with such visits deemed timely if they occur within 10 days of this requirement.

152.   Although this regulation provides an exception for alternating required physician visits between "personal visits by the physician and visits by a physician assistant, nurse practitioner, or clinical nurse specialist" after the initial visit under some circumstances when a physician opts to delegate such tasks, requirements of this exception were not met at Defendant's facilities, including

because the non-physicians did not conduct the visits at the option of the physicians.

153.   Further, the non-physicians were not "under the supervision of the physician," because the physicians did not provide the non-physicians with oversight, assistance, or any other meaningful supervision, as experienced personally by Relator Riner.

154.   Although 42 C.F.R. § 483.30 also provides an exception for services under some circumstances when completed by "a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician," requirements of the exception were not met at Defendant's facilities, because the non-physicians were employees of the facilities.

155.   Further, the non-physicians were not working "in collaboration with a physician," because the physicians did not provide the non-physicians with oversight, assistance, or any other meaningful collaboration, as experienced personally by Relator Riner.

156.   Relator Riner discussed the mischaracterization of patients with physicians, non-physician providers, and others at the nine facilities at which she worked, specifically Riverview, Heritage, Camellia, Azalea, Eagle, Orchard,

Meadows Park, Oxley Park, and Scott, but she was told to ignore the issue so that Defendant could bill the government for the services.

157.   For example, at meetings, non-physician providers discussed Defendant's billing for and accepting payment from the government for "skilled" services when that categorization was not supported, and about submitting and receiving money for claims to the government.

158.   For example, when Relator Riner did not sign forms assigning patients to "skilled services," Defendant, including through an Integra occupational therapist, instructed Relator Riner to sign the forms in order to procure payment from the government.

159.   For example, Defendant's Vice President of Compliance & Quality for Defendant told Relator Riner and other providers that certifications and re-certifications needed to be signed as soon as possible and that one facility was tens of thousands of dollars behind in reimbursement money because of providers being slow to sign them.

160.   For example, with an employee who manages billing at Heritage, Relator Riner discussed Defendant's billing for and accepting payment from the government for "skilled" services for a patient, when Defendant knew that the patient was too sick to qualify for such services.

161.   At annual company meetings, Relator Riner discussed the mischaracterization of patients with physicians and non-physician providers throughout Defendant's facilities, who shared her concerns, giving her reason to believe that these violations occurred throughout all of Defendant's facilities as a matter of Defendant's policy.

162.   Some patients are in the Defendant's facilities for lengthy periods of time without having seen a physician.  Nevertheless, those patients receive the full gamut of treatments and medications so that the Defendant could bill the government for them.  Those patients typically undergo clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services.

163.   For example, Patient S.L., a patient treated by Relator Riner, was admitted for skilled services at Eagle in or around November of 2016.   No physician saw this patient until November 14, 2017, yet the patient received clinical laboratory services, physical therapy services, occupational therapy services, speech therapy services, radiology services, and dietician services prior to that date.

164.   For example, Patient C.B., a patient treated by Relator Riner, was hospitalized and then admitted for skilled services at Eagle in August of 2019

without any physician referral.   Despite not seeing a physician, the patient

received clinical laboratory services, physical therapy services, occupational

therapy services, speech therapy services, radiology services, and dietician services

since then.

165.   For example, Patient C.H., a patient treated by Relator Riner, was

admitted for skilled services at Orchard on June 3, 2016, did not see a physician

until November 20, 2017, but received clinical laboratory services, physical

therapy services, occupational therapy services, speech therapy services, radiology

services, and dietician services during the interim time period.

166.   For example, Patient M.S., a patient treated by Relator Riner, was

admitted for skilled services at Eagle in or around December of 2018.  This patient

was discharged in or around February of 2019.  This patient was never seen by a

physician during this time, yet the patient received clinical laboratory services,

physical therapy services, occupational therapy services, speech therapy services,

radiology services, and dietician services during that entire time period.

167.   For example, Patient P.H., a patient treated by Relator Riner, was

hospitalized and re-hospitalized several times from February to July of 2019.

Patient P.H. was automatically ordered onto skilled services after his hospital

admissions.  He did not see a physician from at least November 21, 2018 until July 31, 2019.

168.   For example, Patient H.B. (discussed above) was admitted to Eagle, and as of the summer of 2021 had not seen a doctor since December 20, 2019. Patient H.B. received and Medicaid paid for thousands of dollars for physical therapy, speech therapy, and occupational therapy as a result of the erroneous designation of Patient H.B. as "skilled."  *See* Exhibit 1 (Medicaid claims paid on behalf of H.B.).

169.   Many of those services were of no help to Patient H.B. and so were worthless and could not have been based on a physician's assessment that the services were medically reasonable and necessary since they took place outside of the time period when a doctor visit was due.

170.   The claims reflected in Exhibit 1 were submitted by Defendant on behalf of Patient H.B. and paid by the government, notwithstanding Defendant's improper and automatic categorization of H.B. as qualifying for "skilled" care. Exhibit 1 (redacted for privacy) is a representative sample of Defendant's actually submitting false claims to the government for payment and receiving such payment and is incorporated by this reference.

171.   For another example, Patient C.A. (discussed above) was admitted to Heritage and only received two physician visits from May 2019 to February 2021 (on February 5 and June 19, 2020).  Patient C.A. received and Medicare paid for thousands of dollars for occupational therapy as a result of the erroneous designation of Patient H.B. as "skilled."  *See* Exhibit 2 (Medicare claims paid on behalf of C.A.).

172.   Many of those services were of no help to Patient C.A. and so were worthless and could not have been based on a physician's assessment that the services were medically reasonable and necessary since they took place outside of the time period when a doctor visit was due.

173.   Exhibit 2 shows Medicare payments of claims for services provided to Patient C.A. at Heritage, including those claimed by Bulloch County Health Care LLC, which shares an address with Heritage and lists a principal office address of 1005 Boulder Drive, Gray, GA, 31032, USA and a registered agent of Brodie Law Group.

174.   The claims reflected in Exhibit 2 were submitted by Defendant on behalf of Patient C.A. and paid by the government, notwithstanding Defendant's improper and automatic categorization of C.A. as qualifying for "skilled" care. Exhibit 2 (redacted for privacy) is a representative sample of Defendant's actually

submitting false claims to the government for payment and receiving such payment and is incorporated by this reference.

175.   The physicians sign orders for these treatments in bulk and after-the-fact, again, regularly without having seen the patients at all.

176.   Physicians are awarded lucrative salaries for going along with this scheme for increased treatments.  If physicians do not submit to the Defendant's scheme, they are terminated.

177.   Defendant terminated the employment of one nurse practitioner after she told her superiors that the FBI had called her to ask questions about the practices at Defendant's facilities.

178.   Dr. Warnock is a founder of Ga MedGroup and has a financial stake in Defendant.  Thus, when he signs orders for the treatments discussed above, he stands to gain financially because Defendant benefits from funds received by Ga MedGroup and the other healthcare service providers operating under Defendant's umbrella.

179.   The service companies that provided some of these services are owned, operated, and controlled by the same individuals who own, operate, and control Defendant and its instrumentalities, including Integra, which provided physical, speech and occupational therapy services.

180.   Defendant fraudulently billed the government for these services that were not medically necessary.

181.   Defendant presented or caused to be presented claims for payment or approval for those designated health services. The government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

182.   Through these acts, Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth presented or caused to be presented false or fraudulent claims for payment or approval and received payment for those claims with such false claims being "material," by categorizing patients as requiring "skilled" care and billing the government for associated services, when this categorization was inappropriate and therefore such services were not medically necessary and appropriate and the payments Defendant received based on its material fraudulent claims were improper.

183.   Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim with such false records being "material," by maintaining forms documenting the classification of patients as

requiring "skilled" care and billing the government for associated services, when this categorization was inappropriate and therefore such services were not medically necessary and appropriate and the payments Defendant received based on its material fraudulent claims were improper.

184.    Defendant acted knowingly, in reckless disregard, and/or in deliberate ignorance of the truth because it controlled the staffing, services provided, claims submitted, and classification of patients as requiring "skilled" care, as well as all forms associated with those roles, and yet Defendant falsely affirmed that the claims it submitted and forms it maintained were for services that were medically reasonable and necessary.

185.   Further, Defendant knew because Relator Riner told Defendant's compliance department about many of the violations, and Defendant terminated the employment of a nurse practitioner who told Defendant that she had received a phone call regarding a potential FBI investigation into Defendant's claims practices.

186.   The United States and Georgia governments, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

187.    These false claims are material pursuant to the FCA and the GFMCA because they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), because payment for such claims is limited to services that are medically reasonable and necessary.

188.    By reason of Defendant's acts, the United States government, the State of Georgia, and the taxpayers of the United States and Georgia have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

189.    Exhibit 1 and 2 constitute representative samples of Defendant's presenting false claims for payment to the government and receiving payment based on materially false claims.

**COUNT THREE**
**(Violation of the FCA and GFMCA by presenting claims and making and using false records for physician visits that never occurred, or occurred in deficient form)**

190.    Relator Riner realleges and incorporates by this reference the allegations alleged in Paragraphs 1-84.

191.    At one point, Defendant dealt with its low staffing levels in a different manner.  Rather than simply not having physician visits at the required intervals and making up for the billing by encouraging unnecessary visits by a host of

unnecessary services, Defendant simply had its physicians make up visits that never occurred or make short visits and charge for longer ones, at its facilities across Georgia.

192.   Specifically, during this time, Defendant's physicians falsified the dates of their patient visits so that it appeared to be compliant with Medicare regulations.

193.   Worse yet, physicians did not actually conduct the required and medically necessary examinations of the patients in Defendant's nursing facilities. Instead, the physicians routinely gave patients only cursory examinations lasting about two to three minutes, and instead relied upon and copied notes from the examinations of patients conducted by physician assistants and nurse practitioners, who see the patient first.

194.   Defendant directed its physicians to falsify the dates of the patient visits and directed their nursing personnel not to object when physicians copied nurse notes instead of conducting their own examinations.  As a direct result of their misconduct, Defendant fraudulently obtained government reimbursements.

195.   Defendant is aware of this practice.  Individuals who work in the corporate compliance department for Defendant interviewed certain nurse practitioners, including Relator Riner, and specifically asked if physicians were

copying nurse practitioner and physician assistant notes.  Relator Riner told these operatives of Defendant that the physicians were copying nurse practitioner and physician assistant notes, rather than conducting their own visits with patients, and signing the notes for the next day in order to misrepresent multiple visits when only one had taken place.

196.   A few weeks later, Relator Riner was disciplined for a detailed patient note that included information that revealed a physician's misconduct.  Others working with this physician wrote similar notes, but they were not disciplined.

197.   To compound its fraud, Defendant bills Medicare for both the patient examination conducted by the physician assistant or nurse practitioner, and then also for the patient "examination" by the physician, which if conducted on the same date is deliberately falsified in the notes as occurring on a different date.  If the examinations of the patient were conducted on the same date, Medicare would only permit reimbursement for one of those examinations.

198.   For example, Dr. Paul Hawkins made his first visit of Patient D.J. in Eagle, on or around January of 2016, but in his computerized notes, he dated his visit as if it had occurred the day after.  By falsifying the date of the visit, Defendant was able to charge both for Dr. Hawkins' visit and for the examination

of the patient by Relator Riner.  Had Defendant properly dated the request, it could not have been paid for both examinations.

199.   Moreover, for this particular visit, Dr. Hawkins did not conduct a comprehensive 45-minute examination of the patient and chart, but rather conducted only a cursory examination and spent less than 15 minutes with the patient.  Dr. Hawkins nevertheless used billing code 99306 to charge Medicare for this visit, instead of billing code 99308, so that Defendant would receive a higher reimbursement from Medicare.

200.   Dr. Hawkins also charted this patient visit by copying from the nurse practitioner's earlier notes of her examination of the patient and did not conduct his own assessment.

201.   For example, in or about December 2018, Dr. Warnock falsely charted a patient for Medicare reimbursement for a visit at Eagle, when in fact that patient was in the shower at the time Dr. Warnock claims he examined her.  Dr. Warnock was not even close enough to the patient to listen to the patient's heartbeat or conduct any physical examination of the patient.  Medicare nevertheless billed for this "examination."

202.   Because Dr. Warnock operated in Defendant's facilities that are not the facilities at which Relator Riner worked, Relator Riner has reason to believe that Defendant submitted false claims of this variety across all of its facilities.

203.   In an effort to meet the patient visit quotas set by Defendant without regard for medical necessity, Defendant's physicians have also billed Medicare for patient examinations that never took place even in deficient form.

204.   For example, in or about September 2017, at Azalea, Dr. Ronald Summers falsely charted a patient visit for reimbursement by Medicare for a patient who was already deceased.

205.   For example, in or about September 2017, Dr. Ronald Summers falsely charted a patient who was not then at Defendant's nursing facility (Azalea), but instead was in the hospital.  Defendant nevertheless billed Medicare as if its physician had actually visited and examined this patient.

206.   For example, in or about February 2019, Dr. Weber falsely charted a patient who was not then at Defendant's nursing facility (Azalea), but instead was in the hospital.  Defendant nevertheless billed the government as if its physician had actually visited and examined this patient.

207.   For example, on or around August 12, 2020, Dr. Weber falsely charted a patient who was not then at Defendant's facility (Orchard), but instead

was in the hospital.  Defendant nevertheless billed the government as if its physician had actually visited and examined this patient.

208.   Because of Relator Riner's observations of Defendant's false charting, her knowledge of instructions to physicians and non-physicians to meet visit quotas for revenue purposes, her discussions as to Defendant's billing and receiving money for claims without physician visits being conducted to assure medical necessity, discussions as to Defendant's improperly categorizing patients as "skilled," Exhibits 1 and 2 supporting those discussions, and the fact that an obvious reason to knowingly falsely chart physician visits is to bill and receive money from the government, Relator Riner believes that Defendant also actually submitted and received money from the government for claims for physician visits that did not actually occur, or occurred in deficient form relative to what Defendant documented.

209.   Through these acts, Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth presented or caused to be presented false or fraudulent claims for payment or approval and received payment for those claims with such false claims being "material," by documenting and billing the government for patient visits with physicians that never occurred, or occurred in deficient form relative to what Defendant claimed to the government.

210.   Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim with such false records being "material," by maintaining forms documenting and billing the government for patient visits with physicians that never occurred, or occurred in deficient form relative to what Defendant claimed to the government.

211.   Defendant acted knowingly, in reckless disregard, and/or in deliberate ignorance of the truth because it controlled the staffing, services provided, and claims submitted, as well as all forms associated with those roles, and yet Defendant falsely affirmed that the claims it submitted and forms it maintained were for services that were actually performed.

212.   Further, Defendant knew because Relator Riner told Defendant's compliance department about many of the violations, and Defendant terminated the employment of a nurse practitioner who told Defendant that she had received a phone call regarding a potential FBI investigation into Defendant's claims practices.

213.   The United States and Georgia governments, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid

and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

214.   These false claims are material pursuant to the FCA and GFMCA because they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), because payment for such claims is limited to services that are actually performed.

215.   By reason of Defendant's acts, the United States government, the State of Georgia, and the taxpayers of the United States and Georgia have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator Riner, acting on behalf of an in the name of the United States and the State of Georgia, demands

1.   Trial by jury;

2.   That Defendant cease and desist from violations of 31 U.S.C. § 3729 *et seq.*;

3.   That Defendant cease and desist from violations of O.C.G.A. § 49-4-168 *et seq.*;

4.     That judgment be entered against Defendant in the amount of the government's damages in an amount to be proven at trial;

5.     That judgment be entered against Defendant in an amount equal to three times the amount of the government's damages;

6.     That this Court assess civil monetary penalties against Defendant for the maximum amount allowed by law for each false claim submitted;

7.     That Relator Riner be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

8.     That Relator Riner be awarded the maximum amount allowed pursuant to O.C.G.A. § 49-4-168.1(a);

9.     That Relator Riner be awarded all costs of this action, including attorney's fees and expenses; and

10.    That Relator Riner recovers such other and further relief as the Court deems just and proper.

Respectfully submitted this 8th day of June 2021.


**STACEY EVANS LAW**

/s/ Stacey Godfrey Evans
Stacey Godfrey Evans
Georgia Bar No. 298555
John Amble Johnson
Georgia Bar No. 229112
STACEY EVANS LAW
4200 Northside Parkway NW
Building One, Suite 200
Atlanta, Georgia 30327
Telephone: 770-779-9602
Facsimile:  404-393-2828
sevans@staceyevanslaw.com
ajohnson@staceyevanslaw.com
*Attorney for Relator*

**THE CLAIBORNE FIRM P.C.**

/s/ William R. Claiborne
William R. Claiborne
Georgia Bar No. 126363
will@claibornefirm.com
410 E. Bay Street
Savannah, GA 31401
Telephone:  (912) 236-9559
Facsimile:  (912) 236-1884


**WOOLF LAW**

/s/ S. Wesley Woolf
S. Wesley Woolf
woolf@wooflawfirm.com
Georgia Bar No. 776175
408 East Bay Street
Savannah, GA 31401
Telephone:  (912) 201-3696
Facsimile:  (912) 236-1884


*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

This certifies that I have this day delivered a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court in the above-styled case using the EM/ECF system, which will send e-mail notification to all counsel of record.

This 8th day of June 2022.

/s/ Stacey Godfrey Evans
Stacey Godfrey Evans
Georgia Bar No. 298555