# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* BETTY RINER, | |
| *Plaintiff-Relator,* | Civil Action File No.: |
| v. | 1:19-cv-04316-MLB |
| COMMUNITY PRIMARY CARE OF GEORGIA, LLC (a/k/a Ga MedGroup), | |
| *Defendant.* | |

**<u>Brief in Support of Motion to Dismiss</u>**
**<u>Relator's Second Amended Complaint</u>**

This is a *qui tam* action under the federal False Claims Act ("FCA") and the Georgia False Medicaid Claims Act ("GFMCA"), in which the United States and the State of Georgia ("Government") declined to intervene. (Docs. 24, 25.) After three tries, Relator Betty Riner ("Relator") has not met, and evidently cannot meet, her pleading burden. Accordingly, Community Primary Care of Georgia, LLC ("CPC") seeks dismissal of the Second Amended Complaint ("SAC") (Doc. 68).

## I.   Procedural History

Relator filed her original complaint against CPC and four other defendants—Community Health Services of Georgia ("CHS"), Integra Rehabilitation Agency, LLC, Affinis Hospice, LLC, and Eldercare Pharmacy, LLC (collectively, along with CPC, "the Original Complaint Defendants"). (Doc. 1 ("Compl.") ¶¶6, 9-12.) Relator alleged that *CHS* owned, operated, and controlled the other four defendants. (*Id.* ¶¶7-12.) The only allegation as to *CPC's* role was that "Ga MedGroup manages all physician services at the facilities where CHS-Ga and its related entities provide or refer healthcare services" and that "Ga MedGroup was previously known as [CPC]." (*Id.* ¶¶8-9.)

Following a motion to dismiss, Relator voluntarily dismissed all Defendants except CPC. (Doc. 40.) Relator then filed her First Amended Complaint. (Doc. 44 ("FAC").) In this iteration, Relator leveled all the formerly collective allegations

against CPC alone. Relator also fundamentally changed her allegations about CHS and CPC's roles and corporate structures, newly alleging that CPC owned, operated, or controlled the other Original Complaint Defendants, as well as several nursing homes. (FAC ¶¶6-9, 69, 81-82, 96-100, 102, 141, 144; *cf*. Compl. ¶¶6-9.) The FAC further alleged that CPC (not CHS as in the original complaint) managed, submitted claims for payment, and received payment on such claims for all healthcare services to residents at the facilities, including both physician and core nursing home services. (FAC ¶9; *cf*. Compl. ¶8.) The FAC alleged that because CPC fails to conduct required physician visits, nursing homes provide services to patients without physician oversight or assessment that the services were medically necessary. (FAC ¶¶99-121.) Relator also added claims that CPC retaliated against her after she left its employ. (FAC ¶¶19, 154-68.)

This Court dismissed both the retaliation counts and the FCA claims, the former with prejudice and the latter with leave to replead. (Doc. 65, "Order".) The Court's Order provided specific guidance on some items that Relator would need to fix to meet her pleading burden, directing *inter alia*, that Relator: (1) "identify—with specificity—the facilities at which she alleges [CPC] submitted false claims"; (2) "identify the specific facilities at which she claims [CPC] engaged in this misconduct and [] plead that fraud with particularity"; and (3) address with

particularity the provision in 42 C.F.R. § 483.30 allowing delegation of physician tasks to non-physicians. (Order at 8, 13-15.)

## II.    Relator's SAC Allegations

Relator's claims against CPC remain the product of guesswork, speculative dot-connecting, and outright misstatements as she seeks to even further enlarge CPC's role. Citing commonalities in website structure and design, addresses, and agents and officers (SAC ¶¶ 8, 12-32), Relator claims that CPC "owns, operates, and controls at least 56 [nursing] facilities across Georgia." (SAC ¶¶ 10, 11.) Relator repeatedly alleges that "Defendant" engaged in certain activities, without specifying whether, in any given context, "Defendant" means CPC (a group of physicians) or one of the many other entities that CPC purportedly owns, operates, or controls (such as nursing homes, therapy providers, or hospices).

As to her fraud claims, Relator accuses CPC of billing for physician visits that never occurred or occurred in deficient form. (*Id*. ¶¶ 190-215.) She also alleges fraudulent billing in connection with the regulatory obligations of nursing homes and claims submitted by nursing homes. For example, she alleges that CPC fails to staff enough physicians to ensure that services billed to the Government are medically necessary, even though the regulation she cites imposes obligations only on nursing homes, not the physicians themselves. (SAC ¶¶ 85-141.) She alleges

that CPC inappropriately categorizes patients as requiring "skilled" care. (*Id.* ¶¶ 142-189.) Her use of "Defendant" in these allegations, without specifying whether this means CPC or one of the many provider types supposedly owned, operated, or controlled by CPC, allows Relator to fudge who exactly she blames for any alleged regulatory deficiencies or claims.

## III.    Pleading Standards

Rule 8(a)(2) provides that a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "plead all facts establishing an entitlement to relief with more than labels and conclusions 'or a formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell* Atl. *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022) (cit. omitted). Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible. *Id.*

Although the Court "must make reasonable inferences in Plaintiff's favor" at the motion to dismiss stage, the Court is "not required to draw [the Plaintiff's] inference." *Aldana v. Del Monte Fresh Produce*, N.A., Inc., 416 F.3d 1242, 1248–49

18348916v4

(11th Cir. 2005). In deciding whether the complaint crosses the line from mere possibility—which will not sustain a claim—courts may infer from the allegations in the complaint obvious alternative explanations that suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer. *Doe*, 29 F.4th at 686 (cits. omitted).

An FCA complaint must also satisfy Rule 9(b)'s particularity requirement:

> To satisfy this particularity standard in a *qui tam* action, a relator must allege the actual "submission of a [false] claim" because "[t]he False Claims Act does not create liability merely for a health care provider's disregard of [g]overnment regulations or improper internal policies unless ... the provider ... asks the [g]overnment to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).... It is not enough that a relator "merely ... describe[s] a private scheme in detail [and] then ... allege[s] simply and without any stated reason ... his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted." *Id.*... In short, he must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions." *Corsello [v. Lincare, Inc.]*, 428 F.3d [1008], 1014 [(11th Cir. 2005)].

*Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018).

## IV.   Argument and Citation of Authority

Relator's most recent effort fails because 1) CPC does not own or operate the nursing homes at issue and 2) the SAC does not identify any false claims.

### 1.   CPC Does Not Own or Operate Nursing Homes.

Judicially noticeable facts confirm that CPC does not own or manage the nursing homes at issue in this suit and cannot have submitted the claims at issue.

18348916v4

In its Order dismissing Relator's FAC, this Court recognized that nursing home ownership and management is capable of accurate and ready determination by resort to www.Medicare.gov; however, it declined to notice the CMS materials proffered by CPC as perhaps not reflecting *historical* ownership and management. (Order at 11-12.) Yet these documents actually *do* show historical ownership and management because they contain a "since" date that shows the start date of ownership and management. (*See, e.g.,* CMS Ownership Certification for Scott Health and Rehabilitation, Doc. 50 Exh. A (identifying Piedmont Regional Health Inc. as sole owner "since 11/01/2006" and Clinical Services, Inc. as the entity with operational and managerial control "since 10/25/2005").)

This Court also declined to judicially notice the CMS ownership documents because the FAC, though ambiguous, could possibly have been referring to nursing homes beyond those identified by name. (Order at 13.) Relator has now identified 49 additional nursing homes (SAC ¶ 11), but CPC does not own these nursing homes either. CPC thus renews its request that this Court notice public records showing that CPC did not own, manage, or control any of the nursing homes identified in the SAC during the relevant time period.[1]

---

[1] The certificates submitted in conjunction with CPC's first Request for Judicial Notice were for the seven facilities identified by name in the FAC. CPC resubmits these certificates, together with certificates for the remaining facilities identified in SAC ¶ 11 as Exhibits A through DDD to CPC's Second Request for Judicial Notice, filed contemporaneously with this motion. Even if the SAC

18348916v4

Relator attempts to escape the judicially noticeable facts establishing CPC's non-ownership of the nursing homes by asserting commonalities in website design, agents and officers, and addresses between CHS, CPC, and other entities. First, Relator alleges that "[CPC's] website, http://www.ga-medgroup.org . . . links to . . . https://www.chs-ga.org/ ." (SAC ¶ 8.) She next states that "[CPC] lists the following 'available services' through this website: skilled nursing, hospice, [ . . . ] and foundation, all as part of providing 'access to a continuum of care across the healthcare spectrum of Georgia.'" (*Id*. ¶ 9.) But the website that Relator identified as "[CPC's] website" makes *no* mention of any such services—only www.chs-ga.org does.[2] To the contrary, CPC's website describes GA MedGroup as simply a "medical services delivery team providing 24/7 primary care for patients in a skilled nursing setting." (www.ga-medgroup.org.) This is consistent with Relator's original allegation that Ga MedGroup manages *physician* services at nursing homes (Compl. ¶¶8-9), not the nursing homes themselves. The very web links cited by Relator belie her new claim that CPC "owns, operates, and controls" nursing homes. (SAC ¶¶ 10, 11.)

could be read to allege CPC's ownership of still more unnamed nursing homes, any such claims would be subject to dismissal for failure to plead with particularity.

[2] This Court may take judicial notice of the contents of these websites because Relator referenced them in her SAC. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

As to Relator's allegations about common addresses, officers and agents, and shared administrative services, these allegations, even if true, are not enough to disregard CPC's independent corporate existence. *See JBS Hair, Inc. v. Beauty Essence, Inc.*, No. 1:21-CV-1860-MLB, 2022 WL 657503, at *4 (N.D. Ga. Mar. 4, 2022) (website identifying defendant's trademark as a "partner," sharing of officers and attorneys, and adjacent principal offices insufficient to pierce corporate veil). In *U.S. ex rel. Heller v. Guardian Pharmacy, LLC,* 521 F.Supp.3d 1254, 1280-81 (N.D. Ga. 2021), the court dismissed allegations against a corporate parent, holding that allegations demonstrating the parent's ownership of "a significant portion of Guardian Atlanta" and control over "its macro-level operations, which are implemented at the local level by a separate team" was "simply not enough." Relator's allegations here are even weaker, consisting only of vague allusions to CPC's affiliation with other entities.

Moreover, the entity relationships and identities alleged by Relator are sometimes contradictory. For example, Relator at one point pleads a unified identity between CPC and Ethica. (*See* SAC ¶ 7 (alleging that CPC was formerly known as CHS, which was also known as Ethica)). But she later describes CPC and Ethica as different entities. (*See id.* ¶ 14 ("Many of [CPC] and Ethica's facilities share [addresses, officers, or agents] with each other, [CPC], and Ethica."); ¶ 10

(alleging that CPC owns, operates, and controls Clinical Services, Inc., which does business as Ethica).) Her ownership allegations regarding CPC and companies offering services in its alleged facilities are also contradictory. (*See id.* ¶ 10 (alleging that CPC owns Integra), ¶¶ 28, 179 (alleging common ownership of CPC and Integra), ¶¶ 6, 178 (alleging that Ga Medgroup (which is synonymous with CPC) operates under "Defendant's" (i.e. CPC's) umbrella).) Portions of the SAC also contradict her allegations that CPC is commonly owned with the entities that own the nursing homes. For instance, she alleges that Dr. Warnock "has a financial stake in [CPC]." (SAC ¶ 29.) Public records show that the nursing homes, on the other hand, are non-profits, meaning they have no owners. (*See, e.g.*, CMS Ownership Certification for Scott Health and Rehabilitation, attached as Exh. A (identifying ownership type as "Non profit – Other").) Thus, far from a short, plain statement showing entitlement to relief against CPC, Relator's SAC remains a confused mess, and her claims should be dismissed. *Doe*, 29 F.4th at 686.

## 2.      Relator Has Not Stated an FCA Claim.

In her third bite at the apple, Relator still fails to plead with particularity the "submission of a [false] claim" in connection with any alleged scheme, which is the "the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1311. "To establish a cause of action under § 3729(a)(1)(A) [a 'presentment' theory], a relator must prove three elements: (1) a false or fraudulent claim, (2) which was

presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false." *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(A)). "To prove a claim under § 3729(a)(1)(B) [a 'false records' theory], a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id.* (citing 31 U.S.C. § 3729(a)(1)(B)). If the relator's "theory of FCA liability is a 'false certification theory,' whereby Defendants are alleged to have falsely certified that they complied with a Medicare statute or regulation the compliance with which is a condition for Government payment," the relator must allege more than just "a violation of the rules governing Medicare." *Id.* (cits. and punct. omitted). She must also allege "that a specific fraudulent claim was in fact submitted to the government." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009). The relator also must show that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with" such requirements. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002-04 (2016).

The GFMCA provisions relied upon by Relator mirror the relevant FCA provisions. *Compare* 31 U.S.C. §§ 3729(a)(1)(A)–(B) *with* O.C.G.A. §§ 49-4-168.1(a)(1)–(2); *see also Hill v. Bd. of Regents of the Univ. Sys. of* Georgia, 351 Ga. App.

455, 459, 829 S.E.2d 193, 198 (2019) (observing that courts generally look to federal case law to decide issues under the GFMCA). Relator's GFMCA claims fail for the same reasons that her FCA claims should be dismissed.

### a.  Relator has not sufficiently pled the submission of false claims due to alleged noncompliance with 42 C.F.R. § 483.30.

In her first two counts, Relator has alleged that CPC presents false claims because it: (1) bills the Government for services provided without the physician oversight necessary to ensure medical necessity (Count 1); and (2) miscategorizes certain patients as requiring "skilled care" without regard to any evaluation by a physician, thereby billing the Government for services that are not medically necessary (Count 2). In both counts, Relator alleges that CPC is required by 42 C.F.R. § 483.30 to ensure that a physician visits a patient for an initial visit and "at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter." (SAC ¶¶ 88, 151.)

As an initial matter, 42 C.F.R. § 483.30 is part of a set of "requirements for participation" governing *nursing homes'* participation in Medicare. These provisions do not impose any regulatory obligations on physicians (or a group of physicians, such as CPC). Aside from baseless assertions that CPC owns and operates the nursing homes, Relator offers no reason to hold CPC responsible for the nursing homes' regulatory compliance. Accordingly, even if these particular

requirements for participation were violated (they were not) and material to payments to *nursing homes* (they are not), Relator supplies no basis to hold *CPC,* a *physician* group, responsible for any nursing home's alleged failure to comply.

Relator also relied on 42 C.F.R. § 483.30 in her FAC. In moving to dismiss that complaint, CPC pointed out that this regulation provides that for non-Medicare Part A patients, any required physician task in a nursing facility (including tasks which the regulations specify must be performed personally by the physician) may, at the State's option, be satisfied when performed by a nurse practitioner who is not an employee of the facility and who is working in collaboration with a physician. 42 C.F.R. § 483.30(f). This Court ordered Relator to address this issue with particularity in her repleading. (Order at 14-15.)

Relator's attempt to comply with this Court's Order falls flat. She begins by asserting that, though 42 C.F.R. § 483.30 includes an exception allowing alternating physician and non-physician visits after the initial visit, the exception was not met at "CPC's facilities" because the non-physicians did not conduct visits at the option of the physicians. (SAC ¶¶ 89, 154; *see* 42 C.F.R. § 483.30(c)(4).) She also seems to allege that delegation to non-physicians was improper due to insufficient supervision. (SAC ¶¶ 90, 156; *see* 42 C.F.R. § 483.30(e)(1)(iii).)

Yet the limitations in § 483.30(c)(4) and (e)(1) apply only to "SNF patients" (i.e., Medicare *Part A* patients). *See* 42 C.F.R. § 483.1(b). As Relator has not alleged that the patients for whom she alleges false claims were submitted were Medicare Part A patients (as opposed to patients whose core nursing home care was covered by Medicaid or some other payor), she cannot state a false claim based on noncompliance with these regulatory provisions. And even if these were applicable, Relator's contention that non-physicians did not conduct visits at the option of the physicians contradicts her allegation that physicians directed nurse practitioners and physician assistants to have daily patient encounters. (SAC ¶ 79.)

Next, in an apparent attempt to allege that CPC did not meet the requirements for delegation of physician tasks found at 42 C.F.R. § 483.30(e)(1)(iii) or (f), Relator alleges that non-physicians were not under the supervision of physicians because the physicians did not provide the non-physicians with "oversight, assistance, or any other meaningful supervision" or "meaningful collaboration," as experienced by Relator. (SAC ¶¶ 90, 92, 153, 155.) Again, this contradicts Relator's allegation that physicians oversaw the patients that she (a nurse practitioner) treated while working for CPC. (*Id*. ¶ 19.) Moreover, Relator's assessment that physicians did not provide "meaningful" collaboration or supervision according to her own subjective standard is not an allegation that the

physicians provided insufficient collaboration or supervision within the meaning of the regulation. Georgia law outlines the required collaboration and supervision requirements, which are performed through the execution of nurse protocol agreements between the delegating physician and nurse practitioner. O.C.G.A. § 43-34-25. Relator does not mention Georgia's requirements, let alone allege that they were not followed.

Finally, Relator alleges that the exception allowing delegation of physician tasks to enumerated non-physicians was not met because the "non-physicians were employees of the facilities." (SAC ¶¶ 91, 154); *see* 42 C.F.R. § 483.30(f). But, as discussed above, judicially noticeable facts establish that CPC did not and does not own the facilities. Thus, the nurse practitioners employed by CPC are not "employees of the facilities."[3] Further, even if Relator had sufficiently pled a regulatory violation with this allegation, it would constitute a violation by the nursing homes, *not* CPC, which is the sole defendant in this case.

### b.   Relator's patient exemplars do not establish the submission of false claims.

The Court noted that, except for Patient H.B., Relator failed to allege details that would satisfy her burden of pleading the "who, what, when, where, and how

---

[3] Relator's need to allege that "non-physicians were employees of the facilities" as a key element of her case explains the puzzle of why she would persist in asserting that CPC owns and operates the facilities, even in the face of clear public record evidence that it does not.

of fraudulent submissions to the government." Aside from adding one patient

("C.A."), the SAC rehashes the same conclusory allegations, all of which lack the

detail necessary to state a fraud claim. (*Compare, e.g.,* FAC ¶¶ 124, 127, 131, 100-16,

134-35 *with* SAC ¶¶ 103-20 194, 197, 201, 204-05.)

Relator's allegations regarding H.B. are substantially unchanged from her

FAC and still fail to establish the submission of any false claim. (*Compare* FAC ¶¶

112, 119-20 *with* SAC ¶¶ 115, 127-29, 168-70.) As in her FAC, Relator alleges that

services provided to H.B. (reflected on a *Medicaid* payments ledger) could not have

been based on a physician's assessment that they were reasonable or necessary

because they took place outside of the time period when a doctor visit was due

under 42 C.F.R. § 483.30. (SAC ¶¶ 88, 102, 127-28.) But that regulation provides

that any required physician task in a nursing facility may also be performed by a

nurse practitioner. 42 C.F.R. § 483.30(f); (Order at 14-15.) CMS has clarified that

this regulation allows that nurse practitioners may provide initial and other

required visits for Medicaid (i.e., "NF") patients where state law permits.[4] And in

---

[4] CPC requested judicial notice of this CMS Delegation of Tasks Memorandum (available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-13-15-.pdf, last visited June 28, 2022) in conjunction with its Motion to Dismiss the FAC. (Doc. 50 at 4-5, Exh. H.) Because this Court did not reach the issue of whether Relator pled falsity with particularity, it declined to address the noticeability of this document. (Order at 14 & n.7.) The Court can take judicial notice of public records available from reliable sources on the Internet, such as government agency websites. *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D.

18348916v4

Georgia, it does. *See, e.g.,* O.C.G.A. § 43-34-25 (regarding delegation of authority to advanced practice registered nurses). Relator admits that she (a nurse practitioner) treated H.B. (SAC ¶¶ 36, 115.) Thus, it remains of no consequence that Medicaid patient H.B. allegedly had no physician visits after December 2019, as that is what the regulation allows.

Relator fares no better with newly-added patient "C.A.," for whom she alleges a similar course of physician non-treatment. (SAC ¶¶ 116, 130-31.) Here, Relator does allege that Medicare paid some claims on C.A.'s behalf (*id.* ¶ 130), providing a Medicare claims ledger for these services. (*Id.* ¶¶ 116, 130-33, 171-74.) But this ledger shows that C.A. received only Medicare *Part B* services, rather than services under Medicare Part A. (SAC Exh. 2.) The distinction between Medicare Part A and Medicare Part B is critical. Medicare Part A covers skilled nursing facility care for up to 100 days following a 3-day hospital stay. According to 42 U.S.C. § 1395yy(e)(2), "covered skilled nursing facility services" for Medicare Part A purposes is defined to "include[] all items and services … for which payment may be made under [Medicare] part B and which are furnished to an individual who is a resident of a skilled nursing facility," with certain exceptions. As stated by CMS, the "consolidated billing" requirement under Medicare Part A "confers

---

Cal. 2015); *see also* Order at 12 & n.5. CPC renews its request for judicial notice of this document, attached for the Court's convenience as Exhibit B.

- 16 -

on the SNF the billing responsibility for the entire package of care that residents receive during a covered Part A SNF stay," including laboratory services and physical, occupational, or speech-language therapy services ("rehab therapy").[5] *See also* 42 U.S.C. §1395yy(e)(2)(ii).

If the patient's stay is not covered by Medicare Part A, then Medicare Part B *does* cover ancillary services that go beyond basic nursing home care (e.g., nursing services, room and board, and housekeeping). These include not only such items as physician and laboratory services, which are billed directly to Medicare Part B by the physician and lab, respectively, but also rehab therapy, which is billed to Medicare Part B by the nursing facility. As stated in the CMS *Medicare Claims Processing Manual*, Ch. 6, § 10.1: "If a resident is not in a covered Part A stay (Part A benefits exhausted, posthospital or level of care requirements not met), the SNF is required to bill for all physical therapy, occupational therapy, and/or speech-language pathology services provided to a SNF resident under Part B."[6] *See also* 42

---

[5] *See* https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling.

[6] CPC requested judicial notice of the CMS *Medicare Claims Processing Manual* in conjunction with its Motion to Dismiss Relator's FAC. (Doc. 50 at 5.) In its Order dismissing Relator's FAC as a shotgun pleading, the Court did not address the noticeability of this document. (Order at 17 n.8.) As it is publicly available on a government website (available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c06.pdf), CPC renews its request for judicial notice of this document. *See Ohome v. U.S.*, No. 1:21-CV-368-MLB, 2021 WL 5771147, at *7 n.4 (N.D. Ga. Dec. 6, 2021); *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381-82 (C.D. Cal. 2014) (taking judicial notice of multiple manuals and forms on the CMS website), *aff'd sub*

U.S.C. § 1395l(a)(8)(A)(i); § 1395k(a)(2)(C) (providing for coverage of rehab therapy services under Medicare Part B); § 1395x(p) (defining outpatient physical therapy to include therapy "furnished by a provider of services …."); § 1395x(u) (defining "provider of services" to include "skilled nursing facilities"); 42 C.F.R. §§ 410.59, 410.60.

SAC Exhibit B demonstrates that the rehab therapy provided to patient C.A. was not billed to Medicare Part A, but rather under Medicare *Part B*, along with a range of other ancillary Medicare Part B services that would not have been covered had C.A. been a Medicare Part A patient. Simply stated, patient C.A. was not a Medicare Part A patient for whom physician visits were required. Because a nurse practitioner was permitted to perform all physician tasks, including ordering the ancillary, Medicare Part B-covered services listed in Exhibit 2, Relator has not pled a regulatory violation, much less a claim that was false due to the lack of a physician visit.[7]

---

*nom., U.S. v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017). A copy of this document is attached as Exhibit C.

[7] Moreover, Exhibit 2 contradicts Relator's allegation that C.A. "only received two physician visits from May 2019 to February 2021 (on February 5 and June 19, 2020)." (SAC ¶ 130.) The provider number associated with those visits—1619395506—belonging to Dr. Christen Weber—appears on the visits Relator lists, as well as on at least five additional visits (on February 12, August 12, August 26, 2020, and January 27 and February 17, 2021). *See* https://npiregistry.cms.hhs.gov/registry/search-results-table?number=1619395506&addressType=ANY (last visited June 28, 2022); (Exh. 2 pp. 4, 6, 41, 42, 65, 91).

Further, even if Relator's strained interpretation of the nursing home regulations were correct (they are not), she offers no factual allegations showing that Medicare would deny payment for these or any other regulatory violations she attempts to allege. *Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019) (quoting *Escobar,* 136 S. Ct. at 2003, 2004, n.6 (2016)) ("[A] plaintiff directly alleging the submission of a false claim must plead facts to support allegations of materiality with 'plausibility and particularity.'").

Finally, as to both H.B. and C.A., Relator alleges that some of the care they received was worthless. (SAC ¶¶ 128, 131, 169, 172.) But a patient's improvement level after receiving care is not the benchmark of a "worthless service" for FCA claim purposes. Rather, the performance of the service must be so deficient that for all practical purposes it is the equivalent of no care at all. *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr.*, Inc., 764 F.3d 699, 710 (7th Cir. 2014) (a "worthless services" claim requires truly "worthless" services, not services that are merely "worth less"). Relator has not pled an FCA/GFMCA violation based on a theory of worthless services.

### c. Relator has not plausibly alleged false claims arising from improper classification of patients as requiring skilled care.

Relator also alleges that CPC instructs nurse practitioners and physician assistants to improperly classify and recertify patients as "skilled patients." (SAC

¶ 147.) Relator does not plead the who, what, when, or where of these "instructions." Nor does she allege that she or any other nurse practitioner falsely certified patients as "skilled" against their own clinical judgment. Instead, she states that "[n]on-physicians may sign certification and re-certification only when they do not have "a direct or indirect employment relationship with the facility" and they are "working in collaboration with a physician." (*Id*. ¶¶148-50). Relator does not cite any source for this requirement, but she appears to derive this language from 42 C.F.R. § 424.20, which establishes "[r]equirements for posthospital SNF care." The regulation goes on to describe conditions for payment for SNF care under Medicare *Part A*. 42 C.F.R. § 424.20 (preamble), 60 Fed. Reg. 38272 (July 26, 1995). And, as discussed *infra*, Relator has not pled with particularity any Medicare *Part A* claims. This regulation is therefore inapplicable on its face and cannot ground Relator's FCA/GFMCA action.

Even if this regulation were applicable to non-Part A services, it would not help Relator. Her quoted language seems to be taken from a provision in the regulation indicating that certification and recertification statements may be signed by "[a] physician extender (that is, a nurse practitioner, a clinical nurse specialist, or a physician assistant [. . .] who does not have a direct or indirect employment relationship with the facility but who is working in collaboration

with a physician." 42 C.F.R. § 424.20(e)(2). Relator alleges that the non-physicians signing the certifications had employment relationships with the facility, but, as discussed above, judicially noticeable facts show that CPC did not own or operate the facilities. (SAC ¶149.)

Relator also seems to allege that CPC violated 42 C.F.R. § 424.20(e)(2) because the non-physicians were not working in collaboration with a physician, but were instructed to certify patients regardless of any physician evaluation. (SAC ¶149.) But per the regulation, "[c]ollaboration means a process whereby a physician extender works with a doctor of medicine or osteopathy to deliver health care services," with "medical direction and appropriate supervision as provided for in guidelines jointly developed by the physician extender and the physician or other mechanisms . . . ." 42 C.F.R. § 424.20(e)(2)(i)(A), (B). Relator's own allegation that physicians oversaw the patients she treated while working for CPC shows that this basic requirement was met. (SAC ¶149.) Relator has failed to state a false claim arising from this regulation, and the claim should be dismissed.

### d. Relator has not plausibly alleged false claims submitted for deficient or nonexistent physician visits.

The allegations in the SAC's Count Three generally repeat verbatim allegations from the FAC—and they still do not plead fraud with particularity. (*Compare* FAC ¶¶ 121-35 *with* SAC ¶¶ 191-201, 203-06.) For example, Relator

alleges that a physician "charted [a] patient visit by copying from the nurse practitioner's earlier notes of her examination of the patient and did not conduct his own assessment." (SAC ¶200.) But Relator does not allege that this resulted in the submission of any claim by CPC, much less one that was false. In another example, Relator alleges that "Medicare was … billed for [an] 'examination'" of an unidentified patient, "in or about December 2018," when a physician "falsely charted a patient for Medicare reimbursement for a visit at Eagle [a nursing facility], when in fact that patient was in the shower at the time [the physician] claims he examined her." (*Id*. ¶201.) Relator's passive formulation—"Medicare was … billed"—is telling. She fails to allege who submitted a claim to Medicare, for which Medicare program (i.e., Medicare Part A, Part B, or Part C—all of which have different payment methodologies), the content of that claim, and how that content was false. Nor does she allege that CPC (or any other entity) knew of the alleged circumstances of the physician's examination. In another example, Relator alleges that a physician entered the wrong billing code "so that Defendant would receive a higher reimbursement from Medicare." (SAC ¶199.) Again, however, Relator does not identify any details about any claim submitted with these alleged billing codes. Relator does not even allege a process by which billing codes entered by physicians would have resulted in claims by Defendant or any other entity.

Relator also alleged that a physician "falsif[ied] the date of [a] visit" so that "Defendant was able to charge both for [the physician's] visit and for the examination of the patient by Relator Riner." (SAC ¶198.) To passively allege that "Defendant was able to charge" is not to allege that Defendant did charge for both; nor does this an allegation include the detail required by Rule 9(b).

Relator alleges four purported examples of "Defendant's physicians" recording "patient examinations that never took place." (SAC ¶¶203-07.) In the first example, the SAC does not allege that any claim was actually submitted. (*Id.* ¶204.) In the other three, the SAC claims only that "Defendant nevertheless billed Medicare as if its physician had actually visited and examined this patient." (Id. ¶¶205-07.) Relator does not provide any details, including such basic facts as who billed Medicare (including even the type of provider—SNF or physician—each of which is subject to different reimbursement methodologies), for what services, or whether CPC knew of any alleged false charting.

Relator attempts to salvage her insufficient pleading by stating that because "an obvious reason to knowingly falsely chart physician visits is to bill and receive money from the government," she believes that CPC "actually submitted and received money from the government for claims for physician visits that did not actually occur, or occurred in deficient form relative to what Defendant

documented." (SAC ¶208.) But such speculation does not satisfy Rule 9(b). *See Jallali v. Sun Healthcare Grp.*, 667 F. App'x 745, 746 (11th Cir. 2016) (affirming dismissal where relator, who alleged a "reliable indication that claims were fraudulently submitted" because she was privy to defendant's internal billing practices, failed to allege that her conclusion that defendant submitted false claims was supported by anything other than conjecture or inference).

The lack of detail is no mere technicality. In the few instances in which Relator does provide actual billing information—as for patients H.B. and C.A.— her claims are exposed as groundless. As stated by the Eleventh Circuit, courts must "decline to make inferences about the submission of fraudulent claims because such an assumption would strip all meaning from Rule 9(b)'s requirements of specificity." *Est. of Helmly v. Bethany Hospice and Palliative Care of Coastal Ga., LLC*, 853 Fed. App'x 496, 503 (11th Cir. Apr. 26, 2021) (punct. and cits. omitted); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (quot. omitted))).

### e. Relator has not sufficiently alleged that false claims were submitted at the additional facilities identified in her SAC.

Finally, Relator does not plead with particularity any fraudulent acts at any of the newly-named nursing homes, as this Court required. (Order at 8; SAC ¶ 11.)

18348916v4

Attempting to obscure this deficiency, Relator alleges that: (1) she discussed mischaracterizations with providers throughout CPC's alleged facilities, and their shared concern led her to believe that these violations occurred throughout the facilities; and (2) a physician who allegedly falsely charted a patient one nursing home worked in other nursing homes that Relator did not, leading her to (a) extrapolate this alleged practice to those nursing homes and (b) assume that this alleged practice actually resulted in the submission of false claims. (SAC ¶¶ 161, 202.) But rumors and conjecture will not sustain an FCA complaint. *See U.S. ex rel. Mastej v. Health Mgmt. Assocs.*, Inc., 591 F. App'x 693, 705 (11th Cir. 2014). Because Relator has not sufficiently explained her basis for alleging that false claims were actually submitted at the additional identified locations, any such allegations should be dismissed for failure to plead fraud with particularity.

Respectfully submitted this 6th day of July, 2022.

ARNALL GOLDEN GREGORY LLP

*/s/ W. Jerad Rissler*
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
W. Jerad Rissler
Georgia Bar No. 142024
171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500
jerad.rissler@agg.com

# EXHIBIT A

Scott Health & Rehabilitation

# Ownership

**Legal business name**

Johnson County Ltc, LLC

**Ownership type**

Non profit – Other

**Contact info**

12 Smith Lane
Adrian, GA 31002
(478) 668-3225

## Owners and managers of Scott Health & Rehabilitation

**OWNER**
5% or greater direct ownership interest

**PIEDMONT REGIONAL HEALTH INC (100%)**

since 11/01/2006

OPERATIONAL/MANAGERIAL CONTROL

### CLINICAL SERVICES, INC.

since 10/25/2005

### HUNT, GEORGE

since 01/01/2019

OFFICER

### BROWNING, BECKY

since 11/10/2014

MANAGING EMPLOYEE

### BROWN, DEANNA

since 01/27/2020

### BROWNING, BECKY

since 11/01/2006

# EXHIBIT B

Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-16
Baltimore, Maryland  21244-1850



## Center for Clinical Standards and Quality/Survey & Certification Group

**Ref: S&C: 13-15-NH**

**DATE:**       **March 8, 2013**

**TO:**         State Survey Agency Directors

**FROM:**       Director
                Survey and Certification Group

**SUBJECT**:    Physician Delegation of Tasks in Skilled Nursing Facilities (SNFs) and
                Nursing Facilities (NFs)

This memorandum replaces Survey and Certification memorandum S&C-04-08 dated
November 13, 2003, which discusses physician delegation of tasks in SNFs and NFs.

<div style="border:1px solid black;">

### Memorandum Summary

- **Guidance revision:**  This memo provides clarification of Federal guidance related
  to physician delegation of certain tasks in SNFs and NFs to non-physician
  practitioners (NPPs; formerly "physician extenders") such as nurse practitioners,
  physician assistants, or clinical nurse specialists
- **Implements Section 3108 of the Affordable Care Act (ACA):**  Implements section
  3108 of the Affordable Care Act, which adds physician assistants to the list of
  practitioners that can perform Skilled Nursing Facility (SNF) level of care
  certifications and re-certifications.
- **Co-signing of orders:**  Clarifies policy on co-signing orders in SNFs and NFs.

</div>

## A.      Background

The Centers for Medicare & Medicaid Services (CMS) is clarifying for State survey agencies
and providers the regulatory differences concerning physician delegation of tasks in SNFs and
NFs.  The distinction in policies between these two settings (SNFs and NFs) is based in statute
and regulation.  Improper application of these regulations may affect a facility's compliance and
may also affect payment to providers.  The key to accurate application is to identify:

(1) in which setting, SNF or NF, the physician services are being provided;
(2) whether the task must be performed personally by the physician; and
(3) whether or not the non-physician practitioner (NPP) is employed by the facility.

The "setting" is determined by whether the visit to a patient in a certified bed is to a resident
whose care is paid for by Medicare Part A in a SNF or under Medicaid in a NF. This
memorandum addresses the authority of NPPs (i.e., nurse practitioners, physician assistants, or

clinical nurse specialists) to perform certain tasks such as conducting physician visits and writing orders, and to sign certifications and re-certifications.

**B.      Physician Delegation of Tasks in Skilled Nursing Facilities (SNFs)**

Under the requirements for long-term care facilities, 42 C.F.R. §483.40(e)(2) provides that, "A physician may not delegate a task when the regulations specify that the physician must perform it personally, or when the delegation is prohibited under State law or by the facility's own policies."

Physician Required and other Medically Necessary Visits in SNFs:  Under 42 C.F.R. §483.40(c)(3), all required physician visits must be made by the physician personally and cannot be delegated.  A required physician visit includes the initial comprehensive visit in a SNF and every alternate required visit thereafter, as required in 42 C.F.R. §483.40(c)(4).  The initial comprehensive visit in a SNF is the initial visit during which the physician completes a thorough assessment, develops a plan of care and writes or verifies admitting orders for the resident.  Under 42 C.F.R. §483.40(c)(1), the initial comprehensive visit must occur no later than 30 days after a resident's admission into the SNF.  Further, under 42 C.F.R. §483.40(c)(4) and (e), the physician may not delegate the initial comprehensive visit in a SNF.  Non-physician practitioners may perform other medically necessary visits prior to and after the physician's initial comprehensive visit.

Once the physician has completed the initial comprehensive visit in the SNF, the physician may then delegate alternate visits to a Physician Assistant (PA), Nurse Practitioner (NP), or Clinical Nurse Specialist (CNS) who is licensed as such by the State and performing within the scope of practice in that State, as permitted under 42 C.F.R. §483.40(c)(4).  These alternate visits, as well as medically necessary visits, may be performed and signed by the NPP (physician co-signature is not required).

Certifications/Re-certifications in SNFs:  Under 42 C.F.R. §424.20, certifications and re-certifications are required to verify that a resident requires daily skilled nursing care or rehabilitation services.  Section 424.20(e)(2) (which reflects the requirements of section 1814 (a)(2) of the Social Security Act (Act)) states that NPs and CNSs who are not employed by the facility and who are working in collaboration with a physician may sign the required initial certification and re-certifications when permitted under the scope of practice for the State.  Effective with services furnished on or after January 1, 2011, Section 1814(a)(2) of the Act, which was amended by section 3108 of the Affordable Care Act, authorizes physician assistants who are not employed by the facility to perform the required initial certification and periodic re-certifications of a beneficiary's need for a SNF level of care.

**C.      Performance of Physician Tasks in Nursing Facilities (NFs)**

Physician Required and Other Medically Necessary Visits in NFs:  Similar to a SNF, the initial comprehensive visit in a NF is the initial visit during which the physician completes a thorough assessment, develops a plan of care and writes or verifies admitting orders for the resident, which must take place no later than 30 days after admission.  Section 483.40(f) provides that "At the

Page 3 - State Survey Agency Directors

option of the State, any required physician task in a NF (including tasks which the regulations specify must be performed personally by the physician) may also be satisfied when performed by a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician."  In other words, NPPs that have a direct relationship with a physician and who are not employed by the facility may perform the initial comprehensive visit, any other required physician visit, and other medically necessary visits for a resident of a NF as the State allows.  NPPs may also perform other medically necessary visits prior to and after the physician initial comprehensive visit.

At the option of the State, NPs, PAs, and CNSs who are employees of the facility, while not permitted to perform visits required under the schedule prescribed at 42 C.F.R. §483.40(c)(1), are permitted to perform other medically necessary visits and write orders based on these visits.  For example, if a resident complains of a headache, the NP, CNS, or PA employed by the NF may assess the resident and write orders to address the condition.  The physician is not required, other than by State law as applicable, to verify and sign orders written by NPPs who are employed by the facility for other medically necessary visits.  These medically necessary visits performed by NPs, CNSs, and PAs employed by the facility may not take the place of the physician required visits, nor may the visit count towards meeting the required physician visit schedule prescribed at 42 C.F.R. §483.40(c)(1).

In contrast to the initial <u>SNF</u> visit, NPPs may provide initial NF visits and other required visits under 42 C.F.R. §§483.40(c)(3) and (f) if the State permits it. Under these regulations, required physician tasks, such as verifying and signing orders in an NF, may be delegated to a PA, NP, or CNS who is **not** an employee of the facility but who is working in collaboration with a physician. Orders written by an NPP who is employed by the NF and are written during visits that are not required visits, and are therefore "other medically necessary visits," do not require physician co-signature except as mandated by State law.

We are issuing this clarification because, where a NPP is permitted to perform a medically necessary visit, the NPP is likewise permitted to write applicable orders during that visit.  The Federal requirements restricting NPPs who are employed by the NF from performing a *required visit*, do not apply to *other medically necessary visits*.  Thus, this guidance clarifies when an NPP employed by a NF may write orders without a countersignature unless State law requires it.

NOTE:  Regulatory language is included for reference purposes:

>**§483.40(f) Performance of Physician Tasks in NFs**
>**At the option of the State, any required physician task in a NF (including tasks which the regulations specify must be performed personally by the physician) may also be satisfied when performed by a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician.**

**D.      Dually-Certified Facilities (SNF/NFs)**

While the regulations do not address dually-certified SNF/NFs directly, the law is clear about who can perform tasks in a SNF and in a NF.  In a facility where beds are dually–certified under

Page 4 - State Survey Agency Directors

Medicare and Medicaid, the facility must determine how the particular resident stay is being paid. For residents in a Part A Medicare stay, the NPP must follow the guidelines for services in a SNF. For residents in a Medicaid stay, the NPP must follow the provisions outlined for care in NFs. As such, in a dually-certified nursing home, any required physician task for a Medicaid beneficiary in a Medicaid stay certified bed, at the option of the State, may be performed by a NPP who is not an employee of the facility but who is working in collaboration with a physician. In addition, in a dually-certified nursing home and at the option of a physician, required physician visits for a Medicare beneficiary in a Part A Medicare stay certified bed may be alternated between personal visits by the physician and visits by a NPP after the physician makes the initial first visit.

Table 1 below summarizes the requirements for non-physician practitioners to perform visits, sign orders, and sign certifications and re-certifications, when this function is permitted under the scope of practice for the State.

**Table 1: Authority for Non-physician Practitioners to Perform Visits, Sign Orders and Sign Certifications/Re-certifications When Permitted by the State\***

|  | **Initial Comprehensive Visit /Orders** | **Other Required Visits^** | **Other Medically Necessary Visits & Orders+** | **Certification/ Recertification** |
|---|---|---|---|---|
| **SNFs** | | | | |
| PA, NP & CNS employed by the facility | May not perform/ May not sign | May perform alternate visits | May perform and sign | May not sign |
| PA, NP & CNS not a facility employee | May not perform/ May not sign | May perform alternate visits | May perform and sign | May sign subject to State Requirements |
| **NFs** | | | | |
| PA, NP, & CNS employed by the facility | May not perform/ May not sign | May not perform | May perform and sign | Not applicable ± |
| PA, NP, & CNS not a facility employee | May perform/ May sign | May perform | May perform and sign | Not applicable ± |

\*This reflects clinical practice guidelines
^Other required visits are the required monthly visits.
+Medically necessary visits may be performed prior to the initial comprehensive visit.
± This requirement relates specifically to coverage of a Part A Medicare stay, which can take place only in a Medicare-certified SNF.

For questions on this memorandum, please contact Alice Bonner at alice.bonner@cms.hhs.gov.

**Effective Date:** This policy is in effect immediately.

**Training:** This policy should be shared with all appropriate survey and certification staff, their managers, and the state/regional office training coordinator.

Page 5 - State Survey Agency Directors

/s/
Thomas E. Hamilton

cc:  Survey and Certification Regional Office Management

# EXHIBIT C

# Medicare Claims Processing Manual

## Chapter 6 - SNF Inpatient Part A Billing and SNF Consolidated Billing

**Table of Contents**
*(Rev. 11109, 11-04-21)*

**Transmittals for Chapter 6**

10 - Skilled Nursing Facility (SNF) Prospective Payment System (PPS) and Consolidated Billing Overview

    10.1 - Consolidated Billing Requirement for SNFs

    10.2 - Types of Facilities Subject to the Consolidated Billing Requirement for SNFs

    10.3 - Types of Services Subject to the Consolidated Billing Requirement for SNFs

    10.4 - Furnishing Services that are Subject to SNF Consolidated Billing Under an "Arrangement" with an Outside Entity

        10.4.1 - "Under Arrangements" Relationships

        10.4.2 - SNF and Supplier Responsibilities

20 - Services Included in Part A PPS Payment Not Billable Separately by the SNF

    20.1 - Services Beyond the Scope of the Part A SNF Benefit

    20.1.1 - Physician's Services and Other Professional Services Excluded From Part A PPS Payment and the Consolidated Billing Requirement

        20.1.1.1 - Correct Place of Service (POS) Code for SNF Claims

        20.1.1.2 - Hospital's "Facility Charge" in Connection with Clinic Services of a Physician

    20.1.2 - Other Excluded Services Beyond the Scope of a SNF Part A Benefit

        20.1.2.1 - Outpatient Surgery and Related Procedures- Inclusion

        20.1.2.2 - Emergency Services

    20.2 - Services Excluded from Part A PPS Payment and the Consolidated Billing Requirement on the Basis of Beneficiary Characteristics and Election

        20.2.1 - Dialysis and Dialysis Related Services to a Beneficiary With ESRD

        20.2.1.1 - ESRD Services

        20.2.1.2 - Coding Applicable to Dialysis Services Provided in a Renal Dialysis Facility (RDF) or Home

20.2.2 - Hospice Care for a Beneficiary's Terminal Illness

20.3 - Other Services Excluded from SNF PPS and Consolidated Billing

20.3.1 - Ambulance Services

20.4 - Screening and Preventive Services

20.5 - Therapy Services

20.6 - SNF CB Annual Update Proces for  A/B MACs (A)

30 - Billing SNF PPS Services

30.1 - Health Insurance Prospective Payment System (HIPPS) Rate Code

30.2 - Coding PPS Bills for Ancillary Services

30.3 - Adjustment Request

30.4 - SNF PPS Pricer Software

30.4.1 - Input/Output Record Layout

30.4.2 - SNF PPS Rate Components

30.4.3 - Decision Logic Used by the Pricer on Claims

30.5 - Annual Updates to the SNF Pricer

40 - Special Inpatient Billing Instructions

40.1 - Submit Bills in Sequence

40.2 - Reprocessing Inpatient Bills in Sequence

40.3 - Determining Part A Admission Date, Discharge Date, and Utilization Days

40.3.1 - Date of Admission

40.3.2 - Patient Readmitted Within 30 Days After Discharge

40.3.3 - Same Day Transfer

40.3.4 - Situations that Require a Discharge or Leave of Absence

40.3.5 - Determine Utilization on Day of Discharge, Death, or Day Beginning a Leave of Absence

40.3.5.1 - Day of Discharge or Death Is the Day Following the Close of the Accounting Year

40.3.5.2 - Leave of Absence

40.4 - Accommodation Charges Incurred in Different Accounting Years

40.5 - Billing Procedures for Periodic Interim Payment (PIP) Method of Payment

40.6 - Total and Noncovered Charges

40.6.1 - Services in Excess of Covered Services

40.6.2 - Showing Discounted Charges

40.6.3 - Reporting Accommodations on the Claim

40.6.4 - Bills with Covered and Noncovered Days

40.6.5 - Notification of Limitation on Liability Decision

40.7 Ending a Benefit Period

40.8 - Billing in Benefits Exhaust and No-Payment Situations

40.8.1 - SNF Spell of Illness Quick Reference Chart

40.8.2 - Billing When Qualifying Stay or Transfer Criteria are Not Met

40.9- Other Billing Situations

50 - SNF Payment Bans, or Denial of Payment for New Admissions (DPNA)

50.1 - Effect on Utilization Days and Benefit Period

50.2 - Billing When Ban on Payment Is In Effect

50.2.1 - Effect of an Appeal to a DPNA on Billing Requirements During the Period a SNF is Subject to a DPNA

50.2.2 - Provider Liability Billing Instructions

50.2.3 - Beneficiary Liability Billing Instructions

50.2.4 - Part B Billing

50.3 - Sanctions Lifted: Procedures for Beneficiaries Admitted During the Sanction Period

50.3.1 - Tracking the Benefit Period

50.3.2 - Determining Whether Transfer Requirements Have Been Met

50.4 - Conducting Resident Assessments

50.5 - Physician Certification

50.6 - A/B MAC (A) Responsibilities

50.7 - Retroactive Removal of Sanctions

60 - Billing Procedures for a Composite SNF or a  Change in Provider Number

70 - Billing for Services After Termination of Provider Agreement, or After Payment is Denied for New Admissions

70.1 - General Rules

70.2 - Billing for Covered Services

70.3 - Part B Billing

80 - Billing Related to Physician's Services

80.1 - Reassignment Limitations

80.2 - Payment to Employer of Physician

80.3 - Information Necessary to Permit Payment to a Facility

80.4 - Services Furnished Within the SNF

80.5 - Billing Under Arrangements

80.6 - Indirect Contractual Arrangement

80.7 - Establishing That a SNF Qualifies to Receive Part B Payment on the Basis of Reassignment

90 - Medicare Advantage (MA) Beneficiaries

90.1 - Beneficiary Disenrolled from MA Plans

90.2 - Medicare Billing Requirements for Beneficiaries Enrolled in MA Plans

100 - Part A SNF PPS for Hospital Swing Bed Facilities

100.1 - Swing Bed Services Not Included in the Part A PPS Rate

110 - A/B MAC (B)/DME MAC Claims Processing for Consolidated Billing for Physician and Non-Physician Practitioner Services Rendered to Beneficiaries in a SNF Part A Stay

    110.1 - Correct Place of Service (POS) Code for SNF Claims

    110.2 - CWF Edits

        110.2.1 - Reject and Unsolicited Response Edits

        110.2.2 - A/B Crossover Edits

        110.2.3 - Duplicate Edits

        110.2.4 - Edit for Ambulance Services

        110.2.5 - Edit for Clinical Social Workers (CSWs)

        110.2.6 - Edit for Therapy Services Separately Payable When Furnished by a Physician

        110.2.7 - Edit to Prevent Payment of Facility Fees for Services Billed by an Ambulatory Surgical Center (ASC) when Rendered to a Beneficiary in a Part A Stay

    110.3 - CWF Override Codes

    110.4 - Coding Files and Updates

        110.4.1 - Annual Update Process

**120- Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM)**

    **120.1 - HIPPS Updates and Structure Changes**

    **120.2 - Interrupted Stay Policy**

    **120.3 - Variable Per Diem (VPD) Adjustment**

    **120.4 - AIDS Adjustments**

    **120.5 - Transition Claims**

    **120.6 - Default Billing**

## 10 - Skilled Nursing Facility (SNF) Prospective Payment System (PPS) and Consolidated Billing Overview
**(Rev.4163, Issued: 11-02-18, Effective: 12-04-18, Implementation: 12-04-18)**

All SNF Part A inpatient services are paid under a prospective payment system (PPS). Under SNF PPS, beneficiaries must meet the regular eligibility requirements for a SNF stay.  That is, the beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least three consecutive calendar days.  In addition, the beneficiary must have been transferred to a participating SNF within 30 days after discharge from the hospital, unless the patient's condition makes it medically inappropriate to begin an active course of treatment in an SNF within 30 days after hospital discharge, and it is medically predictable at the time of the hospital discharge that the beneficiary will require covered care within a predetermined time period.  (See the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care Services Under Hospital Insurance," §20.2, for further information on the 30-day transfer requirement and exception.)  To be covered, the extended care services must be needed for a condition which was treated during the patient's qualifying hospital stay, or for a condition which arose while in the SNF for treatment of a condition for which the beneficiary was previously treated in a hospital.

Also under SNF PPS all Medicare covered Part A services that are considered within the scope or capability of SNFs are considered paid in the PPS rate.  In some cases this means that the SNF must obtain some services that it does not provide directly.  Neither the SNF nor another provider or practitioner may bill the program for the services under Part B, except for services specifically excluded from PPS payment and associated consolidated billing requirements.

Any DME or oxygen furnished to inpatients in a covered Part A stay is included in the SNF PPS rate.  The definition of DME in §1861(n) of the Social Security Act (the Act) provides that DME is covered by Part B only when intended for use in the home, which explicitly does not include a SNF.  This definition applies to oxygen also.  (See the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Service," §110.)

Most prosthetics and all orthotic devices are included in the Part A PPS rate.  An exception involves certain designated customized prosthetic devices that are specifically identified as being outside the rate (see the regulations at 42 CFR 411.15(p)(2)(xvi) and Major Category III.D of the SNF consolidated billing editing).  Those customized prosthetic devices that are considered outside the PPS rate are billed by the qualified outside entity that furnished the service.  That entity bills its normal MAC.

Services that are not considered to be furnished within SNF PPS are identified in sections §§20.1 - 20.4.  These may be billed separately under Part B.  Some services must be billed by the SNF.  (This is referred to as "consolidated billing.")  Some services must be billed by the rendering provider (SNF or otherwise).  These are discussed further in §§20.1 - 20.4.

## 10.1 - Consolidated Billing Requirement for SNFs
**(Rev.4163, Issued: 11-02-18, Effective: 12-04-18, Implementation: 12-04-18)**

Section 4432 (b) of the Balanced Budget Act (BBA) requires consolidated billing (CB) for SNFs.  Under the CB requirement, the SNF must submit ALL Medicare claims for ALL the services that its residents receive under Part A, **except** for certain excluded services described in §§20.1 - 20.3, **and** for all physical, occupational and speech-language pathology services received by residents under Part B (see §20.5).  A SNF resident is defined as a beneficiary who is admitted to a Medicare participating SNF or the participating, Medicare-certified, distinct part unit (DPU) of a larger institution. Under the regulations at 42 CFR 411.15(p)(3)(i)-(iv), if  such a beneficiary leaves the facility (or the DPU), the beneficiary's status as a SNF "resident" for CB purposes (along with the SNF's responsibility to furnish or make arrangements for needed services) ends when any one of the following events occurs:

- The beneficiary is admitted as an inpatient to a Medicare-participating hospital or critical access hospital (CAH), or as a resident to another SNF;

- The beneficiary receives services from a Medicare-participating home health agency under a plan of care;

- The beneficiary receives one of the types of outpatient hospital services that CMS has designated as being exceptionally intensive (see §20.1.2); or

- The beneficiary is formally discharged (or otherwise departs) from the SNF or DPU, unless the beneficiary is readmitted (or returns) to that or another SNF before the following midnight. This provision is sometimes referred to as the "midnight rule" (see Pub. 100-02, Medicare Benefit Policy Manual, chapter 3, §20.1, which specifies that an inpatient day ". . . begins at midnight and ends 24 hours later").  A "discharge" from the Medicare-certified DPU includes situations in which the beneficiary is moved from the DPU to a Medicare non-certified area within the same institution.

When a beneficiary is absent from the SNF overnight (i.e., the absence from the SNF spans midnight), the beneficiary's status as a SNF "resident" for CB purposes would end upon the point of departure from the SNF (per the above-described "midnight rule"), and would not resume until the actual point of arrival back at the SNF the next day. Accordingly, that beneficiary would not be considered a SNF "resident" for CB purposes between those two points, so that any offsite services furnished during the interim (such as an overnight sleep study) would not be subject to CB.

It should be noted that the scenarios described in the first three clauses above would become relevant only if a beneficiary leaves the SNF but then arrives back in that or

another SNF before the following midnight.  This is because under the "midnight rule" discussed in the fourth clause, whenever a beneficiary leaves the SNF but does not arrive back in that or another SNF later on that same day, the beneficiary's "resident" status for CB purposes would end immediately upon departure--before any of the other events described in the first three clauses could even occur.

By contrast, when a beneficiary does return to that or another SNF by the end of the same day (a scenario that normally would serve to maintain the beneficiary's status as a "resident" of the originating SNF throughout the absence), the occurrence of one of the intervening events listed in the first three clauses above would nevertheless serve to end the beneficiary's "resident" status at that point.  For example, when a beneficiary leaves the SNF to receive outpatient emergency services at the hospital, the emergency services would never be subject to CB—even in a situation where the beneficiary returns to the SNF later that same day—because the receipt of the emergency services themselves under the third clause above would have already served to suspend the beneficiary's SNF "resident" status with respect to those services under the regulations at 42 CFR 411.15(p)(3)(iii).

These requirements apply only to Medicare fee-for-service beneficiaries residing in a participating SNF or DPU.

Claims are submitted to the A/B MAC (A) on the ASC X12 837 institutional format or Form CMS-1450.  All services billed by the SNF (including those furnished under arrangements with an outside supplier) for a resident of a SNF in a covered Part A stay are included in the SNF's Part A bill.  If a resident is not in a covered Part A stay (Part A benefits exhausted, posthospital or level of care requirements not met), the SNF is required to bill for all physical therapy, occupational therapy, and/or speech-language pathology services provided to a SNF resident under Part B.  The CB provision requires that effective for services and items furnished on or after July 1, 1998, payment is made directly to the SNF.

Thus, SNFs are no longer able to "unbundle" services to an outside supplier that can then submit a separate bill directly to an A/B MAC (B) or DME MAC for residents in a Part A stay, or for SNF residents receiving physical therapy, occupational therapy, and/or speech-language pathology services paid under Part B.  Instead, the SNF must furnish the services either directly or under an arrangement with an outside supplier or provider of services in which the SNF (rather than the supplier or provider of services) bills Medicare.  Medicare does not pay amounts that are due a provider to any other person under assignment, or power of attorney, or any other direct payment arrangement.  As a result, the outside supplier must look to the SNF (rather than the A/B MAC (A), or (B), or DME MAC or the beneficiary) for payment.  The SNF may collect any applicable deductible or coinsurance from the beneficiary.

**NOTE**:  The requirements for participation at 42 CFR 483.15(c)(1)(i)(A)-(F) specify the limited circumstances under which a resident can be involuntarily moved out of a Medicare-certified SNF or DPU.  These circumstances can include situations in which the resident's health has improved to the point where he or she no longer needs SNF care.

However, if a resident has exhausted Part A benefits but nevertheless continues to require SNF care, he or she cannot be moved out of the Medicare-certified SNF or DPU for reasons other than those specified in the regulations.  For example, the resident cannot be moved to avoid the CB requirements, or to establish a new benefit period.  The determination to move the beneficiary out of the SNF or DPU must not be made on the basis of the beneficiary having exhausted his or her benefits, but rather, on the beneficiary's lack of further need for SNF care.  Once a resident of a Medicare-certified DPU ceases to require SNF care, he or she may then be moved from the DPU to the Medicare non-certified area of the institution.  As discussed above, such a move would end the beneficiary's status as a SNF "resident" for CB purposes.

Enforcement of CB is done through editing in Medicare claims processing systems using lists of Healthcare Common Procedure Coding System (HCPCS) codes that are subject to the CB provision of SNF PPS.  In order to assure proper payment in all settings, Medicare systems must edit for services, provided to SNF beneficiaries, both included and excluded from CB.  Transmittals with instructions provide updates to previous lists of the exclusions, and some inclusions, to CB.  Such transmittals can be found on the CMS Web site at:  https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html or http://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/index.html.  Step-by-step instructions for accessing the exclusion list itself appear in the Medicare Benefit Policy Manual, Chapter 8, §10.2.

The list of HCPCS codes enforcing CB may be updated each quarter.  For the notice on CB for the quarter beginning January, separate instructions are published for A/B MACs (A) and A/B MACs (B)/DME MACs.  Since this is usually the only quarter in which new permanent HCPCS codes are produced, this recurring update is referred to as an annual update.  Other updates for the remaining quarters of the year will occur as needed prior to the next annual update.  In lieu of another update, editing based on the prior list of codes remains in effect.  Some non-January quarterly updates may apply to each of A/B MACs (A) and (HHH) and A/B MACs (B)/DME MACs, and the applicability of the instruction will be clear in each update.  All future updates will be submitted via a Recurring Update Notification form.

- **Effective July 1, 1998**, CB became effective for those services and items that were not specifically excluded by law from the SNF prospective payment system (PPS) when they were furnished to residents of a SNF in a covered Part A stay and also includes physical therapy, occupational therapy, and/or speech-language pathology services in a noncovered stay.  SNFs became subject to CB once they transitioned to PPS.  Due to systems limitations, CB was not implemented at that time for residents not in a Part A covered stay (Part A benefits exhausted, post-hospital or level of care requirements not met).  Section 313 of the Benefits Improvement and Protection Act (BIPA) of 2000 subsequently repealed this aspect of CB altogether, except for physical therapy, occupational therapy, and/or speech-language pathology services.  In addition, for either type of resident, the following requirements were also delayed: (1) that the physicians forward the technical

portions of their services to the SNF; and (2) the requirement that the physician enter the facility provider number of the SNF on the claim.

- **Effective July 1, 1998,** under 42 CFR 411.15(p)(3)(iii) published on May 12, 1998, a number of other services are excluded from CB.  The hospital outpatient department will bill these services directly to the A/B MAC (A) when furnished on an outpatient basis by a hospital or a critical access hospital (see §20.1.2).  Physician's and other practitioner's professional services will be billed directly to the A/B MAC (B) (see §20.1.1).  Hospice care (see §20.2.2) and the ambulance trip that initially conveys an individual to the SNF to be admitted as a resident, or that conveys an individual from the SNF when discharged and no longer considered a resident (see §20.3), are also excluded from CB.

- **Effective April 1, 2000,** §103 of the Balanced Budget Refinement Act (BBRA) excluded additional services and drugs from CB that therefore had to be billed directly to the A/B MAC (B) or DME MAC by the provider or supplier for payment (see §20.3).  As opposed to whole categories of services being excluded, only certain specific services and drugs (identified by HCPCS code) were excluded in each category.  These exclusions included ambulance services furnished in conjunction with renal dialysis services, certain specific chemotherapy drugs and their administration services, certain specific radioisotope services, and certain customized prosthetic devices.

- **Effective January 1, 2001,** §313 of the BIPA, restricted CB to the majority of services provided to beneficiaries in a Medicare Part A covered stay and only to therapy services provided to beneficiaries in a noncovered stay (see §20.5).

    - **Effective for claims with dates of service on or after April 1, 2001,** for those services and supplies that were not specifically excluded by law and are furnished to a SNF resident covered under the Part A benefit, physicians are required to forward the technical portions of any services to the SNF to be billed by the SNF to the A/B MAC (A) for payment (see §20.1.1).

## 10.2 - Types of Facilities Subject to the Consolidated Billing Requirement for SNFs
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11- 05-19)**

Consolidated billing applies to:

- Participating SNFs;
- Short term hospitals, long term hospitals, and rehabilitation hospitals certified as swing-bed hospitals, except critical access hospitals (CAHs) certified as swing bed hospitals (however, while a CAH's SNF-level swing bed services are not subject to consolidated billing, they remain subject to the bundling requirement for **hospitals**, as specified in the Medicare Claims Processing Manual, Chapter 3, §60).  Rural (non-CAH) swing bed hospitals that furnish SNF-level services are

subject to **both** the consolidated billing **and** hospital bundling requirements (see §100.1); accordingly, as explained in the FY 2002 SNF PPS final rule (66 FR 39593, July 31, 2001), for the small number of services (such as dialysis) that are excluded from consolidated billing but remain subject to hospital bundling, the billing responsibility would remain with the rural swing bed hospital itself (in accordance with the hospital bundling requirement), but it would use a separate inpatient Part B claim to bill for those services outside of the bundled SNF PPS rate (in recognition of their exclusion from the consolidated billing requirement).

But consolidated billing does not apply to:

- A nursing home that is not Medicare-certified, such as:

    o   A nursing home that does not participate at all in either the Medicare or Medicaid programs;

    o   A non-certified part of a nursing home that also includes a participating distinct part SNF unit; and

    o   A nursing home that exclusively participates in the Medicaid program as an NF.

- CAHs certified as swing-bed hospitals.  However, as noted above, CAH swing-bed services are subject to the hospital bundling requirement at section 1862(a)(14) of the Social Security Act and 42 CFR § 411.15(m).

**Medicare Coordinated Care Demonstration**

Services for beneficiaries covered under the Medicare Coordinated Care Demonstration will not be subject to consolidated billing.  Common Working File (CWF) will appropriately edit for these codes so that the A/B MACs (B) will pay them separately.

## 10.3 - Types of Services Subject to the Consolidated Billing Requirement for SNFs
**(Rev. 2573, Issued: 10-26-12, Effective: 04-01-13, Implementation: 04-01-13)**

As previously discussed, the consolidated billing requirement applies to all services furnished to a SNF resident in a covered Part A stay (other than the excluded service categories described below) and for physical therapy, occupational therapy, and/or speech-language pathology services provided to residents and paid under Part B. Examples of services that are subject to consolidated billing include:

- Physical therapy, occupational therapy, and/or speech-language pathology services, regardless of whether they are furnished by (or under the supervision of)

a physician or other health care professional (see §1888(e)(2)(A)(ii) of the Act).
Physical therapy, occupational therapy, and/or speech-language pathology
services (other than audiology services, which are considered diagnostic tests
rather than therapy services) furnished to a SNF resident during a noncovered stay
must still be billed by the SNF itself.  This is known as "Part B" consolidated
billing (see §20.5 of this chapter).

- Psychological and other services furnished by a clinical social worker; and

- Services furnished as an "incident to" the professional services of a physician or
  other excluded category of health care professional described in §20.1.1 below.

## 10.4 - Furnishing Services that are Subject to SNF Consolidated Billing Under an "Arrangement" With an Outside Entity
**(Rev .4001, Issued: 03-16-18, Effective: 06- 19- 18, Implementation: 06-19-18)**

As discussed in §10.1 and §10.3, the SNF consolidated billing provisions (at
§1862(a)(18), §1866(a)(1)(H)(ii), and §1888(e)(2)(A) of the Act) place with the SNF
itself the Medicare billing responsibility for most of its residents' services.  "Part A"
consolidated billing requires that a SNF must include on its Part A bill almost all of the
services that a resident receives during the course of a Medicare-covered stay, other than
those services that are specifically excluded from the SNF's global PPS per diem
payment for the covered stay.  (These "excluded" services, such as the services of
physicians and certain other practitioners, remain separately billable to the A/B MAC (B)
directly by the outside entity that actually furnishes them.)  In addition, "Part B"
consolidated billing makes the SNF itself responsible for submitting the Part B bills for
any physical therapy, occupational therapy, and/or speech-language pathology services
that a resident receives during a noncovered stay (see §20.5).

Further, for any Part A or Part B service that is subject to SNF consolidated billing, the
SNF must either furnish the service directly with its own resources, or obtain the service
from an outside entity (such as a supplier) under an "arrangement," as described in
§1861(w) of the Act and in §80.5.  Under such an arrangement, the SNF must reimburse
the outside entity for those Medicare-covered services that are subject to consolidated
billing; i.e., services that are reimbursable only to the SNF as part of its global PPS per
diem or those Part B services that must be billed by the SNF.

Since the inception of the SNF PPS, several problematic situations have been identified
where the SNF resident receives services that are subject to consolidated billing from an
outside entity, such as a supplier.  (In this context, the term "supplier" can also include
those practitioners who, in addition to performing their separately billable professional
services, essentially act as a supplier by also furnishing other services that are subject to
the consolidated billing requirement.)  As discussed in greater detail below, such
situations most commonly arise in one of the following two scenarios:  1) A SNF does

not accurately identify services as being subject to consolidated billing when ordering such services from a supplier or practitioner; or 2) A supplier fails to ascertain a beneficiary's status as a SNF resident when the beneficiary (or another individual acting on the beneficiary's behalf) seeks to obtain such services directly from the supplier without the SNF's knowledge.

The absence of a valid arrangement in the situations described above creates confusion and friction between SNFs and their suppliers.  Suppliers need to understand which services are subject to consolidated billing to avoid situations where they might improperly attempt to bill the A/B MAC (B) (or other payers such as Medicaid and beneficiaries) directly for the services.  In addition, when ordering or furnishing services "under arrangements," both parties need to reach a common understanding on the terms of payment; e.g., how to submit an invoice, how payment rates will be determined, and the turn-around time between billing and payment.  Without this understanding, it may become difficult to maintain the strong relationships between SNFs and their suppliers that are necessary to ensure proper coordination of care to the Medicare beneficiaries.  Whenever possible, SNFs should document arrangements with suppliers in writing, particularly with suppliers furnishing services on an ongoing basis, such as laboratories, x-ray suppliers, and pharmacies.  This also enables the SNF to obtain the supplier's assurance that the arranged-for services will meet accepted standards of quality (under the regulations at 42 CFR 483.70(g)(2), SNFs must ensure that services obtained under an arrangement with an outside source meet professional standards and principles that apply to professionals providing such services).

However, it is important to note that the absence of a valid arrangement does NOT invalidate the SNF's responsibility to reimburse suppliers for services included in the SNF "bundle" of services represented by the SNF PPS global per diem rate.  As the SNF has already been paid for the services, the SNF must be considered the responsible party when medically necessary supplier services are furnished to beneficiaries in Medicare Part A stays.  This obligation applies even in cases where the SNF did not specifically order the service; e.g., during a scheduled physician's visit, the physician performs additional diagnostic tests that had not been ordered by the SNF; a family member arranges a physician visit without the knowledge of SNF staff and the physician bills the SNF for "incident to" services.

Finally, while establishing a valid arrangement prior to ordering services from a supplier minimizes the likelihood of a payment dispute between the parties, it is not unreasonable to expect occasional disagreements between the parties that may result in non-payment of a supplier claim.  However, it is important to note that there are potentially adverse consequences to SNFs when patterns of such denials are identified.  Specifically, all participating SNFs agree to comply with program regulations when entering into a Medicare provider agreement which, as explained below, requires a SNF to have a valid arrangement in place whenever a resident receives services that are subject to consolidated billing from any entity other than the SNF itself.  Moreover, in receiving a

bundled per diem payment under the SNF PPS that includes such services, the SNF is accepting Medicare payment, and financial responsibility, for the service.

Accordingly, these instructions reiterate and clarify the applicable consolidated billing requirements that pertain to SNFs and to the outside suppliers that serve SNF residents.

## 10.4.1 - "Under Arrangements" Relationships
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

Under an arrangement as defined in §1861(w) of the Act, Medicare's payment to the SNF represents payment in full for the arranged-for service, and the supplier must look to the SNF (rather than to A/B MAC (B)) for its payment.  Further, in entering into such an arrangement, the SNF cannot function as a mere billing conduit, but must actually exercise professional responsibility over the arranged-for service (see the Medicare General Information, Eligibility, and Entitlement Manual, Chapter 5, §10.3, and the Medicare Benefit Policy Manual, Chapter 8, §70.4, for additional information on services furnished under arrangements).

Medicare does not prescribe the actual terms of the SNF's relationship with its suppliers (such as the specific amount or timing of payment by the SNF), which are to be arrived at through direct negotiation between the parties to the agreement.  However, in order for a valid "arrangement" to exist, the SNF must reach a mutual understanding with its supplier as to how the supplier is to be paid for its services.  Documenting the terms of the arrangement confers the added benefit of providing both parties with a ready means of resolution in the event that a dispute arises over a particular service.  This type of arrangement has proven to be effective in situations where suppliers regularly provide services to facility residents on an ongoing basis; e.g., laboratory and x-ray suppliers, DME supplies, etc.  Sample model agreements involving arrangements between SNFs and their suppliers are available for review on CMS's "Best Practices Guidelines" website, at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/BestPractices.html.

If a SNF elects to utilize an outside supplier to furnish medically appropriate services that are subject to consolidated billing, but then refuses to reimburse that supplier for the services, then there is no valid arrangement as contemplated under §1862(a)(18) of the Act.  Not only would this potentially result in Medicare's noncoverage of the particular services at issue, but a SNF demonstrating a pattern of nonpayment would also risk being found in violation of the terms of its provider agreement.  Under §1866(a)(1)(H)(ii) of the Act (and 42 CFR 489.20(s)), the SNF's provider agreement includes a specific commitment to comply with the requirements of the consolidated billing provision.  Further, §1866(g) of the Act imposes a civil money penalty on any person who knowingly and willfully presents (or causes to be presented) a bill or request for payment inconsistent with an arrangement or in violation of the requirement for such an arrangement.

## 10.4.2 - SNF and Supplier Responsibilities
**(Rev. 412, Issued: 12-23-04, Effective: 05-21-04, Implementation: 01-24-05)**

Problems involving the absence of a valid arrangement between an SNF and its suppliers typically tend to arise in one of the following two situations.

> Problem Scenario 1:  An SNF elects to utilize an outside supplier to furnish a type of service that would be subject to Part A consolidated billing, but then fails to inform the supplier that the resident receiving the service is in a covered Part A stay.  This causes the supplier to conclude mistakenly that the service it furnishes to that resident is not subject to consolidated billing.

> Based on the inaccurate impression that the resident's SNF stay is noncovered, the supplier inappropriately submits a separate Part B claim for the service, and may also improperly bill other insurers and the resident. Then, the supplier only learns of the actual status of the resident's Medicare-covered SNF stay when that Part B claim is denied.  In this scenario, even though the supplier made reasonable efforts to ascertain from the SNF both the beneficiary's status as an SNF resident and the specific nature of the beneficiary's SNF stay, the information from the SNF (on which the supplier relied) proved to be inaccurate.

While we recognize that inadvertent errors may occasionally occur in the course of furnishing such information, an SNF should not only make a good faith effort to furnish accurate information to its supplier, but must reimburse the supplier once such an error is called to its attention.  If, in the scenario at issue, the SNF refuses to pay the supplier for the service even after being apprised of the inaccuracy of its initial information, the SNF would not be in compliance with consolidated billing requirements.  As discussed previously, having supporting documentation in place for the disputed service would not only help to ensure compliance with the consolidated billing requirements, but should also provide a vehicle for resolving the dispute itself.

Of course, the SNF can often prevent such disputes from arising to begin with, simply by ensuring that the supplier receives accurate and timely information about the status of a resident's Medicare-covered SNF stay.  The SNF's responsibility to communicate accurate and timely relevant information to its suppliers is especially important in those instances where a particular portion of an otherwise bundled service remains separately billable to Part B (for example, the professional component that represents a physician's interpretation of an otherwise bundled diagnostic test).

> Problem Scenario 2:  A resident temporarily departs from the SNF on a brief leave of absence, typically accompanied by a relative or friend.  While briefly offsite, the resident (or the relative or friend, acting on the resident's behalf) obtains services that are subject to the consolidated billing requirement, but fails to notify the SNF.  The SNF refuses to pay for the offsite services, and the supplier bills the beneficiary/family member directly.

As in the previous scenario, the SNF remains responsible for any services included in the SNF "bundle" of services subject to consolidated billing that are furnished to the resident by an outside entity, even in the absence of a valid arrangement with the SNF.
The SNFs can act to prevent such problems from arising by ensuring that each resident (and, if applicable, his or her representative) is fully aware of the applicable requirements.  For example, while the Medicare law at §1802 of the Act guarantees a beneficiary's free choice of any qualified entity that is willing to furnish services to the beneficiary, in selecting a particular SNF, the beneficiary has effectively exercised this right of free choice with respect to the entire package of services for which the SNF is responsible under the consolidated billing requirement, including the use of any outside suppliers from which the SNF chooses to obtain such services.  SNF staff need to communicate these requirements to beneficiaries and family members upon admission.  Further, in providing such advice periodically throughout each resident's stay, the SNF should take particular care to include any resident who is about to leave the facility temporarily, in order to ensure that the resident (and, if applicable, the resident's representative) understands the need to consult the SNF before obtaining any services offsite.

Moreover, while the SNF itself should take reasonable steps to prevent such problems from arising, the supplier in this scenario is also responsible for being aware of and complying with the consolidated billing requirements.  This means that prior to furnishing services to a Medicare beneficiary, the supplier should routinely ascertain whether the beneficiary is currently receiving any comprehensive Medicare benefits (such as SNF or home health benefits) for which Medicare makes a bundled payment that could potentially include the supplier's services.  If the supplier ascertains that a particular beneficiary is, in fact, a resident of an SNF with which the supplier does not have a valid arrangement in place, then the supplier should contact the SNF before actually furnishing any services to that beneficiary that are subject to the consolidated billing provision.  Further, under the regulations at 42 CFR 489.21(h), the beneficiary cannot be charged for the bundled services.

## 20 - Services Included in Part A PPS Payment Not Billable Separately by the SNF
**(Rev. 2573, Issued: 10-26-12, Effective: 04-01-13, Implementation: 04-01-13)**

For cost reporting periods beginning on and after July 1, 1998, SNF services paid under Part A include posthospital SNF services for which benefits are provided under Part A, and all items and services which, prior to July 1, 1998, had been paid under Part B but furnished to SNF residents during a Part A covered stay regardless of source, except for the exclusions listed in the annual SNF consolidated billing update files.  Annual update files, as well as subsequent quarterly updates to the annual update, for SNF consolidated billing can be found at http://www.cms.hhs.gov/SNFConsolidatedBilling/.  This file lists services by HCPCS code, short descriptors, and the major category under which the HCPCS falls.  HCPCS added or removed by subsequent quarterly update transmittals will be listed under the respective year's annual update at the above link.  The respective year's annual update file will be updated to add or remove the HCPCS listed in the quarterly updates.

A general explanation of the five major categories can also be found at the above link.

**NOTE:** It is important for MACs/providers to understand the major categories for SNF CB.  Some major categories exclude services by revenue code (see section 20.1.2.2 for emergency room exclusion) as well as bill types (see section 20.2.1.2 on coding for renal dialysis facilities and 20.2.2 for hospice facilities).

Services paid under Part A cannot be billed under Part B.  Any service paid under Part A that is billed separately will not be paid separately, or payment will be recovered if already paid at the time of the SNF billing.  The following subsections list the types of services that can be billed under Part B for SNF residents for whom Part A payment is made.

## 20.1 - Services Beyond the Scope of the Part A SNF Benefit
**(Rev. 846, Issued:  02-10-06; Effective:  12-15-05; Implementation:  03-13-06)**

The following services are beyond the scope of the SNF Part A benefit and are excluded from payment under Part A SNF PPS and from the requirement for consolidated billing.  These services must be paid to the practitioner or provider that renders them and are billed separately by the rendering provider/supplier/practitioner to the A/B MAC (A) or (B).  The SNF may not bill excluded services separately under Part B for its inpatients entitled to Part A benefits.  HCPCS procedure codes representing these excepted services for services billed to the A/B MACs (A), (B), (HHH), and DME MACs are updated as frequently as quarterly on the CMS Web site at: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/  Physicians, non-physician practitioners, and suppliers billing the A/B MAC (B) should consult the above link for lists of separately billable services.

**Note**:  There are separate Annual Update files for service billed to A/B MACs (B)/DME MACs and services billed to A/B MACs (A) or (HHH) posted to the Web site mentioned above.

## 20.1.1 - Physician's Services and Other Professional Services Excluded From Part A PPS Payment and the Consolidated Billing Requirement
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11- 05-19)**

Except for the therapy services (see §20.5), physician's professional services and services of certain nonphysician providers listed below are excluded from Part A PPS-payment and the requirement for consolidated billing, and must be billed separately by the practitioner to the A/B MAC (B).  See below for Rural Health Clinic (RHC)/Federally Qualified Health Center (FQHC) instructions.

For this purpose "physician service" means the professional services of the physician as defined under the Medicare physician Fee Schedule.  For services that contain both a technical component and a professional component, the technical component, if any, must be billed by the SNF for its Part A inpatients.  The A/B MAC (B) will pay only the professional component to the physician.  For example, the technical component of a

diagnostic radiology test (representing the performance of the procedure itself) is subject to SNF CB, whereas the professional component (representing the physician's interpretation of the test results) is excluded and, thus, remains separately billable under Part B.

- Physician's services other than physical, occupational, and speech-language pathology services furnished to SNF residents;

- Physician assistants, working under a physician's supervision;

- Nurse practitioners and clinical nurse specialists working in collaboration with a physician;

- Certified nurse-midwives;

- Qualified psychologists; and

- Certified registered nurse anesthetists.

SNF CB excludes the categories of practitioner services described above, and this exclusion applies specifically to those professional services that ordinarily require performance by the practitioner personally (see the regulations at 42 CFR 411.15(p)(2)(i) and 415.102(a)(3)).  This means, for example, that an otherwise bundled task (such as a routine blood draw) cannot be converted into an excluded physician service merely by having a physician perform it personally, as such a task does not ordinarily require performance by the physician.  This exclusion also does not encompass services that are performed by someone else as an incident to the practitioner's professional service.  Such "incident to" services remain subject to SNF CB and, accordingly, must be billed to Medicare by the SNF itself (see §10.3).

Providers with the following specialty codes assigned by CMS upon enrollment with Medicare are considered physicians for this purpose.  Some limitations are imposed by §§1861(q) and (r) of the Act.  These providers may bill their A/B MAC (B) directly.

**Physician Specialty Codes**

| | | | |
|---|---|---|---|
| 01 | General Practice | 02 | General Surgery |
| 03 | Allergy/Immunology | 04 | Otolaryngology |
| 05 | Anesthesiology | 06 | Cardiology |
| 07 | Dermatology | 08 | Family Practice |
| 10 | Gastroenterology | 11 | Internal Medicine |

**Physician Specialty Codes**

| | |
|---|---|
| 12 Osteopathic Manipulative Therapy | 13 Neurology |
| 14 Neurosurgery | 16 Obstetrics Gynecology |
| 18 Ophthalmology | 19 Oral Surgery (Dentists only) |
| 20 Orthopedic Surgery | 22 Pathology |
| 24 Plastic and Reconstructive Surgery | 25 Physical Medicine and Rehabilitation |
| 26 Psychiatry | 28 Colorectal Surgery (formerly Proctology) |
| 29 Pulmonary Disease | 30 Diagnostic Radiology |
| 33 Thoracic Surgery | 34 Urology |
| 35 Chiropractic | 36 Nuclear Medicine |
| 37 Pediatric Medicine | 38 Geriatric Medicine |
| 39 Nephrology | 40 Hand Surgery |
| 41 Optometry | 44 Infectious Disease |
| 46 Endocrinology | 48 Podiatry |
| 66 Rheumatology | 69 Independent Labs |
| 70 Multi specialty Clinic or Group Practice | 76 Peripheral Vascular Disease |
| 77 Vascular Surgery | 78 Cardiac Surgery |
| 79 Addiction Medicine | 81 Critical Care (Intensivists) |
| 82 Hematology | 83 Hematology/Oncology |
| 84 Preventive Medicine | 85 Maxillofacial Surgery |
| 86 Neuropsychiatry | 90 Medical Oncology |
| 91 Surgical Oncology | 92 Radiation Oncology |
| 93 Emergency Medicine | 94 Interventional Radiology |
| 98 Gynecological/Oncology | 99 Unknown Physician Specialty |

**Nonphysician Provider Specialty Codes**

| | |
|---|---|
| 42 Certified Nurse Midwife | 43 Certified Registered Nurse Anesthetist, Anesthesia Assistants (effective 1/1/89) |
| 50 Nurse Practitioner | 62 Clinical Psychologist  (billing independently) |
| 68 Clinical Psychologist | 89 Certified Clinical Nurse Specialist |
| 97 Physician Assistant | |

**NOTE:**  Some HCPCS codes are defined as all professional components in the fee schedule.  Fee schedule definitions apply for this purpose.

Effective July 1, 2001, the Benefits Improvement and Protection Act (BIPA) established payment method II, in which CAHs can bill and be paid for physician services billed to their A/B MAC (A).  CAHs must bill the professional fees using revenue codes 96x, 97x, or 98x on an 85x type of bill (TOB).  Like professional services billed to the A/B MAC (B), the specific line items containing these revenue codes for professional services are excluded from the requirement for consolidated billing.

RHC/FQHC Instructions:

Effective January 1, 2005, section 410 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) amended the SNF consolidated billing law to specify that when a SNF's Part A resident receives the services of a physician (or another type of practitioner that the law identifies as being excluded from SNF consolidated billing) from a RHC or a FQHC, those services are not subject to CB merely by virtue of being furnished under the auspices of the RHC or FQHC.  Accordingly, under section 410 of the MMA, services otherwise included within the scope of RHC and FQHC services that are also described in clause (ii) of section 1888(e)(2)(A) are excluded from consolidated billing, effective with services furnished on or after January 1, 2005.  Only this subset of RHC/FQHC services may be covered and paid separately when furnished to SNF residents during a covered Part A stay (see the regulations at 42 CFR 411.15(p)(2)(xvii) and 405.2411(b)(2)).  Use TOBs 71x and 73x, respectively, to bill for these RHC/FQHC services.  See Pub. 100-02, Medicare Benefit Policy Manual, chapter 13 for additional information on Part B coverage of RHC/FQHC services.

## 20.1.1.2 - Hospital's "Facility Charge" in Connection with Clinic Services of a Physician
**(Rev. 3230, Issued: 04-03-15, Effective: 06-15-15, Implementation: 06-15-15)**

As noted above in section 20.1.1, physician services are excluded from Part A PPS payment and the requirement for consolidated billing.  When a beneficiary receives clinic services from a hospital-based physician, the physician in this situation would bill his or her own professional services directly to the A/B MAC (B) and would be reimbursed at the facility rate of the Medicare physician fee schedule - which does not include overhead expenses.  The hospital historically has submitted a separate Part B "facility charge" for the associated overhead expenses to its A/B MAC (A).  The hospital's facility charge does not involve a separate service (such as a diagnostic test) furnished in addition to the physician's professional service; rather, it represents solely the overhead expenses associated with furnishing the professional service itself.  Accordingly, hospitals bill for "facility charges" under the physician evaluation and management (E&M) codes in the range of 99201-99245 and G0463 (for hospitals paid under the Outpatient Prospective Payment System).

E&M codes, representing the hospital's "facility charge" for the overhead expenses associated with furnishing the professional service itself, are excluded from SNF CB.

Effective for claims with dates of service on or after January 1, 2006, the CWF will bypass CB edits when billed with revenue code 0510 (clinic visit) with an E&M HCPCS code in the range of 99201-99245 and, effective January 1, 2014 with HCPCS code G0463.

**NOTE:**  Unless otherwise excluded in one of the Five Major Categories for billing services to A/B MACs (A), physician services codes are to be billed to the A/B MAC (B) by the physician.  Facility charges associated with the physician's clinic visit must be reported as explained above.

## 20.1.2 - Other Excluded Services Beyond the Scope of a SNF Part A Benefit
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

The following services are not included in Part A PPS payment when furnished in a Medicare participating hospital or CAH and may be paid to the provider rendering them.

This exception does not apply if the service is furnished in an ambulatory surgical center (ASC) or other independent (non-hospital) facility, because it specifically addresses those services that are so far beyond the normal scope of SNF care as to require the intensity of the hospital setting in order to be furnished safely and effectively.  In transmittals for Part A and B institutional billing providing the annual update list of HCPCS codes affected by SNF consolidated billing, such services are referred to as " Major Category I" of SNF consolidated billing editing.  Note that of the types of services listed, only ambulatory surgeries are listed as inclusions, rather than exclusions, to consolidated billing.

- Certain cardiac catheterizations;

- Certain computerized axial tomography (CT) scans;

- Certain magnetic resonance imaging (MRIs);

- Certain ambulatory surgeries involving the use of a hospital operating room or comparable hospital facilities (i.e., the use of a gastrointestinal (GI) suite or endoscopy suite for the insertion of a percutaneous esophageal gastrostomy (PEG) tube).  For Part A inpatients, the professional portion of these services is billed by the rendering practitioner to the A/B MAC (B).  Any hospital outpatient charges are billed to the A/B MAC (A).

- Certain radiation therapies;

- Certain angiographies, and lymphatic and venous procedures;

- Emergency services; and

- Ambulance services when related to an excluded service within this list (see §20.3 for ambulance transportation related to dialysis services).

These relatively costly services are beyond the general scope of care in SNFs, and their receipt has the effect of temporarily suspending a beneficiary's status as a SNF "resident" for CB purposes with respect to such services. Even though it may be medically appropriate for a beneficiary to be cared for in a SNF while receiving radiation therapy, the SNF is not responsible for paying for excluded radiation therapy itself when the beneficiary receives it as a hospital outpatient. Similarly, angiography codes and codes for some lymphatic and venous procedures are considered beyond the general scope of services delivered by SNFs. The hospital or CAH must bill the A/B MAC (A) for the services. Excluded services provided to Medicare beneficiaries in swing beds subject to SNF PPS are to be billed on TOB 13x by the swing bed hospital (see §100.1).

Services directly related to these services, defined as services billed for the same place of service and with the same line item date of service as the services listed below, are also excluded from SNF CB, with exceptions as listed below. This language addresses excluding as "directly related" those items and services that are so closely associated with the excluded procedure that it would actually be impossible to perform the excluded procedure itself without them, such as the anesthesia for an excluded ambulatory surgical procedure under §20.1.2.1, or an otherwise bundled diagnostic test when needed to identify the cause of (and appropriate course of treatment for) a medical emergency under §20.1.2.2.

- Note that anesthesia, drugs incident to radiology and supplies will be bypassed by enforcement edits when billed with CT Scans, Cardiac Catheterizations, MRIs, Radiation Therapies, or Angiographies or surgeries.

In general, bypasses also allow CT Scans, Cardiac Catheterization, MRI, Radiation Therapy, Angiography, and Outpatient Surgery HCPCS codes 0001T – 0021T, 0024T – 0026T, or 10021 - 69990 (except those HCPCS codes listed in Major Category I. F.) to process and pay. This includes all other revenue code lines on the incoming claim that have the same line item date of service (LIDOS).

## 20.1.2.1 Outpatient Surgery and Related Procedures - INCLUSION
**(Rev. 3612, Issued: 09-16-16, Effective: 10-18-16, Implementation: 10-18-16)**

Inclusions, rather than exclusions, are given in this one case, because of the great number of surgical procedures that are excluded and can only be safely performed in a hospital operating room setting. It is easier to automate edits around the much shorter list of inclusions under this category, representing minor procedures (such as debriding a mycotic toenail) that, while technically considered "surgery," can nevertheless be safely performed at bedside in the SNF itself. Additionally, this was the approach originally taken in the regulation to present this information.

- Note that anesthesia, drugs, supplies and lab services will be bypassed by enforcement edits when billed with outpatient surgeries excluded from SNF CB.

The bypass is implemented for these services when the line item date of service matches the line item date of service for the excluded surgery.  For revenue codes not requiring a line item date of service (i.e., pharmacy and supplies), the bypass will be implemented when no line item date of service is present.

See §10.1 above for the link to where transmittals providing current lists of HCPCS codes used for Major Category I SNF consolidated billing editing can be found.

## 20.1.2.2 - Emergency Services
**(Rev. 2573, Issued: 10-26-12, Effective: 04-01-13, Implementation: 04-01-13)**

Emergency room services performed in hospitals, including CAHs, are excluded from SNF CB for beneficiaries that are in skilled Part A SNF stays.  Hospitals report emergency room (ER) services under the 045X (Emergency Room -"x" represents a varying third digit) revenue code with a line item date of service (LIDOS) indicating the date the patient entered the ER.  Services related to the ER encounter are also excluded from the SNF CB provision.  "Emergency" services are defined in the regulations at 42 CFR 424.101 as ". . . services that are necessary to prevent death or serious impairment of health and, because of the danger to life or health, require use of the most accessible hospital available and equipped to furnish those services."  In this context, "false alarm" situations may occasionally arise, in which the initial assessment of a beneficiary's condition as life-threatening subsequently proves to be unfounded (for example, where a patient's chest pain and shortness of breath initially appear to be symptoms of a heart attack, but upon subsequent examination turn out to be merely a bad case of indigestion). Such situations still qualify for the emergency services exclusion from SNF CB as long as the initial symptoms provided a reasonable basis for assuming the onset of a medical emergency, even though this assumption ultimately was not borne out by subsequent events.

Where services related to the ER encounter span more than one service date, hospitals must identify those services by appending a modifier ET (Emergency Services) to those line items.  The reporting of the ET modifier will alert CWF that these are related ER services performed on subsequent dates so the SNF CB edits in CWF will be bypassd.

## 20.2 - Services Excluded from Part A PPS Payment and the Consolidated Billing Requirement on the Basis of Beneficiary Characteristics and Election
**(Rev. 2573, Issued: 10-26-12, Effective: 04-01-13, Implementation: 04-01-13)**

**SNF-516**

These services must be provided to specific beneficiaries, either: (A) End Stage Renal Disease (ESRD) beneficiaries, or (B) beneficiaries who have elected hospice, by specific licensed Medicare providers, and are excluded from SNF PPS and consolidated billing. SNFs will not be paid for Category II.A services (dialysis, etc.) when the SNF is the place of service.  To receive Medicare payment, these services must be provided in a

renal dialysis facility.  Hospices must also be the only type of provider billing hospice services.

In transmittals for A/B MAC (A) billing that provide the annual update list of HCPCS codes affected by SNF consolidated billing, such services are referred to as "Major Category II" of SNF consolidated billing editing.  See §10.1 above for the link to where transmittals providing current lists of HCPCS codes used for edits for these types of services, known as "Major Category II" in SNF CB editing for A/B MACs (A).

## 20.2.1 – Dialysis and Dialysis Related Services to a Beneficiary With ESRD

**(Rev. 4001, Issued: 03-16-18, Effective: 06-19-18, Implementation: 06-19-18)**

Beneficiaries with ESRD may receive dialysis and dialysis related services from a hospital-based or free-standing RDF, or may receive home dialysis supplies and equipment from a supplier. The following services are excluded from SNF CB:

- Certain dialysis services and supplies, including any related necessary ambulance services;

- Home dialysis supplies and equipment, self-care home dialysis support services, and institutional dialysis services and supplies (other than those furnished or arranged for by the SNF itself) are not included in the SNF Part A PPS rate. These services may be billed separately to the A/B MAC (A) by the ESRD facility as appropriate; dialysis supplies and equipment may be billed to the Durable Medical Equipment Medicare Administrative Contractor (DME MAC) by the supplier; and

- Erythropoiesis Stimulating Agents (ESAs) for certain dialysis patients, subject to methods and standards for its safe and effective use (see 42 CFR 494.80(a)(2) and (a)(4), 494.90(a)(4), and 494.100) may be billed by the RDF to the A/B MAC (A), or by the retail pharmacy to the DME MAC.

By contrast, services that fall outside the scope of the Part B dialysis benefit do not qualify for the dialysis exclusion from SNF CB. Similarly, the SNF CB exclusion described above for ESAs does not encompass situations involving their use for a **non-dialysis** purpose (such as ameliorating the side effects of chemotherapy treatments). The Part B dialysis benefit generally does not cover dialysis for those beneficiaries who do not have ESRD. However, an exception involves "acute" dialysis (HCPCS code G0491), for patients who do not have ESRD but require dialysis temporarily following an acute kidney injury (AKI) from a severe medical trauma (such as a drug overdose or a traffic accident). In contrast to maintenance dialysis for ESRD patients (who, in the absence of a kidney transplant, would remain on periodic dialysis indefinitely), there is an expectation with acute dialysis that the patient's own kidneys will eventually recover and resume their normal function. For services furnished on or after January 1, 2017, section 808(a)

of Public Law 114-27 added acute dialysis to the scope of the Part B dialysis benefit, thereby effectively adding such services to the scope of the dialysis exclusion from SNF CB as well.

## 20.2.1.1 - ESRD Services
**(Rev. 1252, Issued:  05-25-07; Effective:  10-01-06; Implementation:  08-27-07)**

Home dialysis supplies and equipment, self-care home dialysis support services, and institutional dialysis services and supplies (other than those that are furnished or arranged for by the SNF itself) are not included in the Part A PPS payment.  They may be billed separately to the A/B MAC (A) by the hospital or ESRD facility as appropriate.

Specific coding is used to differentiate dialysis and related services that are excluded from SNF consolidated billing for ESRD beneficiaries in three cases:

   1. When the services are provided in a renal dialysis facility (RDF) (including ambulance services to and from the RDF if medically necessary);

   2. Home dialysis when the SNF constitutes the home of the beneficiary; and

   3. When ESA drugs are used for ESRD beneficiaries in conjunction with dialysis, and given by the RDF.

Note that SNFs may not be paid for home dialysis supplies.

## 20.2.1.2 - Coding Applicable to Dialysis Services Provided in a Renal Dialysis Facility (RDF) or Home
**(Rev. 1252, Issued:  05-25-07; Effective:  10-01-06; Implementation:  08-27-07)**

Providers should review Chapter 8, Outpatient ESRD Hospital, Independent Facility, and Physician/Supplier Claims, for coding applicable to services provided in a Renal Dialysis Facility.

## 20.2.2 - Hospice Care for a Beneficiary's Terminal Illness
**(Rev.4163, Issued: 11-02-18, Effective: 12-04-18, Implementation: 12-04-18)**

Hospice care related to a beneficiary's terminal condition is excluded from SNF PPS and consolidated billing.  This is because section 1862(a)(18) of the Social Security Act (the Act) specifies that SNF consolidated billing applies to "…covered skilled nursing facility services described in section 1888(e)(2)(A)(i)…"  Section 1888(e)(2)(A)(i) of the Act, in turn, defines "covered skilled nursing facility services" specifically in terms of (I) Part A SNF services, along with (II) those non-excluded services that (if not for the enactment of SNF consolidated billing) would be types of services "…for which payment may be made **under Part B**…" (emphasis added). Hospice services would not fall within the scope of clause (I) above because, unlike the **diagnostic** and **therapeutic** services covered under the Part A SNF benefit (see §1862(a)(1)(A) of the Act), hospice services

are **palliative** (see §1862(a)(1)(C) of the Act). Hospice services also would not fall within the scope of clause (II) above, because this clause encompasses services that, if not for the enactment of consolidated billing, would be separately coverable **under Part B**, whereas the hospice benefit is a **Part A** benefit. Hospice services for terminal conditions are identified with the following types of bill: 81X or 82X.  Services unrelated to the beneficiary's terminal condition are designated by the presence of condition code 07. Such unrelated services are included in SNF PPS and consolidated billing.

## 20.3 - Other Services Excluded from SNF PPS and Consolidated Billing
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

The following services may be billed separately under Part B by the rendering provider, supplier, or practitioner (other than the SNF that receives the Part A PPS payment) and paid to the entity that furnished the service.  These services may be provided by any Medicare provider licensed to provide them, other than the SNF that receives the Part A PPS payment, and are excluded from Part A PPS payment and the requirement for consolidated billing, and are referred to as "Major Category III" for consolidated billing edits applied to claims submitted to A/B MACs (A).

- A medically necessary ambulance trip (other than a transfer to another SNF) that transports a beneficiary to the SNF for the initial admission or from the SNF following a final discharge, or that occurs pursuant to the offsite provision of Part B dialysis services (see section 20.3.1 for additional situations involving ambulance transportation);

- Certain chemotherapy (that is, anti-cancer) drugs.  The chemotherapy exclusion applies solely to the particular chemotherapy codes designated under Major Category III.A of the SNF website's A/B MAC (A) Annual Update.  These same codes also appear on the list of exclusions in File 1 of the SNF website's A/B MAC (B) Annual Update (though not displayed as a separate subcategory).  The excluded chemotherapy codes serve to identify those high-intensity chemotherapy drugs that are not typically administered in a SNF, are exceptionally expensive, or require special staff expertise to administer.  By contrast, chemotherapy drugs that are relatively inexpensive and are administered routinely in SNFs do not qualify for this exclusion and, thus, remain subject to SNF CB.  Further, this exclusion would not encompass any related items that, while commonly furnished in conjunction with chemotherapy, are not themselves inherently chemotherapeutic in nature (that is, they specifically address the side effects of the chemotherapy rather than actively fighting the cancer itself).  Examples of such chemotherapy-related drugs would include anti-emetics (anti-nausea drugs), as well as drugs that function as an adjunct to an anti-emetic, such as an anti-anxiety drug that helps to relieve anticipatory nausea.  Even when furnished in conjunction with a chemotherapy drug that is itself excluded (and, thus, separately payable under Part B), these related drugs would remain subject to SNF CB.  Similarly, if a drug designated by one of the excluded chemotherapy codes

is prescribed for a use that is not actually associated with fighting cancer, it would no longer be considered an excluded "chemotherapy" drug in such an instance, because it is not being used for a chemotherapeutic purpose within the meaning of this exclusion.

- Certain chemotherapy administration services.  The chemotherapy administration codes are included in SNF PPS payment for beneficiaries in a Part A stay when performed alone or with other surgery, but are excluded if they occur with the same line item date of service as an excluded chemotherapy agent.  A chemotherapy agent must also be billed when billing these services, and physician orders must exist to support the provision of chemotherapy;

- Certain radioisotope services;

- Certain customized prosthetic devices (see §10);

- Effective for items and services furnished on or after October 1, 2021, certain blood clotting factors indicated for the treatment of hemophilia and other bleeding disorders;

- The transportation costs of electrocardiogram equipment (HCPCS code R0076), but only with respect to those for electrocardiogram test services furnished during 1998; and

- All services provided to risk-based MCO beneficiaries.  These beneficiaries may be identified with a label attached to their Medicare card and/or a separate health insurance card from an MCO indicating all services must be obtained or arranged through the MCO (as noted previously in §10, consolidated billing applies only to Medicare fee-for-service beneficiaries).

The HCPCS code ranges for chemotherapy, chemotherapy administration, radioisotopes, customized prosthetic devices, and blood clotting factors are set in statute.  The statute also gives the Secretary authority to make modifications in the particular codes that are designated for exclusion within each of these service categories.  See §10.1 above for the link to where transmittals providing current lists of HCPCS codes used for Major Category III SNF consolidated billing editing for A/B MACs (A) can be found.

## 20.3.1 - Ambulance Services
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

The following ambulance transportation and related ambulance services for residents in a Part A stay are not included in the Part A PPS payment.  Except for specific exclusions, consolidated billing includes those medically necessary ambulance trips that are furnished during the course of a covered Part A stay.  A/B MACs (A), (B), (HHH), and

DME MACs are responsible for assuring that payment is made only for ambulance services that meet established coverage criteria.

In most cases, ambulance trips are excluded from consolidated billing when resident status has ended.  The ambulance company then must bill the A/B MAC (A), (B), or (HHH), or DME MAC (as appropriate) directly for payment.  Listed below are a number of specific circumstances under which a beneficiary may receive ambulance services that are covered by Medicare, but excluded from consolidated billing.

The following ambulance services may be billed as Part B services by the supplier in the following situations only.

- The ambulance trip is to the SNF for admission (the second character (destination) of any ambulance HCPCS modifier is N (SNF) other than modifier QN, and the date of service is the same as the SNF 21X admission date.);

- The ambulance trip is from the SNF after discharge, to the beneficiary's home (the first character (origin) of any HCPCS ambulance modifier is N (SNF), the second character (destination) of the HCPCS ambulance modifier is R (Residence), and date of ambulance service is the same date as the SNF through date).  Note: this includes beneficiaries discharged home to receive services from a Medicare-participating home health agency under a plan of care;

- The ambulance trip is to or from a hospital based or nonhospital based ESRD facility (the first or second character (origin or destination) of the HCPCS ambulance modifier is N (SNF), and the other character of the HCPCS ambulance modifier is G (Hospital-based dialysis facility) or J (Non-hospital based dialysis facility)) for the purpose of receiving dialysis and related services excluded from consolidated billing.

- The ambulance trip is from the SNF to a Medicare-participating hospital or a CAH for an inpatient admission (the first character (origin) of the HCPCS ambulance modifier is N (SNF), and the second character (destination) of the HCPCS modifier is H).

- The ambulance trip follows a formal discharge or other departure from the SNF to any destination other than another SNF, and the beneficiary does not return to that or any other SNF before the following midnight; and

- An ambulance trip that conveys a beneficiary to a hospital or CAH and back to the SNF, for the specific purpose of receiving emergency or other excluded services (see section 20.1.2 above for list of other excluded services).  As discussed in section 20.1.2, the receipt of these exceptionally intensive outpatient hospital services has the effect of temporarily suspending the beneficiary's status as an SNF "resident" for CB purposes with respect to those services; moreover, once suspended in this manner, the beneficiary's "resident" status would not resume until he or she actually arrives back at the SNF.  Accordingly, the **entire**

related ambulance roundtrip, both the outbound (SNF-to-hospital) portion and the return (hospital-to-SNF) portion, would be excluded from SNF CB and billed separately under Part B.

The following ambulance services are included in SNF CB and may **not** be billed as Part B services to the A/B MAC (A), (B), or (HHH) when the beneficiary is in a Part A stay:

- Transfers Between Two SNFs:  Under the regulations at 42 CFR 411.15(p)(3)(iv), the day of departure from SNF 1 is a covered Part A day (to which consolidated billing would apply) only if the beneficiary's admission to SNF 2 occurs before the following midnight (the first and second character of the ambulance modifier is N).  Patient Status is 03.  An ambulance trip that is medically necessary to effect this type of SNF-to-SNF transfer would be bundled back to SNF 1, as in this specific situation the beneficiary would continue to be considered a "resident" of SNF 1 for CB purposes up until the actual point of admission to SNF 2.  However, it should be noted that in addition to the "medical necessity" criterion in the regulations at 42 CFR 409.27(c) pertaining specifically to ambulance transports under the SNF benefit (i.e., the patient's medical condition is such that transportation by any means other than ambulance would be contraindicated), coverage in this context also involves the underlying requirement of being reasonable and necessary for diagnosing or treating the patient's condition.  For example, a SNF-to-SNF transfer would be considered reasonable and necessary in a situation where needed care is unavailable at the originating SNF, thus necessitating a transfer to the receiving SNF in order to obtain that care.  By contrast, a SNF-to-SNF transfer that is prompted by non-medical considerations (such as the patient's preference to be placed in the receiving SNF) is not considered reasonable and necessary for diagnosing or treating the patient's condition and, thus, would not be bundled back to the originating SNF.

- Ambulance transports to or from a diagnostic or therapeutic site other than a hospital or renal dialysis facility (e.g., an independent diagnostic testing facility (IDTF), cancer treatment center, radiation therapy center, wound care center, etc.).  The ambulance transport is included in the SNF PPS rate if the first or second character (origin or destination) of any HCPCS code ambulance modifier is "D" (diagnostic or therapeutic site other than "P" or "H"), and the other modifier (origin or destination) is "N" (SNF).  The first SNF is responsible for billing the services to the A/B MAC (A).

- An SNF resident's ambulance roundtrip to a physician's office (first or second character (origin or destination) of any HCPCS code ambulance modifier is "P" (physician's office), and the other modifier (origin or destination) is "N" (SNF)) is subject to SNF CB and would remain the responsibility of the SNF, because even though the physician's services are themselves excluded from SNF CB, this exclusion does not affect the beneficiary's overall status as an SNF "resident" for CB purposes.  Further, while a physician's office is not normally a covered destination under the **separate Part B** ambulance benefit, the SNF benefit's Part A coverage of ambulance transportation under the regulations at 42 CFR

409.27(c) incorporates **only** the Part B ambulance benefit's general medical necessity requirement at 42 CFR 410.40(e)(1), and not any of the latter benefit's more detailed coverage restrictions regarding destinations.

See chapter 15 for additional information on Part B coverage of Ambulance Services.

In contrast to the ambulance coverage described above, Medicare simply does not provide any coverage at all under Part A **or** Part B for any **non-ambulance** forms of transportation, such as ambulette, wheelchair van, or litter van.  Further, as noted previously, in order for the Part A SNF benefit to cover transportation via ambulance, the regulations at 42 CFR 409.27(c) specify that the ambulance transportation must be **medically necessary,** that is, the patient's condition is such that transportation by any means other than ambulance would be medically contraindicated.

This means that in a situation where it is medically feasible to transport an SNF resident by some means other than an ambulance, for example, via wheelchair van, the wheelchair van would not be covered (because Medicare does not cover any non-ambulance forms of transportation), and an ambulance **also** would not be covered (because the use of an ambulance in such a situation would not be medically necessary).  With respect to noncovered services for which a resident may be financially liable, the SNF is required under the regulations at 42 CFR 483.10(g)(18) to ". . . inform each resident before, or at the time of admission, and periodically during the resident's stay, of services available in the facility and of charges for those services, including any charges for services not covered under Medicare/Medicaid or by the facility's per diem rate."

## 20.4 - Screening and Preventive Services
**(Rev.4163, Issued: 11-02-18, Effective: 12-04-18, Implementation: 12-04-18)**

The Part A SNF benefit is limited to services that are reasonable and necessary to "diagnose or treat" a condition that has already manifested itself.  Accordingly, this benefit does not encompass screening services (which serve to check an at-risk individual for the possible presence of a specific latent condition, before it manifests any overt symptoms to diagnose or treat) or preventive services (which are aimed at warding off the occurrence of a particular condition altogether rather than diagnosing or treating it once it occurs).  Coverage of screening and preventive services (e.g., screening mammographies, pneumococcal pneumonia vaccine, influenza vaccine, hepatitis B vaccine) is a separate Part B inpatient benefit when rendered to beneficiaries in a covered Part A stay and is paid outside of the Part A payment rate. For this reason, screening and preventive services must not be included on the global Part A bill.  However, screening and preventive services remain subject to consolidated billing and, thus, must be billed separately by the SNF under Part B.

Accordingly, even though the SNF itself must bill for these services, it submits a separate Part B inpatient bill for them rather than including them on its global Part A bill. Screening and preventive services must be billed with a 22X type of bill. Swing Bed providers must use TOB 12x for eligible beneficiaries in a Part A SNF level of care. **NOTE:** For beneficiaries residing in the Medicare non-certified area of the facility, these

services should be billed on a 23x type of bill.  In transmittals for A/B MAC (A) billing providing the annual update list of HCPCS codes affected by SNF consolidated billing, such services are referred to as "Major Category IV".  See §10.1 above for the link to where transmittals providing current lists of HCPCS codes used for Major Category IV can be found.

There are certain limited circumstances in which a vaccine would no longer be considered preventive in nature, and this can affect how the vaccine is covered.  For example, while a booster shot of tetanus vaccine would be considered preventive if administered routinely in accordance with a recommended schedule, it would not be considered preventive when administered in response to an actual exposure to the disease (such as an animal bite, or a scratch on a rusty nail). In the latter situation, such a vaccine furnished to an SNF's Part A resident would be considered therapeutic rather than preventive in nature, as its use is reasonable and necessary for treating an existing condition.

In terms of billing for an SNF's Part A resident, a vaccine that is administered for therapeutic rather than preventive purposes would be included on the SNF's global Part A bill for the resident's covered stay.  Alternatively, if a vaccine is preventive in nature and is one of the three types of vaccines (i.e., pneumococcal pneumonia, hepatitis B, or influenza virus) for which a Part B benefit category exists (see §50.4.4.2 of the Medicare Benefit Policy Manual, Chapter 15), then the SNF would submit a separate Part B bill for the vaccine.  (Under section 1888(e)(9) of the Social Security Act (the Act) and the implementing regulations at 42 CFR 413.1(g)(2)(ii), payment for an SNF's Part B services generally is made in accordance with the applicable fee schedule for the type of service being billed (see the Medicare Claims Processing Manual, Chapter 7, §10.5). However, when these three types of vaccines are furnished in the SNF setting, Part B makes payment in accordance with the applicable instructions contained in the Medicare Claims Processing Manual, Chapter 7, §80.1, and Chapter 18, §10.2.2.1.)

If the resident receives a type of vaccine that is preventive in nature but for which no Part B benefit category exists (e.g., diphtheria), then the vaccine would not be covered under either Parts A or B and, as a consequence, would become coverable under the Part D drug benefit.  This is because priority of payment between the various parts of the Medicare law basically proceeds in alphabetical order:  Part A is primary to Part B (see section 1833(d) of the Act), and both Parts A and B are primary to Part D (see section 1860D-2(e)(2)(B) of the Act).

Further, it is worth noting that unlike preventive services covered under Part B, those preventive vaccines covered under Part D are not subject to SNF CB, even when furnished to an SNF's Part A resident. This is because section 1862(a)(18) of the Act specifies that SNF CB applies to ". . . covered skilled nursing facility services described in section 1888(e)(2)(A)(i) . . . ." Section 1888(e)(2)(A)(i) of the Act, in turn, defines "covered skilled nursing facility services" specifically in terms of (I) Part A SNF services, along with (II) those non-excluded services that (if not for the enactment of SNF CB) would be types of services ". . . for which payment may be made **under Part B** . . ." (emphasis added).  Preventive and screening services as a class would not fall within the

scope of clause (I) above because, as discussed previously, the **diagnostic** and **therapeutic** services covered under the Part A SNF benefit (see §1862(a)(1)(A) of the Act) do not encompass **preventive** services (see §1862(a)(1)(B) of the Act) or **screening** services (see §§1862(a)(1)(F), (G), (H), (L), (M), and (N) of the Act). Similarly, those Part D preventive drugs (such as preventive vaccines) for which **no** Part B benefit category exists would not fall within the scope of clause (II) above, because this clause encompasses services that, if not for the enactment of CB, would be separately coverable **under Part B**.

Formerly, bone mass measurement (screening) was listed as a preventive service excluded from SNF consolidated billing.  This was incorrect.  Such services are diagnostic, not screening, procedures, and therefore are bundled into SNF PPS payment and subject to consolidated billing.

## 20.5 - Therapy Services
**(Rev. 2573, Issued: 10-26-12, Effective: 04-01-13, Implementation: 04-01-13)**

Therapy services are edited as inclusions, rather than exclusions, to consolidated billing. Physical therapy, speech-language pathology services, and occupational therapy are bundled into the SNF's global per diem payment for a resident's covered Part A stay. They are also subject to the SNF "Part B" consolidated billing requirement (for services furnished to SNF residents during **noncovered** stays) and must be billed by the SNF alone for its Part B residents on a 22x type of bill.

As noted in section 10.3 of this chapter, therapy services furnished to SNF residents remain subject to consolidated billing even when performed by a type of practitioner, such as a physician, whose services would otherwise be excluded (see section 1888(e)(2)(A)(ii) of the Social Security Act and the regulations at 42 CFR 411.15(p)(1)(i)).  Further, while most services either clearly fall within the category of therapy or clearly fall outside of it,  there are a few services (such as certain debridement codes) which, based on the specific type of practitioner involved, are sometimes considered "therapy" services and other times not.  However, because the consolidated billing provision focuses on the nature of the therapy service itself (rather than the type of practitioner who happens to be performing it), these "sometimes therapy" codes are **always** considered therapy services in the specific context of SNF consolidated billing.  This means that a practitioner who furnishes such a service to an SNF resident must always look to the SNF itself (rather than to Part B) for payment.

SNF residents that fall below a Medicare skilled level of care may be moved out of the SNF or certified distinct part unit (DPU) to the Medicare non-certified area of the facility. In doing so, the beneficiary is no longer subject to the SNF consolidated billing rule and therapy services may be billed directly to Medicare by the provider rendering the service or if billed by the SNF should be submitted on a 23x type of bill.  If the entire facility qualifies as a Medicare-certified SNF, all Part B therapies must continue to be billed by the SNF on a 22x type of bill.  The CWF SNF CB therapy edit will be bypassed for 22x bill types that contain therapy services when those line item dates of service fall within a non-covered period reported on an inpatient 21x bill type.  For additional instructions, see

Chapter 7, SNF Part B Billing, section 10.1.  In transmittals for A/B MAC (A) billing providing the annual update list of HCPCS codes affected by SNF consolidated billing, such services are referred to as "Major Category V" of SNF consolidated billing.  See section 10.1 above for the link to where transmittals providing current lists of HCPCS codes used for Major Category V can be found.

## 20.6 - SNF CB Annual Update Process for A/B MACs (A)
**(Rev. 3230, Issued: 04-03-15, Effective: 06-15-15, Implementation: 06-15-15)**

Barring any delay in the Medicare Physician Fee Schedule, CMS will provide the new Annual Update code file to CWF by November 1. Should this date change, CWF will be notified through the appropriate mechanism. All future updates will be submitted via a Recurring Update Notification form. These Recurring Update Notifications also describe how the changes will be implemented.

The CWF contractor shall compare the new code list for Major Categories I through V to the codes in the current edits. Codes that appear on the new list, but not in the current edit, shall be added to the edit.

CMS will make a determination as to which codes should be deleted from which edits. This mechanism will allow for any changes in professional component/technical component designations to be correctly coded for edits and for deleted codes and codes no longer valid for Medicare purposes as of the end of the calendar year, to continue to pay correctly for prior dates of service.

CMS will respond to the list provided by the CWF contractor and provide the determination on the codes to the CWF contractor.

The CWF contractor will delete codes from the edits per the CMS determination.

A/B MACs (A), a term used to indicate both Part A and Part B institutional services, shall continue to respond to rejects and unsolicited responses received from CWF per current methodology.  A/B MACs (A) shall reopen and reprocess any claims brought to their attention for services that prior to this update were mistakenly considered to be subject to consolidated billing and therefore, not separately payable.  A/B MACs (A) need not search claims history to identify these claims.  Prior to January 1 of each year, a new code file will be posted to the CMS Web site at: http://www.cms.hhs.gov/SNFConsolidatedBilling/.  Should this date change, A/B MACs (A) will be notified through the appropriate mechanism.

Coding changes throughout the year may also be made as necessary through a quarterly update process.

As soon as the new code file is posted to the CMS Web site, through their Web sites and list serves, A/B MACs (A) shall notify providers of the availability of the new file.

## 30 - Billing SNF PPS Services
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

SNFs and hospital swing bed providers are required to report inpatient Part A PPS billing data as follows.  Refer to the Medicare Claims Processing Manual, Chapter 25, "Completing and Processing the Form CMS-1450 Data Set," for a description of claim data elements.

- In addition to the required fields identified in Chapter 25, SNFs must also report occurrence span code "70" to indicate the dates of a qualifying hospital stay of at least three consecutive days which qualifies the beneficiary for SNF services.

- Separate bills are required for each Federal fiscal year for admissions that span the annual update effective date (October 1).

- Use Type of Bill 21X for SNF inpatient services or 18X for hospital swing bed services.

- Revenue Code 0022.  This code indicates that this claim is being paid under the SNF PPS.  This revenue code can appear on a claim as often as necessary to indicate different HIPPS Rate Code(s) and assessment periods.

- Effective for claims with dates of service on or after January, 1 2011, there must be an occurrence code 50 (assessment date) for each assessment period represented on the claim with revenue code 0022.  The date of service reported with occurrence code 50 must contain the ARD.  An occurrence code 50 is not required with default HIPPS code AAAxx (where 'xx' equals varying digits) or ZZZZZ October 1, 2019 and after.  In addition, for OMRA related AIs 05, 06, 0A, 0B, 0C, 12, 13, 14, 15, 16, 17, 1A, 1B, 1C, 24, 25, 26, 2A, 2B, 2C, 34, 35, 36, 3A, 3B, 3C, 44, 45, 46, 4A, 4B, 4C, 54, 55, 56, 5A, 5B, 5C where 2 HIPPS may be produced by one assessment, providers need only report one occurrence code 50 to cover both HIPPS codes.  As of October 1, 2019, SNF PDPM changes are effective (see §§120ff.).

- HCPCS/Rates field must contain a 5-digit "HIPPS Code".  The first three positions of the code contain the RUG group and the last two positions of the code contain a 2-digit assessment indicator (AI) code.  See Chapter 6 of the MDS RAI manual for valid RUG codes and AI codes.  As of October 1, 2019, SNF PDPM changes are effective (see §§120ff.).

- SNF and SB PPS providers must bill the HIPPS codes on the claim form in the order in which the beneficiary received that level of care.

- Service Units must contain the number of covered days for each HIPPS rate code.

**NOTE:** Fiscal Intermediary Shared System (FISS) requirement:

> The sum of all covered units reported on all revenue code 0022 lines should be equal to the covered days field less the number of days reported in an OSC 77.  (**NOTE**: The covered units field is utilized in FISS and has no mapping to the 837 or paper claim).

- Total Charges should be zero for revenue code 0022.

- When a HIPPS rate code of RUAxx, RUBxx, RUCxx, RULxx and/or RUXxx is present, a minimum of two rehabilitation therapy ancillary codes are required (revenue code 042x and/or, 043x and/or, 044x).  When a HIPPS rate code of RHAxx, RHBxx, RHCxx, RHLxx, RHXxx, RLAxx, RLBxx, RLXxx, RMAxx, RMBxx, RMCxx, RMLxx, RMXxx, RVAxx, RVBxx, RVCxx, RVLxx, and/or RVXxx is present, a minimum of one rehabilitation therapy ancillary revenue code is required (revenue code 042x, 043x, or 044x.  Bills that are missing required rehabilitation therapy ancillary revenue codes are to be returned to the SNF for resubmission.  As of October 1, 2019, SNF PDPM changes are effective (see §§120ff.).

- The accommodation revenue code 018x, leave of absence is reported when the beneficiary is on a leave of absence and is not present at the midnight census taking time.

- Principal Diagnosis Code - SNFs enter the ICD-CM code for the principal diagnosis in the appropriate form locator.  The code must be reported according to Official ICD-CM Guidelines for Coding and Reporting, as required by the Health Insurance Portability and Accountability Act (HIPAA), including any applicable guidelines regarding the use of V codes for ICD-9.  The code must be the full ICD-CM diagnosis code, including all five digits (for ICD-9) or all seven digits (for ICD-10) where applicable.

  - Other Diagnosis Codes Required - The SNF enters the full ICD-CM codes for up to eight additional conditions in the appropriate form locator. Medicare does not have any additional requirements regarding the reporting or sequence of the codes beyond those contained in the ICD-CM guidelines.

## 30.1 - Health Insurance Prospective Payment System (HIPPS) Rate Code
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

The HIPPS rate code consists of the three-character resource utilization group (RUG) code that is obtained from the "Grouper" software program followed by a 2-digit assessment indicator (AI) that specifies the type of assessment associated with the RUG code obtained from the Grouper. Providers may access the Resident Assessment Instrument (RAI) manual located at the following link for assessment-related issues: http://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/index.html.

SNFs must use the version of the Grouper software program identified by CMS for national PPS as described in the Federal Register for that year. The Grouper translates the data in the Long Term Care Resident Instrument into a case-mix group and assigns the correct RUG code. Effective for dates of service on or after October 1, 2010, the Grouper will automatically assign the 2-digit AI.

Providers may access the following link for HIPPS code information: http://www.cms.hhs.gov/ProspMedicareFeeSvcPmtGen/02_HIPPSCodes.asp#TopOfPage

The above link includes documents that contain the complete list of RUG codes and AIs billed for Part A SNF stays. Definitions and usage of each code are included. In addition, a master file of all valid/termed HIPPS codes is provided.

The HIPPS rate code that appears on the claim must match the assessment that has been transmitted and accepted by the State in which the facility operates. The SNF may bill the program only after:

- An assessment has been completed and submitted to the State RAI Database;

- A Final Validation Report indicating that the assessment has been accepted by the state; and

- The covered day has actually been used.

SNFs that submit claims that have not completed this process will not be paid. It is important to remember that the record will be accepted into the State RAI database, even if the calculated RUG code differs from the submitted values. The error will be flagged on the final validation report by issuing a warning message and listing the correct RUG code. When such discrepancies occur, the RUG code reported on the Final Validation Report shall be used for billing purposes. As of October 1, 2019, SNF PDPM changes are effective (see §§120ff.).

## 30.2 – Coding PPS Bills for Ancillary Services
**(Rev. 3230, Issued: 04-03-15, Effective: 06-15-15, Implementation: 06-15-15)**

When coding PPS bills for ancillary services associated with a Part A inpatient stay, the traditional revenue codes will continue to be shown, e.g., 0250 - Pharmacy, 042x -

Physical Therapy, in conjunction with the appropriate entries in Service Units and Total Charges.

- SNFs are required to report the number of units based on the procedure or service.

- For therapy services, that is revenue codes 042x, 043x, and 044x, units represent the number of calendar days of therapy provided. For example, if the beneficiary received physical therapy, occupational therapy or speech-language pathology on May 1, that would be considered one calendar day and would be billed as one unit.

- SNFs are required to report the actual charge for each line item, in Total Charges.

## 30.3 – Adjustment Requests
**(Rev. 3230, Issued: 04-03-15, Effective: 06-15-15, Implementation: 06-15-15)**

Adjustment requests based on corrected assessments must be submitted within 120 days of the service "through" date. The "through" date will be used to calculate the period during which adjustment requests may be submitted based on corrected RAI assessments. The "through" date indicates the last day of the billing period for which the HIPPS code is billed. Adjustment requests based on corrected assessments must be submitted within 120 days of the "through" date on the bill. For HIPPS changes resulting from an MDS correction, providers must append a condition code D2 on their adjustment claim. An edit is in place to limit the time for submitting this type of adjustment request to 120 days from the service "through" date.

The CMS expects that most HIPPS code corrections will be made during the course of the beneficiary's Medicare Part A stay. Therefore, providers that routinely submit corrections after the beneficiary's Part A stay has ended may be subject to focused medical review.

Adjustment requests to change a HIPPS code may not be submitted for any claim that has already been medically reviewed, such claims are identified in the FISS system by an indicator on the claim record. This applies whether or not the medical review was performed either pre- or post-payment. All adjustment requests submitted are subject to medical review. Information regarding medical review is located in the Medicare Program Integrity Manual.

## 30.4 - SNF PPS Pricer Software
**(Rev. 3230, Issued: 04-03-15, Effective: 06-15-15, Implementation: 06-15-15)**

The Balanced Budget Act (BBA) of 1997 (Public Law 105-33) mandated the implementation of a per diem prospective payment system (PPS) for skilled nursing facilities (SNFs), covering all costs (routine, ancillary, and capital) of covered SNF services furnished to beneficiaries under Part A of the Medicare program.

Effective for cost reporting periods beginning on or after July 1, 1998, all skilled nursing services billed on TOB 21x will be paid based on calculations made by the SNF Pricer. The SNF Pricer operates as a module within CMS' claims processing systems. The SNF Pricer makes all payment calculations applicable under SNF PPS. Medicare claims processing systems must send an input record for each HIPPS code reported on the claim to Pricer and Pricer will return an output record to the shared systems. The Pricer is available electronically to the shared systems and is updated at least annually. A PC version of the SNF Pricer Program can be found at:
https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PCPricer/SNF.html

The following describes the elements of SNF PPS claims that are used in the SNF PPS Pricer and the logic that is used to make payment determinations. No part of the Pricer logic is required to be incorporated into a SNF's billing system in order to bill Medicare. The following is presented for A/B MACs (A) and as information for the SNFs, in order to help SNFs understand their SNF PPS payments and how they are determined.

## 30.4.1 - Input/Output Record Layout
*(Rev. 11109, Issued: 11-04-21 Effective:10-01-22, Implementation:01-03-22)*

The SNF Pricer input/output file will be 300 bytes in length. The required data and format are shown below.

| File Position | Format | Title | Description |
|---|---|---|---|
| 1-4 | X(4) | MSA | Input item: The metropolitan statistical area (MSA) code. Medicare claims processing systems pull this code from field 13 of the provider specific file. |
| 5-9 | X(5) | CBSA | Input item: Core-Based Statistical Area |
| 10 | X | SPEC-WI-IND | Input item (if applicable) :Special Wage Index Indicator<br><br>Valid Values: **Y** (yes) or **N** (no) |
| 11-16 | X(6) | SPEC-WI | Input item (if applicable): Special Wage Index |
| 17-21 | X(5) | HIPPS-CODE | Input Item: Health Insurance Prospective Payment System Code – Medicare claims processing systems must copy the HIPPS code reported |

| File Position | Format | Title | Description |
|---|---|---|---|
| | | | by the provider on each 0022 revenue code line |
| 22-29 | 9(8) | FROM-DATE | Input item: The statement covers period "from" date, copied from the claim form. Date format must be CCYYMMDD. |
| 30-37 | 9(8) | THRU-DATE | Input item: The statement covers period "through" date, copied from the claim form.  Date format must be CCYYMMDD. |
| 38 | X | *QRP-IND* | *Input Item-Effective January 1, 2022 field renamed QRP-IND from FED-PPS-BLEND.*<br><br>Input Item: Effective October 1, 2017, MACs shall populate the FED PPS BLEND IND field in the PSF with a "1" to indicate the SNF did not meet the quality reporting requirements.- |
| 39-45 | 9(05)V9(02) | SNF-FACILITY RATE | Input item: Rate based on each SNF's historical costs (from (from A/B MAC (A) audited cost reports) including exception payments.<br><br>**NOTE:**  All facilities have been paid at the full federal rate since FY 2002. |
| 46-52 | X(7) | SNF-PRIN-DIAG-CODE | Input item: The principle diagnosis code, copied from the claim form. Must be three to seven positions left justified with no decimal points. |
| 53-59 | X(7) | SNF-OTHER-DIAG-CODE2 | Input item: Additional Diagnosis Code, copied from the claim form, if present, must be three to seven positions left justified with no decimal points. |
| 60-220 | Defined above | Additional Diagnosis data | Input item: Up to twenty-three additional diagnosis codes accepted from claim. Copied from the claim form.  Must be three to seven |

| File Position | Format | Title | Description |
|---|---|---|---|
| | | | positions left justified with no decimal points. |
| 221-228 | 9(06)V9(02) | SNF-PAYMENT RATE | Output Item: The Calculated TOTAL amount received by the SNF based on the days received. Effective FY 2018, this amount reflects VBP adjustment. **NOTE:** Effective October 1, 2019, the previously calculated RUG per diem rate is replaced by the PDPM Calculated TOTAL amount received by the SNF. |
| 229-230 | 9(2) | SNF-RTC | Output item: A return code set by Pricer to define the payment circumstances of the claim or an error in input data.<br><br>**Payment return code:**<br><br>00   *HIPPS* rate returned<br><br>**Error return codes:**<br><br>*20   INVALID RATE COMPONENT*<br>30 Bad *CBSA* code<br>40 Thru date < July 1, 1998 or Invalid<br>50   Invalid federal blend for that Year-*NO LONGER IN USE*<br>*60   Invalid federal blend-NO LONGER IN USE*<br>61   Federal blend = 0 and SNF<br><br>Thru date < January 1, 2000-*NO LONGER IN USE*<br><br>70   Invalid VBP Multiplier-<br><br>*80   SNF-PDPM-UNITS = ZERO*<br><br>*90   INVALID HIPPS CODE*<br><br>*01   CURRENT-DAYS > 100* |

| File Position | Format | Title | Description |
|---|---|---|---|
| 231-242 | S9V9(11) | VBP-MULTIPLIER | Input item: Medicare systems move this information from field 52 of the provider specific file. |
| 243-250 | S9(06)V9(02) | VBP-PAY-DIFF | Output item: The total SNF VBP adjustment amount, determined by subtracting the SNF VBP adjustment total payment from the SNF PPS payment that would otherwise apply to the line. Added to the claim as a value code QV amount.<br><br>**NOTE:** Effective October 1, 2019, the previously calculated VBP difference per day is replaced by the TOTAL VBP difference amount. |
| 251-252 | 9(02) | SNF-PDPM-UNITS | Input item: The number of service units reported by the SNF on the revenue code 0022 line that is being priced. |
| 253-255 | 9(03) | SNF-PDPM-PRIOR-DAYS | Input item: When pricing the first revenue code 0022 line on a claim, this is the number of prior SNF days identified by FISS from claims history. On later dated revenue code 0022 lines, this is the days from claims history plus any units from any earlier dated. |
| 256-300 | X(45) | FILLER | Blank |

Input records on claims must include all input items. Output records will contain all input and output items.

The Medicare claims processing systems will move the following Pricer output items to the claim record. The return code will be placed in the claim header. The SNF-PAYMENT-RATE amount for each HIPPS code will be placed in the rate field of the appropriate revenue code 0022 line.  The Medicare claims processing systems will multiply the rate on each 0022 line by the number of units that correspond to each line. The system will sum all 0022 lines and place this amount in the "Provider Reimbursement" field minus any coinsurance due from the patient.  For claims with dates of service on or after July 1, 2002, Pricer will compute payment only where the SNF-RTC is 00.

## 30.4.2 – SNF PPS Rate Components
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

The SNF PPS rate for each RUG group consists of 3 components:  a nursing component, a therapy component and a non-case-mix adjusted component.  The following describes the rate components used for SNF PPS:

- The nursing per diem amount is a standard amount which includes direct nursing care and the cost of non-therapy ancillary services required by Medicare beneficiaries.

- The nursing index is based on the amount of staff time, weighted by salary levels, associated with each RUG group.  This index represents the amount of nursing time associated with caring for beneficiaries who qualify for the group.

The nursing per diem amount is case-mix adjusted by applying the nursing index.  The result is the nursing component for that RUG group.

- The therapy per diem amount is a standard amount which includes physical, occupational, and speech-language therapy services provided to beneficiaries in a Part A stay.  Payment varies based on the actual therapy resource minutes received by the beneficiary and reported on the MDS;

- The therapy index is based on the amount of staff time, weighted by salary levels, associated with each RUG group.  This index represents the amount of rehabilitation treatment time associated with caring for beneficiaries who qualify for the group.

If the RUG group is in the Rehabilitation plus Extensive Services or Rehabilitation category, the therapy per diem amount is case-mix adjusted by applying the therapy index.  The result is the therapy component for that Rehabilitation RUG group.

- The non-case-mix therapy component is a standard amount to cover the cost of therapy assessments of beneficiaries who were determined not to need continued therapy services.

If the RUG group is not in the Rehabilitation plus Extensive Services or Rehabilitation category, this payment is added to the rate as therapy component for that RUG group.

- The non-case-mix component is also a standard amount added to the rate for each RUG group to cover administrative and capital-related costs.

  This standard amount is added to all RUG groups.

As of October 1, 2019, SNF PDPM changes are effective (see §§120ff.).

### 30.4.3 - Decision Logic Used by the Pricer on Claims
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

## A. Claims for services furnished prior to October 1, 2019, under RUG-IV

The SNF Pricer shall calculate the rate for each line item with revenue code 0022 on a SNF claim.  The SNF Pricer shall determine the rate using the following information:

> - "HIPPS-CODE" on line item 0022;
> -"CBSA"
> - Per diem amounts defined within the Pricers as types of rate based on the statement covers "THRU-DATE":
> Inpatient rate = Nursing case mix component
> General service rate = Non-case-mix component
> Therapy rate = Therapy non-case mix component
> Rehabilitation rate = Therapy case-mix component
> - Labor and non labor percentages based on the statement covers "THRU-DATE";
> - Wage index, "SNF-FED BLEND" year, and "SNF-FACILITY RATE" based on the statement covers "THRU_DATE"
> - Rate adjustments applicable to the specific RUG code;
> - Nursing index based on the RUG code;
> - Therapy index based on the rehabilitation RUG code;

On input records with TOB 21x (that is, all provider submitted claims and provider or A/B MAC (A) initiated adjustments), Pricer will perform the following calculations in numbered order for each RUG code:

(1)   Multiply the applicable urban or rural inpatient rate depending on CBSA by the nursing index;

(2)   Multiply the applicable urban or rural rehab rate by the therapy index, add to (1);

(3)   For the top 23 RUG categories, add the general service rate to the sum of (1) and (2) for the (non-wage-adjusted) total PPS rate and proceed to step (4); **OR** for the lower 43 RUG categories, add the general service rate to the therapy rate to the sum of (1) and (2) for the (non-wage- adjusted) total PPS rate and proceed to step (4);

(4)   Multiply the sum of (3) by the labor percentage then multiply the product by the applicable wage index and round;

(5)   Multiply the sum of (3) by the non- labor percentage and round;

(6)   Add the product of (5) to the non-labor product in (4) for the (wage-adjusted) total PPS rate.

Conditional Steps completed if applicable after (6):

(6a)  If ICD-10-CM diagnosis code B20 (or, for services furnished prior to October 1, 2015, ICD-9-CM diagnosis code 042) is present, multiply (6) by 2.28.

## B. Claims for services furnished on or after October 1, 2019, under the SNF PDPM

The SNF PDPM Pricer shall calculate the rate for each line item with revenue code 0022 on a SNF claim.  The SNF PDPM Pricer shall determine the rate using the following information:
SNF PRICER uses the REGION IND, HIPPS CODE, QRP-IND & AIDS ADD-ON-IND to CALCULATE THE HCPPS RATES.

1.   CBSA –
   a.   URBAN = 5 numeric characters
   b.   RURAL = 3 spaces & 2 digit state code
   c.   SPECIAL = APPLY SPECIAL WAGE INDEX "IN LIEU" OF CBSA WAGE INDEX
      i.   SPECIAL = SNF-SPEC-WI-IND = '1' ON SNF-INPUT-RECORD and SNF-SPEC-WI-X = 5 numeric characters
      ii.   CBSA-WIR-EFFDATE = '20051001'.

2.   HIPPS CODE - 5 CHARACTERS = 4 alpha/1 numeric character. [on line item 0022]
   Evaluate each of the 1st four characters to select component rates:
   a.   Character # 1 = component rate for Physical Therapy (PT) & Occupational Therapy (OT). There are 16 PDPM Groups "A" thru "P".
   b.   Character # 2 = component rate for Speech Language Pathology  (SLP). There are 12 PDPM Groups "A" thru "L".
   c.   Character # 3 = component rate for Nursing. There are 25 PDPM Groups "A" thru "Y".
   d.   Character # 4 = component for Non-Therapy Ancillary (NTA). There are 6 PDPM Groups "A" thru "F".
   e.   Character # 5 = component for Non-Case Mix (NCM) which do not impact the rates selected, but supply information about Assessment Level.
      i.   5-day assessment =  "1"
      ii.   IPA  = "0"

3.   Non-Case-Mix component is fixed rate based on REGION-IND & QRP-IND [4 options – URBAN, RURAL, URBAN-QRP, & RURAL-QRP applied equally to each payment)

4.   IF SNF-FED-BLEND =1      SET QRP IND TO "Y" identifies that a reduced payment component rate should be selected.

5.   Variable Per Diem adjustment factor applies to PT/OT & NTA components only based on the day-in-stay;

6.   Nursing component is adjusted by factor of 1.18 when AIDS Add-On-Indicator is set to 'Y' ( If input field SNF-PRIN-DIAG-CODE OR [SNF-OTHER-DIAG-CODE2 thru SNF-OTHER-DIAG-CODE25] = 'B20   '.

7. NTA component is adjusted by reassigning a new component rate when AIDS Add-On-Indicator is set to 'Y' (( If input field SNF-PRIN-DIAG-CODE OR [SNF-OTHER-DIAG-CODE2 thru SNF-OTHER-DIAG-CODE25] = 'B20   '.
   a.  If reported NTA group is 'NF', reassigned NTA group is 'NC'
   b.  If reported NTA group is 'NE', reassigned NTA group is 'NB'
   c.  If reported NTA group is 'ND', reassigned NTA group is 'NA'
   d.  If reported NTA group is 'NC, reassigned NTA group is 'NA'
   e.  If reported NTA group is 'NB, reassigned NTA group is 'NA'
   f.  If reported NTA group is 'NA', no reassignment is necessary ('NA' represents the highest per diem component rate).

8.   SNF-PDPM-UNITS  & VBP-MULTIPLIER cannot be = zero

9.   SNF-PDPM-PRIOR DAYS > 100 NF processing HALTS & an ERROR Code is placed in SNF-RTC


On input records with TOB 21x (that is, all provider submitted claims and provider or A/B MAC (A) initiated adjustments), Pricer will perform the following calculations in numbered order
for each SNF input character:

. . . . . . . . . . . . . . . . . . . .

(1)   Capture/select the applicable rate components associated with each HIPPS CODE character from rate tables determined by the Region IND, QRP-IND and AID Add-On IND (applies to Nursing only).

(2)   Compute the PT-OT-FEE ROUNDED =   HIPPS-PT-RATE-COMP + HIPPS-OT-RATE-COMP.

(3)   Compute the PT-OT-PORTION ROUNDED =   PT-OT-FEE * PT-OT-UTIL. (Utilization Days for PT-OT is determined by summing the PT-OT Variable Per Diem factors
  for Total Days (CURRENT-DAYS + PRIOR-DAYS.)).

(4)   Compute the NTA-PORTION ROUNDED = HIPPS-NTA-RATE-COMP * NTA-UTIL.  (Utilization Days for NTA category is determined by summing the NTA Variable Per Diem factors
  for Total Days (CURRENT-DAYS + PRIOR-DAYS.).

(5)   Compute NURS-SLP-NCM-PORTION ROUNDED =   (HIPPS-NURSE-RATE-COMP +   HIPPS-SLP-RATE-COMP +  HIPPS-NCM-RATE-COMP) * CURRENT-DAYS (or SNF-PDPM-UNITS).

(6)   Compute TOT-PDPM-CASEMIX-PERDIEM = (PT-OT-PORTION +   NTA-PORTION +   NURS-SLP-NCM-PORTION).
ALL 3 PORTIONS ARE ADDED TOGETHER TO GET THE  TOTAL CASE MIX PER DIEM.

(7)   Compute LABOR-PORTION ROUNDED =   (TOT-PDPM-CASEMIX-PERDIEM * PERCENT-2020-LABOR).

(8)   Compute LABOR-ADJUSTED ROUNDED =   (LABOR-PORTION * AREA-WAGE-INDEX).

(9)   Compute NON-LABOR-PORTION ROUNDED =   (TOT-PDPM-CASEMIX-PERDIEM * PERCENT-2020-NLABOR)

(10)  Compute TOTAL-LABOR-ADJ-RATE ROUNDED =   (LABOR-ADJUSTED + NON-LABOR-PORTION).

(11)  Compute TOTAL-CALC-PAYMENT-RATE ROUNDED = TOTAL-LABOR-ADJ-RATE.

(12)  Apply the VBP (Value Based Purchasing Factor).
    Compute SNF-PAYMENT-RATE ROUNDED =  VBP-MULTIPLIER *  TOTAL-CALC-PAYMENT-RATE.

(13)  Obtain the VBP PAY Difference

Compute VBP-PAY-DIFF ROUNDED =  SNF-PAYMENT-RATE - TOTAL-CALC-PAYMENT-RATE.

## 30.5 - Annual Updates to the SNF Pricer
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

Rate and weight information used by the SNF Pricer is updated periodically, usually annually.  Updates occur each October, to reflect the fact that SNF PPS rates are effective for a Federal fiscal year.  Updates may also occur at other points in the year when required by legislation.  The following update items, when changed, are published in the "**Federal Register**:"

- The following components of the unadjusted Federal rates for both Rural and Urban areas:
  - physical therapy,
  - occupational therapy,
  - speech-language pathology,
  - nursing,
  - non-therapy ancillary, and
  - non-case-mix.

- The case-mix indexes to be used for each case-mix group.

- The factors to be applied in making the area wage adjustment.

- Changes, if any, to the labor and non-labor percentages.

Whenever these update items change, Medicare also publishes a Recurring Update Notification to inform providers and A/B MACs (A) about the changes.  These Recurring Update Notifications also describe how the changes will be implemented through the SNF Pricer.

## 40 - Special Inpatient Billing Instructions
**(Rev. 1733; Issued: 05-08-09; Effective Date:  10-01-06; Implementation Date:  04-27-09)**

The SNFs bill upon the following:

- Discharge;
- Benefit exhaustion; (Note: Submit both full and partial benefits exhaust claims monthly)
- A decrease in level of care to less than skilled care; or
- Monthly (and if necessary, monthly thereafter).

Each bill must include all diagnoses applicable to the admission.  However, SNFs do not include charges that were billed on an earlier bill.  The "from" date must be the day after the "through" date on the prior bill.

## 40.1 - Submit Bills in Sequence
**(Rev. 1, 10-01-03)**
**SNF-517.13, A3-3603.2**

The SNFs must submit bills in sequence for each beneficiary they service.  The A/B MAC (A) will return to the SNF a continuing stay bill if the prior bill has not been processed.  When the A/B MAC (A) receives an out-of-sequence claim for a continuous stay, it will search its history for the prior adjudicated claim.  If the prior bill has not been finalized, the A/B MAC (A) will return to the provider (RTP), the incoming bill, request that the prior bill be submitted first, and the returned bill only be submitted after the SNF receives notice of adjudication of the prior bill.  A typical error message follows:

> Bills for a continuous stay or admission must be submitted in the same sequence in which services are furnished.  If the provider has not already done so, please submit the prior bill.  Then, resubmit this bill after you receive the remittance advice for the prior bill.

If the prior bill was submitted, the SNF will hold the returned bill until it receives a remittance advice for the prior bill.

## 40.2 - Reprocessing Inpatient Bills in Sequence
**(Rev. 2245, Issued: 06-16-11, Effective: 08-01-11, Implementation: 08-01-11)**

When a beneficiary experiences multiple admissions (to the same or different facilities) during a benefit period, claims are processed by CWF in the same order that they are received, regardless of the dates on which expenses were incurred.  This first-in-first-out method of processing requests for payment facilitates prompt handling of claims.

If a SNF, any beneficiary, or secondary insurer have increased liability as a result of CWF's first-in/first-out (FI/FO) processing, the SNF must notify the A/B MAC (A) to arrange reprocessing of all affected claims.  This approach is not applicable if the liability stays the same, e.g., if the coinsurance or deductible amounts are applied on the second stay instead of the first, but there is no issue with regard to the effective date of supplementary coverage or if the beneficiary is responsible for payment of the first claim instead of the second.

The A/B MAC (A) will verify and cancel any bills posted out-of-sequence and request that any other A/B MAC (A) involved also cancel any affected bills.  The A/B MAC (A) will reprocess all bills in the benefit period in the sequence of the beneficiary's stays to properly allocate days where payment is made in full by Medicare and to identify those days where the beneficiary is required to pay coinsurance.

## 40.3 - Determining Part A Admission Date, Discharge Date, and Utilization Days
**(Rev. 1, 10-01-03)**
**SNF-515.4, SNF-515.4**

## 40.3.1 - Date of Admission
**(Rev. 229, Issued 07-20-04 Effective/Implementation 08-19-04)**

The beneficiary, entitled to Part A benefits, becomes a SNF resident for Part A PPS billing purposes when admitted to a Medicare certified SNF or DPU.  This could be a first time admission or a readmission following events described in §40.3.2.  Services on and after this day are included in the PPS rate and cannot be billed by other providers and suppliers unless excluded as described in this chapter.

## 40.3.2 - Patient Readmitted Within 30 Days After Discharge
### (Rev. 10569, Issued: 01-14-21, Effective: 04-01-21, Implementation: 04-05-21)

A patient is deemed not to have been discharged if the time between SNF discharge and readmission to the same or another SNF is within 30 days. (See the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care Services (SNF) Under Hospital Insurance," §20.2.) However, if more than 30 days elapse after the patient's discharge from a participating SNF or after his/her transfer to a nonparticipating part of the institution, the patient must again meet the 3-day hospital stay requirement to become eligible for SNF benefits. When a discharge bill has been sent and the patient is readmitted to the SNF within 30 days, the SNF must submit another bill, which shows the current admission date and the following additional data. • The SNF must complete condition code "57" on the claim to indicate the patient previously received Medicare covered SNF care within 30 days of the current SNF admission. • The SNF must complete occurrence span code "70" to indicate the qualifying stay dates for a hospital stay of at least 3 days which qualifies the patient for payment of the SNF level of care services billed on the claim. If a discharge bill has not been sent at the time of readmission, the SNF must submit an interim bill with occurrence code "74" to show the from/through dates of the leave of absence (the period the patient was not in the facility) and the number of noncovered days. For claims that contain both covered days and noncovered days, and those noncovered days are the responsibility of the beneficiary (e.g., days submitted for noncovered level of care), the provider should append span code 76 to indicate the days the beneficiary is liable.

## 40.3.3 - Same Day Transfer
### (Rev. 4001, Issued: 03-16-18, Effective: 06-19-18, Implementation: 06-19-18)

The day of admission counts as a utilization day, except in the situation where the patient was admitted with the expectation that he remain overnight but was transferred to another participating provider before the following midnight.  In this instance, the first provider completes the bill as follows:

- Indicate "0" in Covered Days;

- Insert condition code "40" to indicate the patient was transferred from one participating provider to another before the midnight immediately following the admission to the first provider; and,

- Admission date, statement "from" and "through" dates are the same.

No payment is made to the originating participating provider. Instead, the participating provider to which the patient was transferred counts the admission day as a utilization day that includes the day of admission and may bill the HIPPS default code.

If a patient is transferred from a Medicare participating facility to a nonparticipating facility the day of admission counts as a utilization day and the Medicare-participating facility may bill the HIPPS default code.

These general rules apply to transfers between SNFs and between a hospital and an SNF. However, under these same circumstances, if the two providers represent an institution composed of a participating hospital and a distinct part participating SNF, the first provider cannot bill for accommodations, but may bill for ancillary charges.

## 40.3.4 - Situations that Require a Discharge or Leave of Absence
**(Rev. 4001, Issued: 03-16-18, Effective: 06-19-18, Implementation: 06-19-18)**

Medicare systems are set up so that the SNF need not submit a discharge bill when the situation is that the beneficiary (who leaves the SNF and then returns before the following midnight) receives outpatient services from a Medicare participating hospital, CAH, or other appropriate provider during his/her absence. Edits allow hospitals and CAHs to bill for these services for a beneficiary in a Part A PPS stay. Receipt of outpatient services from another provider does not normally result in a SNF discharge.

Two situations force a discharge from a SNF:  1) the beneficiary's admission as an inpatient to a Medicare participating hospital or CAH, or 2) the beneficiary's transfer to another SNF for inpatient services. A beneficiary cannot be an inpatient in more than one facility at a time. Consequently, the SNF **must** submit a discharge bill if either of these events occur.

If the patient is readmitted to the SNF, the SNF should submit a new bill (TOB 211 or 212) with a new admission date. See §40.3.2, Patient Readmitted Within 30 days After Discharge, for further instructions.

Bills for excluded services (identified in §20 of this chapter) rendered by participating hospitals, CAHs, or other appropriate providers may be paid to the rendering provider in addition to the Part A PPS payment made to the SNF. Other outpatient services furnished to a resident in a Part A PPS stay by another provider/supplier must be billed by the SNF.

Home health or outpatient services provided during a leave of absence do not affect the leave and no discharge bill is required.

Home health services are not payable unless the patient is confined to his home, and under Medicare regulations, a SNF cannot qualify as a home.  Where the beneficiary receives services from a home health agency, the home health agency is responsible for billing.

If the beneficiary is formally discharged or otherwise departs for reasons other than described above but then, is readmitted or returns before the following midnight, he is not considered discharged.  The SNF is responsible for billing for services during the period of absence, unless such services are otherwise excluded from Part A PPS payment or are excluded from Medicare coverage (see §10.1).

**NOTE:**  This instruction only applies to Medicare fee-for-service beneficiaries in a participating SNF.

## 40.3.5 - Determine Utilization on Day of Discharge, Death, or Day Beginning a Leave of Absence
**(Rev. 4001, Issued: 03-16-18, Effective: 06-19-18, Implementation: 06-19-18)**
**SNF-517.6.B, A3-3103.4**

Generally, the day of discharge, death, or a day on which a patient begins a leave of absence, is not counted as a utilization day. (See the Medicare Benefit Policy Manual, Chapter 3, "Duration of Covered Inpatient Services.") This is true even where one of these events occurs on a patient's first day of entitlement or the first day of a provider's participation in the Medicare program. In addition, a benefit period may begin with a stay in a hospital or SNF, on that day.

The exception to the general rule of not charging a utilization day for the day of discharge, death, or day beginning a leave of absence is where the patient is admitted with the expectation that he will remain overnight but is discharged, dies, or is transferred to another, nonparticipating-provider (or to a nonparticipating portion of the same provider) before the following midnight. In these instances, such a day counts as a utilization day. This exception includes the situation where the beneficiary was admitted (with the expectation that he would remain overnight) on either the first day of his entitlement or the provider's first day of participation, and on the same day he was discharged, died, or transferred to a nonparticipating provider.

Payment is not made under PPS unless a covered day can be billed. Also, for a noncovered day such as the day of discharge (for which no payment is possible under PPS), separate billing is not allowed for ancillary services. Ancillary charges for such days have already been included in the PPS rates for those days that **can** be billed. This is because, in accordance with the longstanding instructions in Pub. 15-1, Provider

Reimbursement Manual, Part I, chapter 22, section 2205.1, ancillary charges for services furnished on the day of (but before the actual moment of) discharge are included on the SNF's cost report and reflected in final cost settlement (see also §40.6.3). Accordingly, such charges have been built into the PPS base. As a result, even though the day of discharge itself is not a Medicare-covered day for the SNF, the PPS per diem for all of the covered days **leading up to** the day of discharge is somewhat higher than it otherwise would have been, reflecting the historical cost of these day-of-discharge services.

When a patient is discharged on the first day of a provider's participation or the first day of the patient's entitlement, complete the bill as follows:

• Admission date is the actual date of admission;

• From date of service is the date the patient became entitled or date the SNF began participation; and

• The number of noncovered days = 1.

### 40.3.5.1 - Day of Discharge or Death Is the Day Following the Close of the Accounting Year
**(Rev. 1, 10-01-03)**
**SNF-517.2**

Where the day of discharge or death is the day following the close of the cost reporting period, the ancillary charges for services rendered on that day must be included in the bill submitted for services in the prior accounting year, which includes the covered days for the billing period in that year.  In such cases, "Statement Covers Period", should show the date of discharge or death as the through date.  The "Patient Status" should reflect the date of discharge or death, as appropriate.  The SNF uses the same billing method when developing accrued non-Medicare charges.  For cost settlement purposes, ancillary charges incurred in the new fiscal year, but billed under the prior fiscal year, are considered charges for the prior fiscal year.

### 40.3.5.2 - Leave of Absence
**(Rev. 4001, Issued: 03-16-18, Effective: 06-19-18, Implementation: 06-19-18)**

A leave of absence for the purposes of this instruction is a situation where the patient is absent, but not discharged, for reasons other than admission to a hospital, other SNF, or nonparticipating portion of the same institution. If the absence exceeds 30 consecutive days, the 3-day prior stay and 30-day transfer requirements, as appropriate, must again be met to establish re-entitlement to SNF benefits.

Leave of absence (LOA) days are shown on the bill with revenue code 018X and LOA days as units. However, charges for LOA days are shown as zero on the bill, and the SNF cannot bill the beneficiary for them except as specified in Chapter 1 of this manual at §30.1.1.1. Occurrence span code 74 is used to report the LOA from and through dates.

Providers should review the RAI manual to clarify situations where an LOA is not appropriate, for example observation stays in a hospital lasting greater than 24 hours.

## 40.4 - Accommodation Charges Incurred in Different Accounting Years
**(Rev. 1, 10-01-03)**
**SNF-517.1**

The SNF must not put accommodation charges incurred in different accounting years on the same bill.  (See §40.3.5.1 when billing for ancillary charges for services furnished on the day of discharge or death when it is also the day after the end of the accounting year.) At the end of the accounting year, the SNF must submit a bill that contains the charges for all services furnished to the patient since the last bill and through the end of that year. The SNF shows services furnished in the following accounting year on a separate bill.

## 40.5 - Billing Procedures for Periodic Interim Payment (PIP) Method of Payment
**(Rev. 3220, Issued: 03-16-15, Effective: ICD-10: Upon Implementation of ICD-10, ASC-X12: 01-01-12, Implementation: 10-01-14, ICD-10: Upon Implementation of ICD-10 ASC X12: 09-16-14)**

The SNFs using the PIP method of payment follow the regular billing instructions in Medicare Claim Processing Manual, Chapter 25.

See the Medicare Claims Processing Manual, Chapter 1, "General Billing Requirements," §80.4, for requirements SNFs must meet and A/B MACs (A) must monitor to continue PIP reimbursement.  Refer to the Medicare Claims Processing Manual, Chapter 25 for further information about completing the claim.

## 40.6 - Total and Noncovered Charges
**(Rev. 10569, Issued: 01-14-21, Effective: 04-01-21, Implementation: 04-05-21)**

ASC X12 837 Institutional Claim See the related implementation guide on the official Washington Publishing Company website. Form CMS -1450 For each cost center for which a separate charge is billed (type of accommodation or ancillary), a revenue code is assigned and is entered on the claim with the related charges. On Form CMS-1450 the appropriate numeric revenue code is entered in FL 42 to explain each charge in FL 47. Additionally, there is no fixed "Total" line in the charge area. Instead, revenue code "0001" is always entered last in FL 42. Thus, the adjacent charge entry, in FL 47, is the sum of charges billed. This is also the same line on which noncovered charges, if any, in FL 48, are summed. The total charge for all services, covered and noncovered, will generally be shown. See §40.6.1 below, for certain exceptions. In the "noncovered charges" column (FL48) enter the amount of any noncovered charge except where: • The A/B MAC (A) has notified the SNF that payment can be made under the limitation of liability provisions; and • A payer primary to Medicare is involved. (See the Medicare Secondary Payer [MSP] Manual, Chapter 3, "MSP Provider Billing Requirements," and

Chapter 4, "Contractor Prepayment Processing Requirements.") Where a bill is submitted for a period including both covered and noncovered days (e.g., days submitted for noncovered level of care), the SNF must list the charges for noncovered days under noncovered charges. Refer to the Medicare Claims Processing Manual, Chapter 25 for further information about completing the claim. For claims that contain both covered days and noncovered days, and those noncovered days are the responsibility of the beneficiary (e.g., days submitted for noncovered level of care), the provider should append span code 76 to indicate the days the beneficiary is liable.

## 40.6.1 - Services in Excess of Covered Services
**(Rev. 3220, Issued: 03-16-15, Effective: ICD-10: Upon Implementation of ICD-10, ASC-X12: 01-01-12, Implementation: 10-01-14, ICD-10: Upon Implementation of ICD-10 ASC X12: 09-16-14)**

Where items and services are furnished which are more expensive or in excess of the services covered by the program, the SNF will make the following entries in the Total Charges and Noncovered fields on the bill:

- If the patient did not request such excess or more expensive services, the patient may not be charged for them, and only the services covered by the program are shown in total charges.  No entry is made in noncovered charges in this situation. (However, where all patients are routinely billed for such excess or more expensive items, total charges **may** reflect the excess items or services as discussed in total and noncovered charges, above.);

- If the patient did request such excess or more expensive services, the SNF may charge the patient for them.  In this case, the SNF show the line item total charge (any customary charges covered by the program plus the excess charges).  The excess charges that will be billed to the patient are shown in noncovered charges.

- In the same situation as above, except that the SNF will not bill the patient for the excess services.  Instead the SNF will show only the customary charges for covered services in total charges and make no entry in noncovered charges.

## 40.6.2 - Showing Discounted Charges
**(Rev. 1, 10-01-03)**
**SNF-517.11**

The SNFs do not show credit or minus entries on the bill.  Where the SNF gives a discount to some patients, they show charges in one of two ways:

1. SNFs show the charges as the full, undiscounted charge if full undiscounted charge data is accumulated for all patients for the purposes of the final cost report; or

2. They show the discounted charges as the only charges, if the SNF, for the purposes of the final cost report, accumulates charges for all patients at the discounted rate.

### 40.6.3 - Reporting Accommodations on the Claim
**(Rev. 3220, Issued: 03-16-15, Effective: ICD-10: Upon Implementation of ICD-10, ASC-X12: 01-01-12, Implementation: 10-01-14, ICD-10: Upon Implementation of ICD-10 ASC X12: 09-16-14)**

See the Medicare Benefit Policy Manual, Chapter 1, "Inpatient Hospital Services," for an explanation of the rules when other than semi-private accommodations are furnished that apply to SNFs as well as hospitals.  The type of accommodation furnished at the time of the SNF census-taking hour determines the applicable revenue code.  Where a patient is admitted with the expectation that he will remain overnight, but on the same day is discharged, dies, or is transferred prior to the census, the revenue code is determined by the type of accommodation furnished at the time of the patient's discharge, death, or transfer.

Payment is based on the PPS rate, not on accommodation levels.  See §40.6.1 where the patient requests more expensive accommodations or patient convenience items.

The determination of charges does not affect the determination of inpatient utilization days or when a patient may be considered an inpatient for Medicare purposes as outlined in the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care (SNF) Services Under Hospital Insurance," §50 and §60.2.  Refer to the Medicare Claims Processing Manual, Chapter 25 for further information about billing.

SNFs show total charges for accommodation for the entire billing period and charges for any noncovered days in noncovered charges.)

The accommodation days do not include the day of death or discharge, even where the discharge was late.  However, where the SNF customarily makes an extra charge for a late discharge, they include this amount in total charges with the appropriate accommodation revenue code.  The day of discharge is not included in Covered Days even though an extra charge is included.  Where the late discharge was for the patient's convenience and not for any medical necessity, SNFs enter the charge for late discharge as a noncovered charge.  Where the late discharge is for a medical reason, the charge is covered.  (See the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care (SNF) Services Under Hospital Insurance," §60.3.)

The charges for accommodations reflect only the total charges for general routine services as defined in §2202.6 and §2203.1 of the Medicare Provider Reimbursement Manual.  All charges, which are charged to every patient for every patient day, are included in the routine accommodation charge.

SNFs bill ancillary charges for day of discharge, death or the day on which a leave of absence begins, under the proper revenue code.

Where the patient is discharged on his first day of entitlement or the first day of the SNF participation in the Medicare program, they submit a bill with no accommodation charge, but with ancillary charges.

Where some of the days cannot be paid under Part A because benefits were exhausted before discharge, death, or the day on which a leave of absence began, SNFs show the charges for days after benefits where exhausted under noncovered charges, and enter the appropriate occurrence code, e.g., A3, and the date benefits are exhausted.  See the Medicare Claims Processing Manual, Chapter 7, "SNF Part B Billing," §10, for billing under Part B in such circumstances.

## 40.6.4 - Bills with Covered and Noncovered Days
**(Rev. 3220, Issued: 03-16-15, Effective: ICD-10: Upon Implementation of ICD-10, ASC-X12: 01-01-12, Implementation: 10-01-14, ICD-10: Upon Implementation of ICD-10 ASC X12: 09-16-14)**

Any combination of covered and noncovered days may be billed on the same bill.  It is important to record a day or charge as covered or noncovered because of the following:

- Beneficiary utilization is recorded based upon days during which the patient received hospital or SNF accommodations, including days paid by Medicare and days for which the provider was held liable for reasons other than medical necessity or custodial care.

- The provider may claim credit on its cost report only for covered accommodations, days and charges for which actual payment is made.  Provider liable days and charges are not included on the cost report.  Data from the bill payment process are used in preparing the cost report.

SNFs show noncovered charges for denied or noncovered days, which will not be paid. The SNF submits the bill with occurrence span code 76 and completes the from/through dates to report periods where the beneficiary is liable.  Occurrence span code 77 is used to report periods of noncovered care where the SNF is liable.  If applicable, the FISS system will automatically assign occurrence code A3 indicating the last date for which benefits are available or the date benefits were exhausted.

The A/B MAC (A) will use Occurrence Span Code 79 (a payer only code sent to CWF) to report periods of noncovered care due to lack of medical necessity or custodial care for which the provider is held liable.  Periods of beneficiary liability and provider liability may be reported on one bill.  Report all noncovered days.

See Chapter 25, Completing and Processing the CMS-1450 Data Set, for a complete description of billing data elements.  See the Medicare Claims Processing Manual, Chapter 30, "Limitation on Liability," for determining SNF liability.

The provider is always liable unless the appropriate notice is issued.  If the SNF issues the appropriate notice, and the beneficiary agrees to make payment either personally or through a private insurer, the days will not be charged towards the 100-day benefit period.  Notice requirements for periods of noncoverage are found in Chapter 30, §70.

## 40.6.5 - Notification of Limitation on Liability Decision
**(Rev. 133, 04-02-04)**
**SNF-517.8**

Detailed instructions and application of limitation on liability is found in The Medicare Claims Processing Manual, Chapter 30, "Limitation on Liability."  The limitation on liability decision is made by the A/B MAC (A) when the medical evidence and admission notice, or the bill is submitted.  When coverage is denied, notification will be by telephone, if possible, so written notice can be provided to the patient immediately. When it is determined during the course of a beneficiary's stay in an SNF that the care is not covered but both the beneficiary and the SNF are entitled to limitation on liability, the Medicare program may make payment for the noncovered services for a grace period of one day (24 hours) after the date of notice to the SNF or to the beneficiary, whichever is earlier.  If it is determined that more time is required in order to arrange post-discharge care, up to 1 additional "grace period" day may be paid for.

Limitation of liability may apply to Part A and Part B services furnished by the provider.

## 40.7 - Ending a Benefit Period
**(Rev. 930, Issued: 04-28-06, Effective: 10-01-06, Implementation: 10-02-06)**

A benefit period ends 60 days after the beneficiary has ceased to be an inpatient of a hospital and has not received inpatient skilled care in a SNF during the same 60-day period.

When the SNF resident's health has improved to the point where he or she no longer needs or receives the level of skilled care required for Part A coverage, the SNF must bill one of the two following scenarios:

1.  For the resident that leaves the Medicare-certified SNF or DPU:

    a.  Submit a final discharge bill, and

    b.  Any services rendered after the discharge and billed by the SNF should be submitted on a 23x.

2.  For the resident that remains in the Medicare-certified SNF or DPU after the skilled level of care has ended:

    a.  Submit the last skilled care claim with an occurrence code 22 to indicate the date active care ended. i.e., date covered SNF level of care ended, and patient status code 30 to indicate the patient is still a resident in the Medicare-certified SNF or DPU;

    b.  Any Part B covered services rendered and billed by the SNF after the skilled care ended should be submitted on a 22x; and

    c.  All therapies must be billed by the SNF on the 22x.

For additional instructions on ending a benefit period go to the Medicare General Information, Eligibility, and Entitlement Manual, Chapter 3, §10.4.2.

## 40.8 - Billing in Benefits Exhaust and No-Payment Situations
**(Rev. 4491, Issued: 01-09- 20, Effective: 04-01-20, Implementation: 04-06-20)**

An SNF is required to submit a bill for a beneficiary that has started a spell of illness under the SNF Part A benefit for every month of the related stay even though no benefits may be payable.  CMS maintains a record of all inpatient services for each beneficiary, whether covered or not.  The related information is used for national healthcare planning and also enables CMS to keep track of the beneficiary's benefit period.  These bills have been required in two situations:  1) when the beneficiary has exhausted his/her 100 covered days under the Medicare SNF benefit (referred to below as benefits exhaust bills) and 2) when the beneficiary no longer needs a Medicare covered level of care (referred to below as no-payment bills).

For benefits exhaust bills, an SNF must submit monthly a benefits exhaust bill for those patients that continue to receive skilled care and also when there is a change in the level of care regardless of whether the benefits exhaust bill will be paid by Medicaid, a supplemental insure, or private payer.  There are two types of benefits exhaust claims:  1) Full benefits exhaust claims: no benefit days remain in the beneficiary's applicable benefit period for the submitted statement covers from/through date of the claim and 2) Partial benefits exhaust claims: only one or some benefit days, in the beneficiary's applicable benefit period, remain for the submitted statement covers from/through date of the claim.  Monthly claim submission of both types of benefits exhaust bills are required in order to extend the beneficiary's applicable benefit period posted in the Common Working File (CWF).  Furthermore, when a change in level of care occurs after exhaustion of a beneficiary's covered days of care, the provider must submit the benefits exhaust bill in the next billing cycle indicating that active care has ended for the beneficiary.

**NOTE**:  Part B 22x bill types must be submitted after the benefits exhaust claim has been submitted and processed.

In addition, SNF providers must submit no-payment bills for beneficiaries that have previously received Medicare-covered skilled care and subsequently dropped to a non-covered level of care but continue to reside in a Medicare-certified area of the facility.  Consolidated Billing (CB) legislation indicates that physical therapy, occupational therapy, and speech language pathology services furnished to SNF residents are always subject to SNF CB.  This applies even when a resident receives the therapy during a non-covered stay in which the beneficiary who is not eligible for Part A extended care benefit still resides in an institution (or part thereof) that is Medicare-certified as a SNF.  SNF CB edits require the SNF to bill for these services on a 22x (inpatient part B) bill type.  **NOTE**: Unlike with benefits exhaust claims, Part B 22x bill types may be submitted prior to the submission of bill type 210 no payment claims.

If a facility has a separate, distinct non-skilled area or wing then beneficiaries may be discharged to this area using the appropriate patient discharge status code and no-payment bills would not be required.  In addition, SNF CB legislation for therapy services would not apply for these beneficiaries.

No-payment bills are not required for non-skilled beneficiary admissions.  As indicated above, they are only required for beneficiaries that have previously received covered care and subsequently dropped to non-covered care and continue to reside in the certified area of the facility.

**NOTE:**  Providers may bill benefits exhaust and no payment claims using the default HIPPS code AAA00 prior to October 1, 2019 and ZZZZZ October 1, 2019 and after, in addition to an appropriate room & board revenue code only.  No further ancillary services need be billed on these claims.

SNF providers and A/B MACs (A) shall follow the billing guidance provided below for the proper billing of benefits exhaust bills and no-payment bills.

1) SNF providers shall submit benefits exhaust claims for those beneficiaries that continue to receive skilled services as follows:

    **a)  Full or partial benefits exhaust claim. (Submitted monthly)**

        i) Bill Type = Use appropriate covered bill type (i.e., 211, 212, 213 or 214 for SNF and 181, 182, 183 or 184 for Swing Bed (SB).  **NOTE:**  Bill types 210 or 180 should not be used for benefits exhaust claims submission).

        ii) Occurrence Span Code 70 with the qualifying hospital stay dates.

        iii) Covered Days and Charges = Submit all covered days and charges as if beneficiary had days available.

        iv) Value Code 09 (First year coinsurance amount) 1.00 (If applicable, the FISS will assign the correct coinsurance amount based off the CWF response).

        v) Patient Status Code = Use appropriate code.

    **b)   Benefits exhaust claim with a drop in level of care within the month; Patient remains in the Medicare-certified area of the facility after the drop in level of care.**

        i) Bill Type = Use appropriate bill type (i.e., 212 or 213 for SNF and 182 or 183 for SB.  **NOTE:**  Bill types 210 or 180 should not be used for benefits exhaust claims submission).

        ii) Occurrence Span Code 70 with the qualifying hospital stay dates.

    iii) Occurrence Code 22 (date active care ended, i.e., date covered SNF level of care ended) = include the date active care ended; this should match the statement covers through date on the claim.

    iv) Covered Days and Charges = Submit all covered days and charges as if the beneficiary had days available up until the date active care ended.

    v) Value Code 09 (First year coinsurance amount) 1.00 (If applicable, the FISS will assign the correct coinsurance amount based off the CWF response).

    vi) Patient Status Code = 30 (still patient).

**c) Benefits exhaust claim with a patient discharge.**

    i) Bill Type = 211 or 214 for SNF and 181 or 184 for SB (**NOTE:** Bill types 210 or 180 should not be used for benefits exhaust claims submission).

    ii) Covered Days and Charges = Submit all covered days and charges as if beneficiary had days available up until the date active care ended.

    iii) Value Code 09 (First year coinsurance amount) 1.00 (If applicable, the FISS will assign the correct coinsurance amount based off the CWF response).

    iv) Patient Status Code = Use appropriate code other than patient status code 30 (still patient).

**NOTE:** Billing all covered days and charges allow the Common Working File (CWF) to assign the correct benefits exhaust denial to the claim and appropriately post the claim to the patient's benefit period. Benefits exhaust bills must be submitted monthly.

2) SNF providers shall submit no-payment claims for beneficiaries that previously dropped to non-skilled care and continue to reside in the Medicare-certified area of the facility using the following options.

**a) Patient previously dropped to non-skilled care. Provider needs Medicare denial notice for other insurers.**

    i) Bill Type = 210 (SNF no-payment bill type) or 180 (SB no-payment bill type)

    ii) Statement Covers From and Through Dates = days provider is billing, which may be submitted as frequently as monthly, in order to receive a denial for other insurer purposes. No-payment billing shall start the day following the date active care ended.

    iii) Days and Charges = Non-covered days and charges beginning with the day after active care ended.

    iv) Condition Code 21 (billing for denial).

    v)  Patient Status Code = Use appropriate code.

**b)   Patient previously dropped to non-skilled care.  In these cases, the provider must only submit the final discharge bill that may span multiple months but must be as often as necessary to meet timely filing guidelines.**

    i)  Bill Type = 210 (SNF no-payment bill type) or 180 (SB no-payment bill type)

    ii) Statement Covers From and Through Dates = days billed by the provider, which may span multiple months, in order to show final discharge of the patient.  No-payment billing shall start the day following the date active care ended.

    iii) Days and Charges = Non-covered days and charges beginning with the day after active care ended.

    iv) Condition Code 21 (billing for denial).

    v)  Patient Status Code = Use appropriate code other than patient status code 30 (still patient).

**NOTE:** No pay bills may span both provider and Medicare fiscal year end dates.

Refer to Chapter 25 for further information about billing.

## 40.8.1 – SNF Spell of Illness Quick Reference Chart

**(Rev.4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

| Level of Care | Patient's Medicare SNF Part A Benefits Are Exhausted | Patient Is In Medicare Certified Area of the Facility * | If in non-Medicare Area, the Facility Meets the Definition of a SNF ** | Is the Inpatient Spell of Illness Continued? | Billing Action |
|---|---|---|---|---|---|
| Medicare Skilled | YES | YES | N/A | YES | Submit Monthly Covered Claim. |
| | NO | YES | N/A | YES | Submit Monthly Covered Claim. |
| | YES | NO | YES | YES | Submit Monthly Covered Claim. |
| | NO | NO | YES | YES | Patient should be returned to certified area for Medicare to be billed. Submit Monthly Covered Claim. |
| | NO | NO | NO | NO | Facility should determine whether it would be appropriate to send patient back to a certified area for Medicare coverage. |
| Not Medicare Skilled | YES | NO | NO | NO | Do not submit claim if pt came in non-skilled.  Otherwise, submit no-pay claim w/ discharge status code when patient leaves the certified area. |

| | | | | |
|---|---|---|---|---|
| YES | YES | N/A | NO | Do not submit claim if pt came in non-skilled.  Otherwise, submit no-pay claim w/ discharge status code when patient leaves the certified area. |
| NO | YES | N/A | NO | Do not submit claim if pt came in non-skilled.  Otherwise, submit no-pay claim w/ discharge status code when patient leaves the certified area. |
| NO | NO | YES | NO | Do not submit claim if pt came in non-skilled.  Otherwise,  submit no-pay claim w/ discharge status code when patient leaves the certified area. |
| YES | NO | YES | NO | Do not submit claim if pt came in non-skilled.  Otherwise,  submit no-pay claim w/ discharge status code when patient leaves the certified area. |

* Whether the facility considers a patient's bed in the certified area to be a Medicare bed or not has no effect on whether the spell of illness is continued and has no effect on the SNF's action.

** In some states, licensing laws for all nursing homes have incorporated requirements of the basic SNF definition (Social Security Act §1819(a)(1)). When this is the case, any nursing home in such a state would be considered to meet this definition (see CMS Internet-Only Manual, Pub. 100-7, Chapter 2, §2164 at www.cms.hhs.gov/manuals/ on the CMS website).

## 40.8.2 - Billing When Qualifying Stay or Transfer Criteria are Not Met
**(Rev. 1618, Issued: 10-24-08, Effective: 04-01-09; Implementation: 04-06-09)**

SNF providers are required to submit claims to Medicare for beneficiaries that receive a skilled level of care. This includes beneficiaries that do not meet the qualifying stay or transfer criteria. Although these claims will not be paid by Medicare, providers must submit these claims as covered in order to extend existing beneficiary spells of illness in CWF. A prior qualifying hospital stay (occurrence span code 70) would not be applicable and shall not be included with these claims. This will allow Medicare systems to deny the claim for the appropriate reason.

Note: This instruction includes beneficiaries that were previously admitted for skilled care then subsequently drop to non-skilled for greater than 30 days and then require skilled care again but do not have a new qualifying hospital stay.

## 40.9 - Other Billing Situations
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

### A. Demand Bills

Where the SNF believes that a covered level of care has ended but the beneficiary disagrees, they report occurrence code 21 (UR notice received) or 22 (date active care ended) as applicable and condition code 20 indicating the beneficiary believes the services are covered beyond the occurrence date.

See the Medicare Claims Processing Manual, Chapter 1, "General Billing Requirements," §60.3, for instructions on advance beneficiary notices and demand bills.

Refer to the Medicare Claims Processing Manual, Chapter 25 for further information about billing.

### B. Request for Denial Notice for Other Insurer

The SNFs complete a noncovered bill and enter condition code 21 to indicate a request for a Medicare denial notice. Refer to Chapter 25 further information about billing.

### C. Another Insurer is Primary to Medicare

See the Medicare Secondary Payer (MSP) Manual, Chapter 3, "MSP Provider Billing Requirements" and Chapter 5, "Contractor Prepayment Processing Requirements," for submitting claims for secondary benefits to Medicare. Refer to the Medicare Claims Processing Manual, Chapter 25 for further information about billing.

### D. Special MSN Messages

The Medicare Prescription Drug Improvement and Modernization Act of 2003 requires that Medicare Summary Notices (including SNF claims for post-hospital extended care

services provided under Part A) report the number of covered days remaining in the given spell of illness.  This requirement became effective July 6, 2004.

**E. Interrupted Stay**

Refer to the Medicare Claims Processing Manual, Chapter 6, "Interrupted Stay Policy," §120.2, for information about billing when a patient returns to a covered level of care after an interrupted stay.

# 50 - SNF Payment Bans, or Denial of Payment for New Admissions (DPNA)
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

Under the Act at §§1819(h) and 1919(h) and CMS' regulations at 42 CFR 488.417, CMS may impose a denial of payment for new admissions (DPNA) against a SNF when a facility is not in substantial compliance with requirements of participation. To understand the effect on coverage of SNF services, see the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care (SNF) Services Under Hospital Insurance," §§20.3 - 20.3.1.6.

## 50.1 - Effect on Utilization Days and Benefit Period
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

Payment sanctions are applied to days that would otherwise be Part A-payable; i.e., the care is covered but no payment will be made to the provider. Therefore, if the Medicare participating SNF assumes responsibility for the beneficiary's costs during the sanction period, it will be considered the same as a program payment, and the days will count towards the 100-day benefit period.

In situations where the beneficiary is subject to the payment ban, but the provider fails to issue the proper beneficiary liability notice, the provider is liable for all services normally covered under the Medicare Part A benefit.  Since the beneficiary is receiving benefits, the days will be considered Part A days and charged against the beneficiary's benefit period.  The SNF may collect any applicable copayment amounts.  These days will be charged against the beneficiary's utilization as is currently done with other types of technical denials (i.e., late filing, late denial notices to the patient, etc.).

If the SNF issues the appropriate beneficiary liability notice, and the beneficiary agrees to make payment either personally or through a private insurer, the days will not be charged towards the 100-day benefit period.

## 50.2 - Billing When Ban on Payment Is In Effect

**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

Beneficiaries admitted before the effective date of the denial of payment and taking temporary leave, whether to receive inpatient hospital care, outpatient services or as therapeutic leave, are not considered new admissions, and are not subject to the denial of payment upon return. This policy applies even if there are multiple hospitalizations and returns to the SNF during the period sanctions are in effect.

When determining if the beneficiary was admitted prior to the imposition of the ban, the actual status of the beneficiary rather than the primary payor is the determining factor. Therefore, there may be situations where the beneficiary is a private pay patient or a dual eligible who was receiving Medicaid benefits prior to the imposition of the payment ban. If this private pay patient or dual eligible goes to the hospital for needed care, and meets the Medicare Part A criteria for SNF coverage upon return to the SNF, the readmission is exempt from the denial of payment sanction.  When billing for a readmission that is NOT subject to the payment ban, providers must enter occurrence span code 80, Prior Same-SNF Stay Dates for Payment Ban Purposes, on the claim to identify the prior same-SNF stay dates, in addition to reporting any LOA and prior hospital stay dates, using occurrence span codes, that may affect the A/B MACs (A)'s determination of payment ban exemption status.  See Chapter 25 of this manual for occurrence span code titles and definitions.

## 50.2.1 - Effect of an Appeal to a DPNA on Billing During the Period the SNF is Subject to a DPNA
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

In those situations where the SNF decides to appeal the imposition of a DPNA, it must still bill the program as set forth in the instructions below.

## 50.2.2 - Provider Liability Billing Instructions
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

The SNF must file a covered bill with the A/B MAC (A) using occurrence span code 77 that indicates the facility is liable for the services in situations where the SNF failed to issue the proper beneficiary liability notice and any applicable copayments will be charged to the beneficiary's Part A benefit period.  Furthermore, the sum of all covered units reported on all revenue code 0022 lines should be equal to the covered days field less the number of provider liable days reported in the occurrence span code 77.  See §60 of Chapter 1 in this manual for detailed instructions on nonpayment billing requirements.

When the SNF is liable for the Part A stay, the SNF is required to provide all necessary covered Part A services, including those services such as therapies and radiology mandated under consolidated billing.  For example, if the beneficiary goes to the hospital

for a non-emergency chest x-ray, the SNF will be responsible for the outpatient hospital radiology and any ambulance charges. In this case, the SNF may not charge the beneficiary or family members for any services that, in the absence of a payment sanction, would have been covered under the Part A PPS payment.

### 50.2.3 - Beneficiary Liability Billing Instructions
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

The SNF shall file a non-payment bill for noncovered Part A services, using condition code 21 that indicates beneficiary liability.  Services that would have been eligible for Part A benefits in the absence of sanctions cannot be billed as Part B charges.  However, the SNF may directly bill the beneficiary, family members or other third party insurers for services provided to that beneficiary.

### 50.2.4 - Part B Billing
**(Rev. 1, 10-01-03)**

PM AB-01-131

Facilities subject to a payment ban may continue to bill services for beneficiaries who are not in a Part A stay in the same way as any other SNF.  However, services that would have been payable to the SNF as Part A benefits in the absence of a payment sanction must not be billed to either the A/B MAC (A) or the A/B MAC (B) as Part B services.

### 50.3 - Sanctions Lifted: Procedures for Beneficiaries Admitted During the Sanction Period
**(Rev. 1, 10-01-03)**

PM AB-01-131

For new admissions to certified beds, Medicare payments for eligible beneficiaries should begin on the date the sanction is lifted.  The beneficiary must meet technical eligibility requirements (e.g., a 3-day hospital stay, etc.), services must be reasonable and necessary and the beneficiary must be receiving skilled care.  The date the sanction is lifted is considered the first day of the Part A stay.

For Part A PPS payment purposes, the period between the actual date of admission and the last day the sanction was in effect should be billed as noncovered days.

(See §50.3.1 below on procedures to track these noncovered days for benefit period and break in spell of illness calculations.  RAI requirements are discussed in §30.5.)

### 50.3.1 - Tracking the Benefit Period
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

SNF days during the sanction period will be used to track breaks in the spell of illness if a beneficiary's care in the SNF meets the skilled level of care requirements.  If the patient is receiving a skilled level of care the benefit period cannot end.  Therefore, it will be tracked in CWF.

## 50.3.2 - Determining Whether Transfer Requirements Have Been Met
**(Rev. 1, 10-01-03)**

**PM AB-01-131**

It is very important to safeguard the beneficiary while applying necessary sanctions to the provider.  It is certainly possible that a beneficiary may remain at a facility under sanction for a period of time and later transfer to a second SNF.  The 30-day transfer requirement will be applied in the same way it would be for a beneficiary transferring between two SNFs that are not under sanction.  Part A coverage will be available to the second SNF for all remaining days in the benefit period as long as the beneficiary:

1. Had a qualifying hospital stay

2. Was admitted to a Medicare-certified bed in the first (sanctioned) SNF within 30 days of the hospital discharge, and

3. Is receiving a covered level of care at the time of transfer.

## 50.4 - Conducting Resident Assessments
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

The imposition of sanctions does not waive the SNF's responsibility to perform assessments in accordance with the clinical schedule defined in the SOM. Comprehensive admission assessments are still due within 14 days of admission to the SNF. Facility staff must also maintain the schedule for quarterly and annual assessments, and perform SCSAs and SCPAs when clinically appropriate.

Medicare-required assessments are also necessary for all beneficiaries in the SNF whose stays are not subject to the payment ban.  If, during the sanction period, staff do not perform Medicare-required assessments for beneficiaries in covered Part A stays, no payment is made and the SNF must submit a claim using the HIPPS default rate code and an occurrence code 77 indicating provider liability, in order to ensure that the beneficiary's spell of illness (benefit period) is updated.

Part A benefits are NOT available for beneficiaries admitted after the effective date of the payment ban.  Therefore, the facility is not required to perform Medicare PPS assessments.  Medicare payments can begin no earlier than the date the sanction is lifted. For Medicare PPS assessment scheduling purposes, the date the sanction is lifted should be considered day 1.  In this case, if the sanctions are lifted effective June 15, the

assessment reference date for the Medicare 5-day assessment must be set between June 15 and June 22 (i.e., the eighth day of the covered stay).

An SNF may choose to perform the Medicare-required assessments during the sanction period, but is not required to do so.  Generally, a facility should continue to do the Medicare PPS assessments if SNF staff believe the sanction was in error and may be lifted retroactively.  In this case, the SNF would be able to bill Medicare at the correct rate.

When the SNF does not receive timely notification that a payment ban has been lifted, and staff is unaware of the need to start the Medicare-Required schedule (the beneficiary meets all applicable eligibility and coverage requirements), the SNF shall bill the Medicare 5-day and 14-day assessment using the HIPPS code generated by the 14-day OBRA required assessment.  If the SNF did not perform any assessments with an assessment reference date during the assessment window for the Medicare-Required 5-day or 14-day assessment, the SNF shall bill the default rate for those covered days associated with the assessment.  Where the SNF did not perform an assessment with an ARD that fell in the applicable Medicare-Required Assessment window for the 30, 60 and 90-day Medicare-Required Assessments it shall bill the default rate.  If the SNF did perform an assessment, including a SCSA, where the ARD fell in the window of a 30, 60 or 90-day Medicare-Required Assessment (including grace days), the SNF shall bill using the HIPPS code generated from the assessment in accordance with the payment policies found in Chapter 28 of the Provider Reimbursement Manual.  The date the sanction is lifted is Day 1 for purposes of the Medicare assessment schedule.

> **NOTE**: In order to bill with the default code the beneficiary must at least meet the requirements for SNF coverage.

**EXAMPLE 1**:    The SNF is notified on June 15th that its payment ban was lifted effective June 1.  The beneficiary was admitted on June 1.  The SNF did not perform any of the Medicare-Required Assessments.  However, the SNF did perform the initial OBRA assessment.  The initial OBRA assessment shall be used to bill the 5-day Medicare-Required Assessment for up to 14 days.  Day 15 is day 1 for purposes of starting the Medicare-required assessment schedule and a 5-day Medicare required assessment shall be performed.

**EXAMPLE 2**:    The SNF is notified on August 15 that its payment ban was lifted on June 1.  The beneficiary was admitted on June 1.  The SNF did not perform any of the Medicare-Required Assessments.  However, the SNF did perform the initial OBRA Assessment.  The initial OBRA assessment shall be used to bill the 5-day Medicare required assessment and the 14-day Medicare required assessment.  The 30-day assessment shall be billed through day 44 at the default rate.  Day 45 is day 1 for purposes of starting the Medicare- required assessment schedule and a 5-day Medicare required assessment shall be performed.

See §120.1 for the revised Medicare-required assessment schedule under the SNF PDPM effective October 1, 2019.

## 50.5 - Physician Certification
**(Rev. 1, 10-01-03)**

**PM AB-01-131**

The SNFs under a payment ban are still participating providers, and remain subject to Medicare coverage requirements.  Providers are still responsible for evaluating whether beneficiaries meet the Medicare Part A medical necessity and level of care requirements for Medicare Part A coverage, and for obtaining the required physician certifications even though Medicare payment cannot be made for the admission.

The SNFs are required to obtain physician certifications upon notification that a sanction was lifted.  The date of notification will be considered day 1 when verifying the timeliness of the physician certification.

When A/B MACs (A) process a reconsideration for a claim that was billed as a Part A stay, but rejected due to an incorrect application of the sanction provision, the physician certification is required regardless of the dates of service.  Since the provider clearly believed the stay was eligible for Part A payment, all Medicare coverage requirements must have been met.

## 50.6 - A/B MACs (A) Responsibilities
**(Rev. 1555; Issued:  07-18-08; Effective Date:  01-01-09; Implementation Date: 01-05-09)**

The A/B MACs (A) will receive notices from the CMS Regional Office when sanctions have been imposed or lifted and in some cases when sanctions are proposed.  The CMS' primary objective is always to bring the facility into compliance.  In many cases, enforcement activity does not go beyond the notice of intent.  A/B MACs (A) shall initiate action only when notified that sanctions have been imposed.

Upon notification that a sanction is imposed, A/B MACs (A) shall identify claims affected with admission dates on and after the effective date of the sanction. Overpayments for claims erroneously paid should be recovered and CWF properly updated to reflect the payment ban action.  Claims for new admissions should be denied from the date of admission through the last date of the sanction period.

In addition, A/B MACs (A) shall determine whether claims with admission dates after the effective date of the sanctions qualify for readmission status, as defined in the previous sections, and are not subject to a payment ban.  A/B MACs (A) shall bypass local payment ban edits for claims that are not subject to a payment ban when dates associated with occurrence span code 80, Prior Same-SNF stay for payment ban purposes, indicates

the beneficiary resided in the SNF prior to the imposition of the ban.  (See §50.2 above for further payment ban bypassing criteria for hospitalizations and LOAs).

## 50.7 - Retroactive Removal of Sanctions
**(Rev. 4409, Issued: 10-04- 19, Effective: 11-05-19, Implementation: 11-05-19)**

**PM AB-01-131**

Occasionally, resolution between the State Agency and the SNF is reached after the payment ban has been imposed, and the ban is removed retroactive to its effective date.  If bills were denied before notice was received that the ban had been reversed, they should be reprocessed and paid.  When reprocessing bills, MDS assessments are needed to support the case-mix classification group billed.

Beneficiaries and providers may request A/B MACs (A) to reopen and process bills denied as a result of a misunderstanding of the sanction requirements.  These reopenings shall be done on a request basis only, and will be limited to service dates on and after January 1, 1999.

## 60 - Billing Procedures for a Composite SNF or a Change in Provider Number
**(Rev. 767, Issued: 12-02-05, Effective: N/A, Implementation: N/A)**

**SNF-520, A3-3600.5**

A hospital with a sub-provider that meets the criteria for a composite distinct part SNF defined in 42 CFR 483.5 is required to use the single SNF number assigned for all claims, beginning with the date the provider number is effective.

Where there is a change of ownership (CHOW), and the new owner refuses assignment of the existing provider agreement, the old owner submits all claims for periods prior to the CHOW using the old provider number.  The new owner submits claims for services rendered after the date of the CHOW using the new provider number.

Also with respect to CHOWs, the SNF submits a bill with the old provider number for the period before the change and another with the new provider number for the period after the change.  The date of discharge on the first bill and the date of admission on the second bill are the same, which is the effective date of the new provider number.  All subsequent billings are submitted under the new provider number.

## 70 - Billing for Services After Termination of Provider Agreement, or After Payment is Denied for New Admissions
**(Rev. 767, Issued: 12-02-05, Effective: N/A, Implementation: N/A)**

## 70.1 - General Rules
**(Rev. 767, Issued: 12-02-05, Effective: N/A, Implementation: N/A)**

A SNF whose provider agreement terminates or that is denied payment for new admissions as an alternative to termination for noncompliance with one or more requirements for participation, may only be paid for covered Part A inpatient services under the following conditions:

**Termination (Voluntary or Involuntary)**

- Payment can continue to be made for up to 30 days for covered Part A inpatient services furnished **on and after** the effective date of termination for beneficiaries who were admitted **prior** to the termination date.

  **EXAMPLE:**  Termination date:  9/30/86

  o  Beneficiary admitted:  before 9/30/86
  o  Payment can be made:  from 9/30/86, up to and including 10/29/86

**Denial of Payments for New Admissions (DPNA)**

- Payment can continue to be made for covered Part A inpatient services furnished **on or after** the effective date of denial of payments for beneficiaries who were admitted **before** the effective date of denial of payments.

  **EXAMPLE:**  Denial of payment date:  9/30/86

  o  Beneficiary admitted before:  9/30/86
  o  Payment can be made:  Indefinitely

For detailed instructions on SNF payment bans, or denial of payment for new admission see IOM 100-04, Chapter 6, section 50.

**NOTE:**  An inpatient, who goes on leave from the SNF before or after the effective date of denial of payments for new admissions is not considered a new admission when returning from leave.

## 70.2 - Billing for Covered Services
**(Rev. 4247, Issued: 03-01-19, Effective: 04-01-19, Implementation: 04-01 -19)**

The term Medicare beneficiary identifier (Mbi) is a general term describing a beneficiary's Medicare identification number. For purposes of this manual, Medicare beneficiary identifier references both the Health Insurance Claim Number (HICN) and the Medicare Beneficiary Identifier (MBI) during the new Medicare card transition period and after for certain business areas that will continue to use the HICN as part of their processes.

Upon cessation of a SNF's participation in the program, or when a SNF is not receiving payments for new admissions, the RO is supplied with the names and Medicare

beneficiary identifiers of Medicare beneficiaries entitled to have payment made on their behalf for services in accordance with §80.1.

SNFs no longer participating in the program, or those under a denial of payment for new admissions, continue to bill for covered services per §80.l.  They continue to submit "no-payment" death, discharge and reduction from SNF level of care bills for Medicare beneficiaries admitted prior to the termination of their agreement, or prior to the denial of payments for new admissions.

## 70.3 - Part B Billing
**(Rev. 767, Issued: 12-02-05, Effective: N/A, Implementation: N/A)**

Following termination of its agreement, a SNF is considered to be a "nonparticipating provider."  An inpatient of such a SNF who has Part B coverage, but for whom Part A benefits have been exhausted or are otherwise not available, is entitled to payment only for those services that are covered in a nonparticipating institution.  Do not bill Part A services furnished **on or after** the effective date of termination.

## 80 - Billing Related to Physician's Services
**(Rev. 2245, Issued: 06-16-11, Effective: 08-01-11, Implementation: 08-01-11)**

Normally physicians are responsible for billing for their own services.

The services of facility-based physicians (e.g., those on a salary or percentage arrangement, lessors of departments, etc., whether or not they bill patients directly) include two distinct elements - the professional component and the provider component.

The professional component of facility-based physicians' services includes services directly related to the medical care of the individual patient.  SNFs cannot bill for the professional components of physician services, these must be billed under a physician provider number to the A/B MAC (B).  The technical component (e.g. the component representing the performance of the diagnostic procedure itself) of physician services delivered to SNF inpatients are bundled into the Part A PPS payment and not paid separately.

### A - Podiatry Services

Covered professional services rendered by facility-based podiatrists to individual patients are covered only as physicians' services under Part B.  Note that certain foot care services are excluded under both Part A and Part B.  Payments to podiatrists for noncovered services are not allowable Medicare costs regardless of whether the podiatrist's professional services are covered under Part B.

## 80.1 - Reassignment Limitations
**(Rev. 1, 10-01-03)**
**SNF-507**

Assigned benefits for physician's services may not be paid to anyone other than the physician who furnished the services, except:

- To the employer of the physician who provided the service, if such physician is required as a condition of his employment to turn over his fee for the service to his employer.  (See §80.2 below.)

- To a facility in which the service is provided if there is a contractual arrangement between the facility and the physician furnishing the service under which only the facility can bill for the service.  (See §80.3 below.)

- To an organization, which furnishes health care through an organized health care delivery system (e.g., a freestanding physician clinic, or prepaid group practice prepayment plan) if there is a contractual arrangement between the organization and the physician furnishing the service under which only the organization can bill for the service.

## 80.2 - Payment to Employer of Physician
**(Rev. 1, 10-01-03)**
**SNF-508, SNF-510**

Subject to the conditions and limitations described below, payment of Part B benefits due a physician under assignment for services furnished in a facility may be made to the facility if the facility and physician have an agreement under which only the facility may bill and receive fees or amounts charged for the services.
40.1
Form CMS-855R must be completed to describe the arrangement with the facility.  This form and instructions for completing it can be downloaded from the CMS Forms Web page.  See the Medicare Program Integrity Manual for processing instructions after completion.

The contractual arrangement between the facility and a physician may apply to all services the physician furnishes in the facility, or merely to a particular category of services that is clearly distinguishable from other categories.  The distinction between the categories must be consistent with proper determination of Part B reimbursement and may not be based on whether the patient has Medicare.

While the law permits physicians to reassign to a facility the Part B benefits for the patient care services they perform in the facility, this exception in favor of the facility is intended to apply to an arrangement in which the facility obtains a significant degree of control or interest in the disposition of the benefits.  Under the law, Medicare benefits cannot be paid to a facility under terms that make the facility a mere conduit for payment to another person or entity.

**EXAMPLE**

Under an agreement between a facility and a partnership of teaching physicians, the facility bills and receives payment in its name for the physician services but is required to turn over to the partnership all fees received, less a small deduction to defray billing expenses.  The partnership distributes the monies received among its physician members in accordance with the partnership agreement.  Since the SNF functions under the agreement as a mere conduit for payment to the partnership, the agreement is not an acceptable contractual arrangement for purposes of the exception to the prohibition on reassignment.

## 80.3 - Information Necessary to Permit Payment to a Facility
**(Rev. 1, 10-01-03)**
**SNF-510.1**

A facility may ordinarily qualify to receive Part B payment for the services of physicians in the facility by submitting a Form CMS-855R to its A/B MAC (A), certifying that it will bill for their services only as called for by its written contractual arrangements.

For purposes of Medicare benefits payable for the services, this agreement may be terminated by either party upon written notice to the other, but such termination is not binding upon Medicare until two weeks after the A/B MACs (A) receives a revised Form CMS-855R notice of this termination.

## 80.4 - Services Furnished Within the SNF
**(Rev. 1, 10-01-03)**
**SNF-510.2**

The term "facility" is limited for purposes of furnishing services to individuals as inpatients, e.g., hospitals, university medical centers that own and operate hospitals, SNFs, nursing homes, homes for the aged, or other institutions of a similar nature.  Physician services furnished outside the physical premises of the facility are considered furnished in the SNF if furnished in connection with services received by patients in the SNF.  For example, if SNF inpatients are taken to the private office of a neurologist for necessary tests such as an encephalograph, the services are considered performed in the SNF for billing and payment.

## 80.5 - Billing Under Arrangements
**(Rev. 1, 10-01-03)**
**SNF-510.2**

A provider may have others furnish certain covered items and services to their patients through arrangements under which receipt of payment by the provider for the services discharges the liability of the beneficiary or any other person to pay for the service.  In permitting providers to furnish services under arrangements, it is not intended that the provider merely serve as a billing mechanism for the other party.  Accordingly, for services provided under arrangements to be covered, the provider must exercise professional responsibility over the arranged-for services.  See the Medicare General

Information, Eligibility, and Entitlement Manual, Chapter 5, "Definitions," §10.3, for additional discussion on services furnished under arrangement.

The law is silent regarding specific terms of a SNF's payment to the outside provider or supplier and currently does not authorize the Medicare program to impose any requirements in this regard.  Thus, the issue of the outside provider or supplier's payment by the SNF is a private, contractual matter that must be resolved through direct negotiations between the parties.  However, services provided under consolidated billing arrangements must be provided by Medicare certified providers that are licensed to provide the service involved.  In addition, payment may not be made if the provider or supplier is subject to OIG sanctions that would prohibit Medicare payment for the service if the provider or supplier were billing independently.

In some cases, SNFs may purchase services for their patients from a hospital "under arrangements."  Such services may include a physician component.  When the physician has entered into a valid contractual arrangement with the hospital in which his/her services are furnished for it to bill for the services, no additional written authorization is needed for SNFs to bill for his/her services.  For example, where SNFs arrange to obtain an EKG interpretation from Hospital B, and Hospital B has a valid contractual arrangement with its cardiologist authorizing it to bill for his/her services, SNFs do not need written authorization from the cardiologist to bill Medicare for the cost of the services.

See the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care (SNF) Services Under Hospital Insurance," §70.4, for additional information on services under arrangements.

## 80.6 - Indirect Contractual Arrangement
**(Rev. 1, 10-01-03)**
**SNF-510.3**

The necessary contractual arrangement between physicians and the facility in which they perform their services may exist indirectly by reason of the terms of their relationship with an employer and the employer's contractual arrangement with the facility.

**EXAMPLE**

A professional corporation enters into a contractual arrangement with an SNF to provide physician services for it.  Under this arrangement, the SNF alone bills and receives payment for the physician services and pays the corporation a percentage of the charges.  The corporation, in turn, employs several physicians to provide the services, and under the terms of their employment, is entitled to any fees payable for the services (other than the portion of the fees retained by the SNF).  The combination of the two arrangements - between the SNF and the corporation and the corporation and the physicians - constitutes an indirect contractual arrangement between the SNF and the physicians.  For the SNF to bill and receive payment for the physician services furnished in the SNF, the SNF must also enter into a direct contractual arrangement with the physicians for this purpose.

### 80.7 - Establishing That a SNF Qualifies to Receive Part B Payment on the Basis of Reassignment
**(Rev. 1, 10-01-03)**
**SNF-512**

A SNF wishing to receive Part B payment as a reassignee of one or more physicians must furnish the A/B MAC (B) sufficient information to establish clearly that it qualifies or does not qualify to receive payment for their services.  Where there is any doubt that a SNF qualifies as a reassignee, A/B MACs (B) will obtain additional evidence.

In some cases, a SNF may qualify to receive payment for the services of a physician both as the employer of the physician and as the facility in which the services are performed. As soon as it is determined that a SNF can qualify on either basis, no further development is undertaken with respect to that physician or to other physicians having the same status, and reassigned claims submitted by the SNF for services furnished by those physicians are honored.  However, where other physicians have, or appear to have different status, further development is required.  It is possible in some instances that a determination is made that Part B payment can be made only to the physician himself.

Where the SNF qualifies as a reassignee, it assumes the same liability for any overpayments that it may receive as a reassignee as the physician would have had if the payment had been made to him/her.

### 90 - Medicare Advantage (MA) Beneficiaries
**(Rev. 1252, Issued:  05-25-07; Effective:  10-01-06; Implementation:  08-27-07)**

For billing to MA plans, SNFs follow the requirements of the agreement they have with the plans.  In cases where the patient may have enrolled or disenrolled from the plans during the billing period, the SNF will split the bill and send the plan's portion to it and the remaining portion to the A/B MAC (A).

### 90.1 - Beneficiaries Disenrolled from MA Plans
**(Rev. 1618, Issued: 10-24-08, Effective: 04-01-09; Implementation: 04-06-09)**

If a beneficiary voluntarily or involuntarily dis-enrolls from a risk MA plan while an inpatient of an SNF and converts to original Medicare (i.e., fee for service) the requirement for a three day hospital stay will be waived if the beneficiary meets the level of care criteria found in 42 CFR 409, Subpart D, up through the effective date of dis-enrollment.  The beneficiary will then be eligible for the number of days that remain out of the 100 day SNF benefit for that particular SNF stay minus those days that would have been covered by the program under original Medicare while the beneficiary was enrolled in the risk MA plan.  However, in cases where the beneficiary disenrolls from a risk MA plan after discharge from the SNF, and then is readmitted to the SNF under the 30 day rule, all requirements for original Medicare (i.e., fee for service), including the 3-day

hospital stay must be met.  Rules regarding cost sharing apply to these cases.  That is, providers may only charge beneficiaries for SNF coinsurance amounts.

If the beneficiary voluntarily disenrolls from a risk MA plan and converts to original Medicare (i.e., fee for service) <u>before admission</u> to a SNF then the beneficiary must meet **all** original Medicare requirements for a SNF stay, including that of a three day inpatient hospital stay.

SNFs submit all applicable fee-for-service inpatient SNF claims with condition code "58" to indicate a patient was disenrolled from an MA plan and the 3-day prior stay requirement was not met.  Claims with condition code 58 will not require the 3-day prior inpatient hospital stay.  The A/B MAC (A) must use CWF files to validate the beneficiary was enrolled in an MA organization upon admission to the SNF and that the MA enrollment period ended prior to the "from" date on the claim.  The A/B MAC (A) does not need to verify that the MA plan was the one that terminated.

## 90.2 - Medicare Billing Requirements for Beneficiaries Enrolled in MA Plans
**(Rev.4491, Issued: 01-09- 20, Effective: 04-01-20, Implementation: 04-06-20)**

If a beneficiary chooses an MA plan as his or her form of Medicare, he/she cannot look to traditional "fee for service" Medicare to pay the claim if the MA plan denies coverage. SNF providers shall apply the following policies to MA beneficiaries who are admitted to a SNF:
• If the SNF is non-participating with the plan, the beneficiary must be notified of his or her status because he/she MAY be private pay in this circumstance, depending upon the type of MA plan in which he/she is enrolled;

• If the SNF is participating with the plan, pre-approve the SNF stay with the plan;

• If the plan denies coverage, appeal to the plan, not to the "fee for service" FI;

• Count the number of days paid by the plan as Part A days used (this IS the beneficiary's 100 days of Medicare SNF benefits);

• Submit a claim to the "fee for service" A/B MAC (A) to subtract benefit days from the CWF records. (Note: The plans do not send claims to CWF for SNF stays). Failure to send a claim to the A/B MAC (A) will inaccurately show days available.

• If a beneficiary no longer requires skilled care under the MA plan the SNF may discharge the patient using a patient status code 04. No- payment bills are not required for beneficiaries that are receiving non-skilled care and are enrolled in an MA plan. If the beneficiary again requires skilled care after a period of non-skilled care, the provider should begin a new admission claim for Medicare to continue the spell of illness.

**Billing Requirements**

• Submit covered claims and include a HIPPS code (use default code AAA00 prior to 10/1/2019 and ZZZZZ after 10/1/2019) if no assessment was done), room and board charges and condition code 0**4.**

**NOTE:** If the beneficiary drops his or her MA plan participation during their SNF stay, the beneficiary is entitled to coverage under Medicare FFS for the number of days available that remain out of the 100 days available under the SNF benefit.

## 100 - Part A SNF PPS for Hospital Swing Bed Facilities
**(Rev. 1, 10-01-03)**
**PM A-02-016**

Section 4432(a) of the Balanced Budget Act (BBA) of 1997 specifies that swing bed facilities must be incorporated into Part A SNF PPS by the end of the statutory transition period.  Effective with cost reporting periods beginning on or after July 1, 2002, swing bed bills are not paid on the cost-based method, but rather on the basis of the Part A SNF PPS.  These payment rates cover all payment for furnishing covered swing bed extended care services (routine, ancillary, and capital-related costs) other than approved educational activities as defined in 42 CFR 413.85.

Part A SNF PPS applies to short-term hospitals, long-term care hospitals, and rehabilitation hospitals that have Medicare swing bed agreements.  CAHs with swing beds are exempt from the Part A SNF PPS, and are not affected by these instructions.

The Part A PPS is phased in based on each swing bed hospital's fiscal year.  The transition to Part A PPS is effective with the start of the provider's first cost reporting period that begins on or after July 1, 2002.  Consequently, billing for all beneficiaries in a swing bed must be split at the end of the provider's fiscal year.  A new bill is created for beneficiaries remaining in the facility at the start of the new fiscal year.  The bill must be prepared under the Part A PPS claim guidelines described in this chapter and in Chapter 1, "General Billing Requirements."  Payment is made according to the instructions for SNFs under Part A PPS found in the Medicare Provider Reimbursement Manual.

Providers of swing bed services submit Part A inpatient claims using TOB 18X.

The swing bed program does not include an inpatient Part B benefit.  For beneficiaries who continue to receive extended care services after the end of a Part A stay (e.g., benefits exhausted, not receiving a skilled level of care, etc.), ancillary services may be billed under the hospital as inpatient Part B services.

If the beneficiary remains a resident in the swing bed facility after the end of the Part A stay, the hospital may submit a claim to the A/B MAC (A) for those inpatient services covered by Part B using TOB 12X.  The beneficiary would be eligible for the same benefits available to a hospital inpatient in a Part B stay.  The hospital provider of SNF

level swing bed services must also file a Part A nonpayment bill monthly using the appropriate nonpayment code.

For Part A PPS purposes, A/B MACs (A) assign swing bed hospitals to provider type 38 on their Provider-Specific File.  Swing bed providers will be paid at 100 percent of the Federal rate.  Swing bed claims will be paid using the actual MSA code (based on county codes), and the related rural or urban rate tables.  A/B MACs (A) must set the Federal PPS Blend Indicator in the Provider-Specific file to "4."  The CMI ADJ CPD field should be blank.

Unless exceptions are noted, instructions applicable to SNFs are also applicable to swing bed providers e.g., demand bills, spell of illness, covered and noncovered days, nonpayment bills, and adjustment bills.

## 100.1 - Swing Bed Services Not Included in the Part A PPS Rate
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**
**PM A-02-016**

For their SNF-level inpatients, rural (non-CAH) swing bed hospitals must submit all services that are not specifically excluded from consolidated billing on their Part A swing bed bill (TOB 18x). However, they are eligible for additional payment outside the bundled SNF PPS rate for those services that are excluded from the SNF Part A consolidated billing requirements.  Further, because the swing bed hospital itself still remains subject to the hospital bundling requirements specified in §1862(a)(14) of the Act and in 42 CFR 411.15(m), it retains the Medicare billing responsibility for any excluded services to which the hospital bundling provision applies.  Accordingly, it would use a separate inpatient Part B claim to bill for such services (see §10.2 of this chapter).

As noted above, if a swing bed hospital furnishes a service or supply to a beneficiary receiving SNF-level services, which is excluded from the Part A PPS rate, the swing bed hospital may submit a separate bill to the A/B MAC (A) for the SNF PPS-excluded service.  This bill must use TOB 13x with all appropriate revenue codes, HCPCS codes, and line item date of service billing information and will be paid as inpatient Part B services under the Outpatient Prospective Payment System (OPPS).  (By contrast, those services bundled into the SNF PPS rate may not be billed separately, and must all be included on the Part A swing bed bill (TOB 18x).)  A list of services that are excluded from the SNF PPS rate is found in §§20.1 - 20.4 above.

Likewise, swing bed hospitals may file bills with the A/B MAC (A) for Part B Ancillary services furnished to beneficiaries who are not in a Part A PPS swing bed stay. Such claims are billed as inpatient Part B services, and are paid under the OPPS.

## 110 - A/B MAC (B)/DME MAC Claims Processing for Consolidated Billing for Physician and Non-Physician Practitioner Services Rendered to Beneficiaries in a SNF Part A Stay
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

For an overview of SNF consolidated billing, including types of facilities and services subject to consolidated billing, see sections 10 and 20.

## 110.1 - Correct Place of Service (POS) Code for SNF Claims
**(Rev. 76, 02-06-04)**

Place of Service (POS) code 31 should be used with services for patients in a Part A covered stay and POS code 32 should be used with services for beneficiaries in a noncovered stay.  A/B MACs (B) should adjust their prepayment procedure edits as appropriate.

## 110.2 - CWF Edits
**(Rev. 76, 02-06-04)**

The following edits have been implemented in CWF.

## 110.2.1 - Reject and Unsolicited Response Edits
**(Rev. 4247, Issued: 03-01-19, Effective: 04-01-19, Implementation: 04-01 -19)**

The term Medicare beneficiary identifier (Mbi) is a general term describing a beneficiary's Medicare identification number. For purposes of this manual, Medicare beneficiary identifier references both the Health Insurance Claim Number (HICN) and the Medicare Beneficiary Identifier (MBI) during the new Medicare card transition period and after for certain business areas that will continue to use the HICN as part of their processes.

### A.  Reject Edits

When CWF receives a bill from the SNF that shows that a beneficiary became a resident of a SNF, that SNF stay is posted to history.  Effective April 2002, for claims processed and adjusted with dates of service on or after April 1, 2001, CWF will apply the reject edits to any claims received after the SNF stay is posted that have dates of service during the periods the beneficiary is shown to have been a resident of the SNF based on that first SNF bill.  These claims can be correctly rejected since it will be clear that the beneficiary was in the SNF during those spans that were shown on the SNF claim.  This process will repeat when the next SNF bill is received.  The process will continue until CWF posts a discharge date, date of death, or the covered number of SNF days has been used.

Based on the CWF line item rejects, A/B MACs (B)/DME MACs must deny assigned and unassigned services they have been billed that should have been consolidated and paid by the SNF and/or billed to the A/B MAC (A).  Appeals rights must be offered on

all denials.  Shared systems must develop, and along with A/B MACs (B)/DME MACs must implement, an automated resolution process whereby when they receive a reject from CWF, they must pay those services correctly billed and only deny those services on the claim incorrectly billed to them.

**B. Unsolicited Response Edits**

Effective July 1, 2002, CWF implemented the unsolicited response edit based on the same coding files made available for the reject edits.  Upon receipt of a Part A SNF claim at CWF, CWF searches paid claims history and compares the period between the SNF from and through dates to the line item service dates of the claims in history.  It then identifies any services within the dates of the SNF stay that should have been subject to consolidated billing and should not have been separately paid by the A/B MAC (B)/DME MAC.

The CWF generates an unsolicited response, with a trailer that contains the identifying information regarding the claim subject to consolidated billing and a new trailer containing line item specific information that identifies all the individual services on that claim that fall within the SNF period.  The unsolicited response provides all necessary information to identify the claim, including Document Control Number, Medicare beneficiary identifier, beneficiary name, date of birth, and beneficiary sex.  CWF electronically transmits this unsolicited response to the A/B MAC (B)/DME MAC that originally processed the claim with consolidated services.  These unsolicited responses are included in the CWF response file.  The unsolicited responses in that file for claims to be adjusted for consolidated billing are identified with a unique transaction identifier. The previously paid claim is not canceled and remains on CWF paid claims history, pending subsequent adjustment.

Upon receipt of the unsolicited response, the shared system software reads the line item information in the new trailer for each claim and performs an automated adjustment to each claim.  Services subject to consolidated billing must be denied at the line level.  The adjusted claims must then be returned to CWF, so that the claim on CWF paid claims history is replaced with the adjusted record.  A/B MACs (B)/DME MACs must return the claims with entry code 5.  Both the covered and the non-covered services must be returned to CWF on the adjustment claim.

When CWF adjusts the claim on history, the deductible is updated on the beneficiary's file and the corrected deductible information is returned to the A/B MAC (B)/DME MAC in trailer 11.  To recover any monies due back to Medicare resulting from these denials, A/B MACs (B)/DME MACs must follow the criteria in current overpayment recovery for the policy guidelines for furnishing demand letters and granting appeals rights.

In cases where all services on the claim are identified in CWF as subject to consolidated billing, the claim is adjusted by the standard system to line item deny all the services on the claim.  These fully non-covered claims must be returned to CWF, in order to reflect the denial actions in CWF paid claims history and to update the information in CMS's

national claims history file.  A/B MAC (B)/DME MAC systems must employ existing processes for the submission of fully non-covered claims.

## 110.2.2 - A/B Crossover Edits
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

Effective April 1, 2002, CWF implemented the following crossover edits for A/B MAC (B) submitted claims.  Automated processes were implemented for the resolution of these edits based on the codes returned in the trailers from CWF.

### A. Edits 7258 and 7259 - Part B Physical Therapy Claim Against an Inpatient SNF 21x and Inpatient Part B 22x Claim

Reject if an A/B MAC (B) claim is received containing physical therapy (type of service of W), occupational therapy, or speech-language pathology and From/Thru Dates overlap or are within the From/Thru Dates on an SNF inpatient claim (21x) or an inpatient Part B claim (22x).

Use separate error codes where (1) dates are within (A/B MAC (B) will reject claim) or (2) where dates overlap (A/B MAC (B) will automate a separate denial message to provider).

Bypass the edit in the following situations:

- The 21x or 22x type of bill contains a cancel date.

- The incoming claim from date equals the SNF 21x or 22x history claim discharge date or incoming through date equals the SNF 21x or 22x history claim admission date.

Effective for claims with dates of service on or after April 1, 2001, CWF implemented revisions on January 2, 2008 to bypass the edits 7258 and 7259 when a therapy claim with a date of service on or after April 1, 2001 is submitted and the date of service is within the From/Thru dates of an occurrence Span code date of 74 reported on a SNF inpatient claim 21x in history.  This will allow for services to be separately payable outside of SNF consolidated billing during non-covered periods in the SNF.

Effective for claims with dates of service on or after April 1, 2001, CWF implemented revisions on April 7, 2008 to modify the existing therapy edit for Part B claims processing for non-covered SNF stays to read claims history to look for a 21x (SNF Inpatient) bill type that contains an Occurrence Code 22 (Date Active Care Ended) and a Patient Status Code 30 (Still patient or expected to return for outpatient services) where there is no subsequent 21x (SNF inpatient) bill type discharge claim from the same provider.  As therapy services provided in a SNF must be consolidated when a beneficiary is in either a covered or non-covered stay, CWF will reject claims with dates of service after the posted SNF claim containing Occurrence Code 22 (Date Active Care Ended) and Patient Status 30 (Still patient or expected to return for outpatient services)

until a 21x (SNF inpatient) bill type discharge claim is processed.  The entity furnishing the therapy services must look to the SNF for reimbursement rather than the A/B MAC (A) or (B).  For claims processed on or after January 5, 2009, this edit shall no longer be functional.  A/B MACs (A) and (B) shall re-open and-re-process claims previously denied due to this edit when brought to their attention should they determine that the beneficiary was not in a SNF stay during the period the therapy service was rendered.

**B. Edits 7260 and 7261 - Part B Claim Without Therapy Against an Inpatient SNF**

Reject if a Part B claim is received with From/Thru Dates overlapping or are within the From/Thru Dates on an SNF Inpatient claim (21x).  If the SNF 21x claim on history has patient status 30 <u>and</u> occurrence code 22 (Date Active Care Ended), use occurrence 22 date instead of the through date.

Use separate error codes where (1) dates are within (A/B MAC (B) will reject claim); or (2) where dates overlap (A/B MAC (B) will automate a separate denial message to provider).

Bypass the edit in the following situations:

- The 21x history claim contains a cancel date.

- The incoming A/B MAC (B) claim from date equals the SNF 21x history claim discharge date.  The incoming A/B MAC (B) claim through date equals the SNF 21x history claim admission date.

- A diagnosis code in any position on the incoming claim is for renal disease.

- The A/B MAC (B) claim contains ambulance codes per the files supplied to CWF in the annual and quarterly updates with modifiers other than N (SNF) in both the origin and destination on the same claim.

- The A/B MAC (B) claim is a CANCEL ONLY (Action Code 4) claim.

- The A/B MAC (B) claim is denied.

- The A/B MAC (B) service has a Payment Process Indicator other than A (allowed).

- The A/B MAC (B) claim contains only separately payable services per the files supplied to CWF in the annual and quarterly updates.

Effective for claims with dates of service on or after April 1, 2001, CWF implemented revisions on January 2, 2008 to bypass the edits 7260 and 7261 when a claim with a date of service on or after April 1, 2001 is submitted and the date of service is within the

From/Thru dates with an occurrence Span code date of 74, 76, 77, 79, or M1 reported on a SNF inpatient claim 21x in history or the date of service is greater than the occurrence date on a SNF inpatient claim 21x in history with an occurrence code date of A3, B3, or C3.  This will allow for services to be separately payable outside of SNF consolidated billing during non-covered periods in the SNF.

## 110.2.3 - Duplicate Edits
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

Effective April 1, 2002, CWF implemented the following duplicate edits for A/B MAC (B) submitted claims.

### A. Edit 7253 - Part B Ambulance Claim Against an Outpatient Part B SNF Ambulance Claim on History

Reject if a Part B claim is received with ambulance codes per the files supplied to CWF in the annual and quarterly updates and the Date of Service equals the Date of Service on an outpatient Part B SNF (23x) claim with revenue code 54x (ambulance).

Bypass the edit if either the incoming or history claim contains any of the following situations:

- The claim is a CANCEL ONLY (Action Code 4) claim.
- The claim is denied.
- The incoming claim payment process indicator is other than A (allowed).

### B. Edit 7257 - A/B MAC (B) or DME MAC or A/B MAC (A) Part B Claim Against An Inpatient B SNF (22x) Claim on History

Reject as a duplicate claim if an A/B MAC (B) or DME MAC Part B claim or A/B MAC (A) Part B claim (12x, 13x, 14x, 23x, 33x, 71x, 73x, 74x, 75x, 76x, 83x or 85x) is received containing date of service, HCPCS code and modifier if present, equal to the date of service, HCPCS code and modifier, if present, on an inpatient Part B SNF (221, 222, 223, 224 or 225) claim.

Bypass the edit if either the incoming or history claim contains any of the following situations:

- The claim is a CANCEL ONLY (Action Code 4) claim.
- The claim is denied.
- HCPCS code is not present on the A/B MAC (A) claim.
- The A/B MAC (B) Part B claim payment process indicator is other than A (allowed).
- For the A/B MAC (B)/DME MAC claim only, the Part B claim contains only separately payable services per the files supplied to CWF in the annual and quarterly updates.

## 110.2.4 - Edit for Ambulance Services
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

When a medically necessary transport from one SNF to another SNF occurs when the beneficiary is discharged from the first SNF and admitted to the second, this transport is included in consolidated billing. The first SNF is responsible for the ambulance service and the cost is included in the Part A rate. It is not separately billable. CWF will reject these services to the A/B MAC (B). The A/B MAC (B) must deny the service with appeals rights.

Effective for claims with dates of service on or after April 1, 2001, CWF implemented revisions on January 2, 2008 to bypass edit 7275 when a claim with a date of service on or after April 1, 2001 is submitted and the date of service is within the From/Thru dates with an occurrence Span code date of 74, 76, 77, 79, or M1 reported on a SNF inpatient claim 21x in history or the date of service is greater than the occurrence date on a SNF inpatient claim 21x in history with an occurrence code date of A3, B3, or C3. This will allow for services to be separately payable outside of SNF consolidated billing during non-covered periods in the SNF.

## 110.2.5 - Edit for Clinical Social Workers (CSWs)
**(Rev. 3481, Issued: 03-18-16. Effective: 06-20-16, Implementation: 06-20-16)**

Per the Balanced Budget Act, services provided by CSWs to beneficiaries in a Part A SNF stay may not be billed separately to the A/B MAC (B). Payment for these services is included in the prospective payment rate paid to the SNF by the A/B MAC (A). Though the policy was in effect since April 1, 2001, there were no corresponding edits. With the April 2003 release, CWF implemented a new SNF consolidated billing edit to prevent payment to CSWs for services rendered to beneficiaries in a Part A SNF stay.

Effective April 1, 2003, CWF established the new edit 7269 for services rendered to these beneficiaries with dates of service on or after April 1, 2001, for claims received on or after April 1, 2003. Once CWF determines that a beneficiary is in a Part A stay, prior to applying the edits that review procedure codes to determine if payment should be allowed, CWF will review the performing provider type of the submitting entity. If the performing provider type is 80, CWF will reject the claim to the A/B MAC (B) or return an unsolicited response with new error code 7269. The A/B MAC (B) will then take the same adjustment and recovery action as for other rejects and unsolicited responses.

When A/B MACs (B) receive the new reject code, they must deny the claim and use the following RA and MSN messages.

The contractor shall use the following remittance advice messages and associated codes when rejecting/denying claims under this policy. This CARC/RARC combination is compliant with CAQH CORE Business Scenario Three.

Group Code: CO

CARC: 96
RARC: N121
MSN: 13.10

Effective for claims with dates of service on or after April 1, 2001, CWF implemented revisions on January 2, 2008 to bypass edit 7269 when a claim with a date of service on or after April 1, 2001 is submitted and the date of service is within the From/Thru dates with an occurrence Span code date of 74, 76, 77, 79, or M1 reported on a SNF inpatient claim 21x in history or the date of service is greater than the occurrence date on a SNF inpatient claim 21x in history with an occurrence code date of A3, B3, or C3.  This will allow for services to be separately payable outside of SNF consolidated billing during non-covered periods in the SNF.

## 110.2.6 - Edit for Therapy Services Separately Payable When Furnished by a Physician
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

A number of therapy services are considered separately payable when provided by a physician and shall be paid separately by the A/B MAC (B).  However, these services are considered therapy when provided by a physical or occupational therapist and are subject to consolidated billing.

Effective for claims with dates of service on or after July 1, 2004, edits will be implemented in the claims processing system to correctly process claims for these services.  A complete list of these services can be found on the CMS website at https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/.

## 110.2.7 - Edit to Prevent Payment of Facility Fees for Services Billed by an Ambulatory Surgical Center (ASC) when Rendered to a Beneficiary in a Part A Stay
**(Rev. 1911; Issued:  02-05-10; Effective Date:  01-01-08; Implementation Date:  07-06-10)**

The Balanced Budget Act (BBA) of 1997 required the implementation of a SNF prospective payment system and the consolidated billing of services provided to residents of the SNF.  Facility services provided by a freestanding non-hospital ASC are included under the SNF CB provisions.  This edit will prevent payment of those facility services when provided in an ASC to a beneficiary in a Part A SNF CB stay.

Effective for claims with dates of service on or after January 1, 2008 that are processed on or after July 6, 2010, when CWF receives a claim for a facility service from an ASC that is enrolled as a provider specialty type 49, and the service has a Type of Service F, and the patient is in a Part A SNF stay, it shall notify the A/B MACs (B) that they shall reject the claim line for the service(s).  It shall send the same trailer that is currently sent for services subject to SNF consolidated billing.  (The services subject to this editing will also appear on the ASC Fee schedule.)

Also, when CWF receives a Part A SNF claim, it shall also notify A/B MACs (A), (B), or (HHH), and DME MACs through an unsolicited response of any facility services as described above that were incorrectly paid.  MACs shall follow current processes to recoup any overpayments.

A/B MACs (A), (B), (HHH), or DME MACs shall return the same messages found in Section 110.2.1C.

## 110.3 - CWF Override Codes
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

A CWF override code has been developed for A/B MAC (B) or DME MAC use where, in the course of pursuing a reconsideration, a provider or supplier may bring to the attention of the A/B MAC (B) a situation where services on a claim have been denied, but should actually be allowed to be paid through the A/B MAC (B)/DME MAC.  At the A/B MAC (B)/DME MAC's discretion, to allow that claim to process through CWF to payment, enter a "2" in the SNF consolidated billing override field.

## 110.4 - Coding Files and Updates
**(Rev. 1757, Issued: 06-19-09, Effective: 07-20-09, Implementation: 07-20-09)**

To correspond with the annual and quarterly coding and payment updates, CWF will be provided with files of codes that are not included in consolidated billing and can be paid through the A/B MAC (B) or DME MAC.  These codes are available for informational purposes on the CMS Web site at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/ConsolidatedBilling.html.  Changes in designation of codes from excluded to included (or vice versa) in consolidated billing will be considered corrections to align the codes with policy as opposed to changes in policy.  Newly established Healthcare Common Procedure Coding System codes will be added to CWF edits to allow A/B MACs (B)/DME MACs to make appropriate payments.

## 110.4.1 - Annual Update Process
**(Rev. 2802, Issued: 10-25-13, Effective: 01-01-14, Implementation: 01-06-14)**

Barring any delay in the Medicare Physician Fee Schedule, CMS will provide the new code files to CWF by November 1.  Should this date change, CWF will be notified through the appropriate mechanism.  All future updates will be submitted via a Recurring Update Notification form.  These Recurring Update Notifications also describe how the changes will be implemented.

CWF will be provided with 4 coding files (Physician Services, Professional Component of Physician Services to be Submitted with the 26 Modifier, Ambulance, and Therapy) that are effective based on dates of service January 1 through December 31 for that year.  New files shall be provided for each calendar year.  Quarterly updates to the four files will continue as usual.

A/B MACs (B)/DME MACs must continue to respond to rejects and unsolicited responses received from CWF per current methodology.

A/B MACs (B)/DME MACs must reopen and reprocess any claims brought to their attention for services that prior to this update were mistakenly considered to be subject to consolidated billing and therefore, not separately payable.  A/B MACs (B)/DME MACs need not search claims history to identify these claims.

Prior to January 1 of each year, new codes files will be posted to the CMS Web site at. https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/.  Should this date change, A/B MACs (B)/DME MACs will be notified through the appropriate mechanism.

Coding changes throughout the year may also be made as necessary through a quarterly update process.

As soon as the new code files are posted to the CMS Web site, through their Web sites and list serves, A/B MACs (B)/DME MACs must notify physician, non-physician practitioners, and suppliers of the availability of the files.

## 120 - Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM)
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

SNFs billing on Type of Bill (TOB) 21X and rural hospital (non-CAH) swing-bed providers billing on TOB 18X (subject to SNF PPS), will be subject to these requirements. Currently, under the SNF PPS, revenue code 0022 indicates that this claim is being paid under the SNF PPS. This revenue code can appear on a claim as often as necessary to indicate different Health Insurance Prospective Payment System (HIPPS) Rate Code(s) and assessment periods. The HCPCS/Rates field must contain a 5-digit "HIPPS Code". Under the previous case-mix classification model, the Resource Utilization Groups, version 4 (RUG-IV), the first three positions of the code contained the RUG group, and the last two positions of the code contained a 2-digit assessment indicator (AI) code.

## 120.1 - HIPPS Updates and Structure Changes
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

Under PDPM, the HIPPS code is structured differently, as a result of there being five case-mix adjusted rate components under the revised model. The first position represents the Physical and Occupational Therapy case-mix group. The second position represents the Speech-Language Pathology case-mix group. The third character represents the nursing case-mix group. The fourth character represents the Non-Therapy Ancillary (NTA) case-mix group. The fifth character represents the AI code. CMS would note that this also affects the number of potentially valid HIPPS codes under PDPM, as compared to RUG-IV.

The PPS assessment schedule under PDPM is also significantly different from that used under RUG-IV. The only assessments under PDPM that would produce a HIPPS code would be the initial Medicare ("5-day") PPS assessment, which follows the same schedule as under the previous RUG-IV model, and the optional Interim Payment Assessment (IPA), which may be completed at any point during a PPS stay.

The initial SNF PDPM HIPPS Codes can be found online at:
https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ProspMedicareFeeSvcPmtGen/HIPPSCodes.html

Note: AAA00 default will be replaced with ZZZZZ effective October 1, 2019.

## 120.2 - Interrupted Stay Policy
**(Rev. 10880, Issued: 08-06-21, Effective: 11-08-21, Implementation: 11-08-21)**

PDPM includes an interrupted stay policy, which would combine multiple SNF stays into a single stay in cases where the patient's discharge and readmission occurs within a prescribed window (i.e., interruption window), similar to that which exists currently in many other Medicare inpatient facilities.  Specifically, if a patient in a covered Part A SNF stay is discharged from the SNF but returns to the SNF no later than 11:59pm of the third consecutive calendar day after having left Part A coverage, then this would be considered a continuation of the same SNF stay. In such cases, no new patient assessments are required and the variable per diem adjustment is not reset.  If the patient returns to the same SNF outside the interruption window, or returns to a different SNF, then this would be considered a new stay.

The interruption window begins on the first non-covered day following a Part A-covered SNF stay and ends at 11:59pm on the third consecutive non-covered day.  The first non-covered day in this context may be different depending on whether the patient actually leaves the facility or simply leaves Part A coverage.  Specifically, if the patient physically leaves the SNF, the first day of the interruption window would be the day of departure itself, whereas if the patient simply discontinues Part A coverage but remains in the SNF, the first day of the interruption window would be the day following the final day of Part A coverage.

Specifying the endpoint of the interruption window's third day as occurring at 11:59 pm rather than at midnight is consistent with the regulations at 42 CFR 411.15(p)(3)(iv), which define a beneficiary's SNF "resident" status for consolidated billing purposes as ending whenever he or she is formally discharged (or otherwise departs) from the SNF, unless he or she is readmitted (or returns) to that or another SNF ". . . **before** the following midnight" (emphasis added). See §10.1 of this chapter, and also see §20.1 in the Medicare Benefit Policy Manual, Chapter 3, which specifies that in counting inpatient days, ". . . a day begins at midnight and ends 24 hours later."  However, unlike similar interrupted stay policies under some of the other prospective payment systems, the SNF interrupted stay policy is not used in determining whether bundling would apply to services furnished during the interruption.  That determination would instead continue to

follow the longstanding set of rules under 42 CFR 411.15(p)(3) regarding SNF "resident" status for consolidated billing purposes (see §§10ff.).

The day of discharge (as noted above, this date could be different if the patient leaves the facility or simply leaves Part A coverage) is the FROM date and the last day the patient is not in the SNF at midnight is the THROUGH date.  Occurrence span code 74 should be reported for each interruption of more than ONE day.

The interrupted stay would be recorded on the claim in the same manner as is done for the IRF PPS, and as further discussed in the examples below.

**Examples:**
1) Patient is admitted to SNF on 11/07/19 and is in a covered Part A stay. Patient is discharged from the SNF and admitted to the hospital on 11/20/19.  Patient is readmitted to the same SNF on 11/25/19 and is in a covered Part A stay.  The readmission is a new stay because more than 3 days have passed from the date the patient was discharged from the SNF and the date the patient was readmitted to the same SNF.

New stay
Assessment Schedule: Reset; stay begins with new 5-day assessment.
Variable Per Diem (VPD): Reset: stay begins on Day 1 of VPD Schedule.

2) Patient is admitted to SNF on 11/07/19 and in a covered Part A stay.  The patient is discharged from Part A on 11/20/19 but remains in the facility.  The patient returns to a covered Part A stay on 11/22/19.  This is a continuation of a previous stay because the patient returned to a covered Part A stay within 3 days of being discharged from a covered Part A stay.

Continuation of previous stay
Assessment Schedule: No PPS assessments required, IPA optional
VPD: Continues from Day 14 (Day of Part A Discharge).

**Billing Example**: Patient is admitted to SNF on 10/1/2019 and discharged to home on 12/25/2019, with an interrupted stay to an IPPS on 10/20/2019-10/22/2019. This was an admission to an IPPS on 10/20/2019-10/22/2019.

10/1/2019 – 10/31/2019 first interim claim,
Claim must be billed with occurrence span code 74 and occurrence span dates 10/20 – 10/21/2019 to represent the interrupted stay,
11/1/2019 – 11/30/2019 second interim claim,
12/1/2019 – 12/25/2019 final interim claim,
(Occurrence span code 74 only appears on the claim in which its dates fall within the statement covers period – in this example only on October claim).

- Accommodation revenue code 018x is reported during the interrupted stay and is when the beneficiary is not present at the midnight census taking time.
- Occurrence span code 74 and date range for the interruption.

Days for the interruption shall be reported as non-covered, not to exceed 3 days or it will be considered a new admission.

On the SNF Medicare bill, the presence of occurrence span code 74 indicates an interrupted stay has occurred.  Report occurrence span code 74 with the FROM and THROUGH dates of the interruption in the stay.  The day of discharge from the SNF is the FROM date and the last day the patient is not in the SNF at midnight is the THROUGH date.  Report accommodation revenue code 18X (leave of absence) and the quantity of leave days.  Occurrence span code 74 should be reported for each interruption of more than 1 day along with the dates of each interruption.  Revenue code 018X should reflect the total number of days for all occurrence span code 74 entries.  In other words, revenue code 018X should be listed on one line, with all interrupted days included in the units column.  No charges should be added to this charge line.

## 120.3 - Variable Per Diem (VPD) Adjustment
**(Rev.4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

The Social Security Act requires that Medicare Part A-covered SNF stays be paid on a per-diem basis. PDPM SNF PPS per diem payments will be reduced according to a prescribed schedule, referred to as the VPD adjustment. Specifically, the PDPM provides for an adjustment factor that is applied to certain components and changes the per diem rate over the course of the stay.

Thus, under PDPM, the per diem rate for a given day of the SNF PPS stay may be different from the prior day, depending on an adjustment factor that may be applied against the SNF PPS rate connected with the HIPPS code. Moreover, the VPD schedule applies only to the PT, OT, and NTA components of the per diem rate, with different schedules for the PT/OT components than for the NTA component. A similar adjustment exists under the Inpatient Psychiatric Facility (IPF) PPS.

For the PT, OT, and NTA components, the case-mix adjusted per diem rate is multiplied against the variable per diem adjustment factor, following a schedule of adjustments for each day of the patient's stay

**<u>VPD Adjustment Schedules</u>**

PT & OT Components

| Day in Stay | Adjustment Factor | Day in Stay | Adjustment Factor |
|---|---|---|---|
|  |  |  |  |

| | | | |
|---|---|---|---|
| **1-20** | 1.00 | **63-69** | 0.86 |
| **21-27** | 0.98 | **70-76** | 0.84 |
| **28-34** | 0.96 | **77-83** | 0.82 |
| **35-41** | 0.94 | **84-90** | 0.80 |
| **42-48** | 0.92 | **91-97** | 0.78 |
| **49-55** | 0.90 | **98-100** | 0.76 |
| **56-62** | 0.88 | | |

NTA Component

| **Day in Stay** | **Adjustment Factor** |
|---|---|
| | |
| **1-3** | 3.00 |
| **4-100** | 1.00 |

## 120.4 - AIDS Adjustments
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**
As under the previous RUG-IV model, patients with a "B20" ICD-10 diagnosis code on the SNF claim, meaning the patient has AIDS/HIV, receive an adjustment factor for their PPS rate. Under PDPM, the adjustment factor is different from that used under RUG-IV. Rather than a 128 percent adjustment for the entire PPS per diem rate, the adjustment under PDPM is an increase of 18 percent in the nursing component of the per diem rate and a reclassification under the NTA component to a higher rate category.
All other adjustment factors, such as adjustments for geographic variation in wage costs, remain the same under PDPM as under the previous RUG-IV model.

## 120.5 - Transition Claims
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

With regard to transition between RUG-IV and PDPM, a hard transition between the two systems has been implemented, such that days paid under RUG-IV would stop on September 30, 2019 and days would be paid under PDPM beginning October 1, 2019.

In order to receive a RUG-IV HIPPS code that can be billed for services furnished prior to October 1, 2019, providers must use an assessment with an ARD set for on or prior to September 30, 2019.

If the patient's stay begins on or after October 1, 2019, then the provider would begin with the 5-day assessment, as usual.

For patients admitted prior to October 1, 2019, but whose stays continue past this date, in order to receive a PDPM HIPPS code that can be used to bill for services furnished on or after October 1, 2019, providers must complete an IPA with an ARD no later than October 7, 2019 (i.e., transitional IPA):

October 1, 2019, will be considered Day 1 of the VPD schedule under PDPM, even if the patient began their stay prior to October 1, 2019.

Any "transitional IPAs" with an ARD after October 7, 2019, will be considered late and relevant penalty for late assessments would apply (described below).


## 120.6 - Default Billing
**(Rev. 4409, Issued: 10-04-19, Effective: 11-05-19, Implementation: 11-05-19)**

As under RUG-IV, there may be instances in which providers may bill the "default" rate on a SNF claim (e.g., when an MDS assessment is considered late).

- The default rate refers to the lowest possible per diem rate.
- The default code under PDPM is ZZZZZ, as compared to the default code under RUG-IV of AAA00.
- Billing the default code under PDPM represents the equivalent of billing the following PDPM groups:

PT Payment Group: TP

OT Payment Group: TP

SLP Payment Group: SA

Nursing Payment Group: PA1

NTA Payment Group: NF

## Transmittals Issued for this Chapter

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R11109CP | 11/04/2021 | Skilled Nursing Facility (SNF) Claims Processing Updates | 01/03/2022 | 12344 |
| R10904CP | 08/10/2021 | Skilled Nursing Facility (SNF) Claims Processing Updates – Rescinded and replaced by Transmittal 11109 | 01/03/2022 | 12344 |
| R10880CP | 06/08/2021 | Internet Only Manual Updates to Pub. 100-01, 100-02, and 100-04 to Implement Consolidated Appropriations Act Changes and Correct Errors and Omissions (SNF) | 11/08/2021 | 12009 |
| R10569CP | 01/14/2021 | Updates to Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM) Claims | 04/05/2021 | 11992 |
| R10448CP | 11/06/2020 | Updates to Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM) Claims – Rescinded and replaced by Transmittal 10569 | 04/05/2021 | 11992 |
| R10236CP | 07/31/2020 | Update to the IOM Publication (Pub) 100-04, Medicare Claims Processing Manual, Chapters 1, 6, 8, 17, 20, 22, 24, and 31 Referencing the Active Universal Resource Locators (URLs) for the Washington Publishing Company (WPC) and the ASC X12 Organizations, and Updates to the HIPAA Eligibility Transaction System (HETS) | 08/31/2020 | 11857 |
| R10222CP | 07/14/2020 | Updates in the Fiscal Intermediary Shared System (FISS) Inpatient Provider Specific Files (PSF) | 10/05/2020 | 11797 |
| R10140CP | 05/15/2020 | Updates in the Fiscal Intermediary Shared System (FISS) Inpatient Provider Specific Files (PSF)- Rescinded and replaced by Transmittal 10222 | 10/05/2020 | 11797 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| | 01/09/2020 | Updates to CR 11152 Implementation of the Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM) | 04/06/2020 | 11513 |
| R4409CP | 10/04/2019 | Manual Updates for CR11152 Implementation of the Skilled Nursing Facility (SNF) Patient Driven Payment Model (PDPM) | 11/05/2019 | 11454 |
| R4247CP | 03/01/2019 | Update to Publication 100-04 Chapters 2, 6, and 18 to Provide Language-Only Changes for the New Medicare Card Project | 04/01/2019 | 11155 |
| R4157CP | 11/02/2018 | Hospital and Critical Access Hospital (CAH) Swing-Bed Manual Revisions and Shared Systems Changes | 04/01/2019 | 10962 |
| R4163CP | 11/02/2018 | Internet Only Manual Updates to Pub. 100-01, 100-02 and 100-04 to Correct Errors and Omissions (SNF) (2018 Q4) | 12/04/2018 | 11004 |
| R4001CP | 03/16/2018 | Internet Only Manual Updates to Pub. 100-01, 100-02 and 100-04 to Correct Errors and Omissions (SNF) (2018) | 06/19/2018 | 4001 |
| R3612CP | 09/16/2016 | Internet Only Manual Updates to Pub. 100-01, 100-02 and 100-04 to Correct Errors and Omissions (SNF) | 10/18/2016 | 9748 |
| R3481CP | 03/18/2016 | Updates to Pub. 100-04, Chapters 3, 6, 7 and 15 to Correct Remittance Advice Messages | 06/20/2016 | 9562 |
| R3379CP | 10/16/2015 | Internet Only Manual Updates to Pub. 100-01, 100-02 and 100-04 to Correct Errors and Omissions (2015) | 11/16/2015 | 9336 |
| R3230CP | 04/03/2015 | Updates to the Medicare Internet-Only Manual Chapters for Skilled Nursing Facility (SNF) Providers | 06/15/2015 | 8997 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R3220CP | 03/16/2015 | Update to Pub. 100-04, Chapters 5 and 6 to Provide Language-Only Changes for Updating ICD-10, ASC X12, and Medicare Administrative Contractor (MAC) Implementation | 09/16/2014 | 8524 |
| R3216CP | 03/13/2015 | Updates to the Medicare Internet-Only Manual Chapters for Skilled Nursing Facility (SNF) Providers – Rescinded and replaced by Transmittal 3230 | 06/15/2015 | 8997 |
| R3028CP | 08/15/2014 | Update to Pub. 100-04, Chapters 5 and 6 to Provide Language-Only Changes for Updating ICD-10, ASC X12, and Medicare Administrative Contractor (MAC) Implementation – Rescinded and replaced by Transmittal 3220 | 09/16/2014 | 8524 |
| R2921CP | 04/04/2014 | Internet Only Manual Updates to Pub. 100-01, 100-02 and 100-04 to Correct Errors and Omissions | 05/05/2014 | 8669 |
| R2899CP | 03/07/2014 | Pub 100-04, Language Only Update for Chapters Five and Six for Conversion to ICD-10 | 10/01/2014 | 8524 |
| R2815CP | 11/15/2013 | Updates to the Medicare Claims Processing Internet-Only Manual (IOM) | 03/18/2014 | 8490 |
| R2802CP | 10/25/2013 | 2014 Annual Update of Healthcare Common Procedure Coding System (HCPCS) Codes for Skilled Nursing Facility (SNF) Consolidated Billing (CB) Update | 01/06/2014 | 8474 |
| R2573CP | 10/26/2012 | Manual Updates to Clarify SNF Claims Processing | 04/01/2013 | 8044 |
| R2399CP | 01/26/2012 | Clarification for Skilled Nursing Facility (SNF) and Swing Bed (SB) Part A Billing - Updating System Requirements for Assessment Date | 07/02/2012 | 7717 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|------|-----------|---------|-----------|-----|
| | | Reporting and Removal of the Occurrence Code 16 Reporting Requirement | | |
| R2377CP | 12/30/2011 | Manual Revision to Chapter 6, Section 20.1.1 Physician's Services and Other Professional Services Excluded From Part A PPS Payment and the Consolidated Billing Requirement | 01/31/2012 | 7658 |
| R2245CP | 06/16/2011 | Manual Clarifications for Skilled Nursing Facility (SNF) Part A Billing | 08/01/2011 | 7339 |
| R2239CP | 06/14/2011 | Manual Clarifications for Skilled Nursing Facility (SNF) Part A Billing – Rescinded and replaced by Transmittal 2245 | 08/01/2011 | 7339 |
| R2183CP | 03/25/2011 | Manual Clarifications for Skilled Nursing Facility (SNF) Part A Billing – Rescinded and replaced by Transmittal 2239 | 06/28/2011 | 7339 |
| R2028CP | 08/13/2010 | 5010 Implementation--Processing Additional International Classification of Diseases, 9th Revision-Clinical Modification (ICD-9-CM) Diagnosis and Procedure Codes in Pricer, Grouper, and the Medicare Code Editor (MCE) | 01/03/2011 | 7004 |
| R2016CP | 07/30/2010 | 5010 Implementation--Processing Additional International Classification of Diseases, 9th Revision-Clinical Modification (ICD-9-CM) Diagnosis and Procedure Codes in Pricer, Grouper, and the Medicare Code Editor (MCE) - Rescinded and replaced by Transmittal 2028 | 01/03/2011 | 7004 |
| R2011CP | 07/30/2010 | Revised Instructions for Reporting Assessment Dates under the Inpatient | 01/03/2011 | 7019 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|------|------------|---------|-----------|-----|
| | | Rehabilitation Facility (IRF), Skilled Nursing Facility (SNF), and Swing Bed (SB) Prospective Payment Systems (PPS) | | |
| R1958CP | 04/28/2010 | Skilled Nursing Facility (SNF) Health Insurance Prospective Payment System (HIPPS) Coding Updates Effective October 1, 2010 | 10/04/2010 | 6916 |
| R1911CP | 02/05/2010 | Implementation of a New Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edit for Facility Services Billed by Ambulatory Surgical Centers (ASCs) | 07/06/2010 | 6702 |
| R1814CP | 09/04/2009 | 2010 Annual Update of Healthcare Common Procedure Code System (HCPCS) Codes for Skilled Nursing Facility (SNF) Consolidated Billing (CB) Update | 01/04/2010 | 6619 |
| R1757CP | 06/19/2009 | Claims Processing for Skilled Nursing Facility Consolidated Billing | 07/20/2009 | 6521 |
| R1749CP | 06/05/2009 | Revised Billing Instructions for Occurrence Span Code 74 on Skilled Nursing Facility (SNF) No Payment Claims | 10/05/2009 | 6523 |
| R1733CP | 05/08/2009 | Manual Clarification for Skilled Nursing Facility (SNF) and Therapy Billing | 04/27/2009 | 6407 |
| R1706CP | 03/27/2009 | Manual Clarification for Skilled Nursing Facility (SNF) and Therapy Billing – Rescinded and replaced by Transmittal 1733 | 04/27/2009 | 6407 |
| R1618CP | 10/24/2008 | Revision to the Reporting Requirements of Qualifying Hospital Stays on Inpatient Skilled Nursing Facility (SNF) and Swing Bed (SB) Claims | 04/06/2009 | 6233 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R1565CP | 07/25/2008 | Clarification on the Correct Condition Code to Report on Provider Adjustment Requests to Indicate a Health Insurance Prospective Payment System (HIPPS) Code Change | 01/05/2009 | 6002 |
| R1555CP | 07/18/2008 | Revision of the Requirements for Denial of Payment for New Admissions (DPNA) for Skilled Nursing Facility (SNF) Billing | 01/05/2009 | 6116 |
| R1554CP | 07/18/2008 | Revision to Skilled Nursing Facility (SNF) Common Working File (CWF) Editing | 01/05/2009 | 6128 |
| R1553CP | 07/18/2008 | Clarification on the Correct Condition Code to Report on Provider Adjustment Requests to Indicate a Health Insurance Prospective Payment System (HIPPS) Code Change - Rescinded and replaced by Transmittal 1565 | 01/05/2009 | 6002 |
| R1472CP | 03/06/2008 | Update of Institutional Claims References | 04/07/2008 | 5893 |
| R1450CP | 02/15/2008 | Update to the Common Working File (CWF) to Allow the Posting of Skilled Nursing Facility (SNF) and Swing Bed (SB) Claims to the Beneficiary's Spell of Illness When Qualifying Stay Criteria are Not Met | 07/07/2008 | 5872 |
| R1421CP | 01/25/2008 | Update of Institutional Claims References - Rescinded and Replaced by Transmittal 1472 | 04/07/2008 | 5893 |
| R1394CP | 12/14/2007 | Manual Updates to Chapter 6, Skilled Nursing Facility (SNF) Inpatient Part A Billing for No Payment and Medicare Advantage (MA) Claims | 03/17/2008 | 5840 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|------|-----------|---------|-----------|-----|
| R1365CP | 11/02/2007 | Additional Common Working File (CWF) Editing for Skilled Nursing Facility (SNF) Consolidated Billing (CB) – Part II | 04/07/2008 | 5757 |
| R1355CP | 10/19/2007 | National Uniform Billing Committee (NUBC) Update on Revenue Codes and Corrected Skilled Nursing Facility (SNF) Spell of Illness Chart | 01/22/2008 | 5734 |
| R1290CP | 07/13/2007 | Clarification of Skilled Nursing Facility (SNF) Billing Requirements for Beneficiaries Enrolled in Medicare Advantage (MA) Plans | 01/07/2008 | 5653 |
| R1289CP | 07/13/2007 | Additional Common Working File (CWF) Editing for Skilled Nursing Facility (SNF) Consolidated Billing (CB) | 01/02/2008 | 5624 |
| R1252CP | 05/25/2007 | Clarification of Skilled Nursing Facility (SNF) No Pay Billing | 08/27/2007 | 5583 |
| R1151CP | 01/11/2007 | Skilled Nursing Facility (SNF) Consolidated Billing (CB) Common Working File (CWF) Edit Bypass Instructions for Hospital Emergency Room (ER) Services Spanning Multiple Service Dates | 04/02/2007 | 5389 |
| R1109CP | 11/09/2006 | Skilled Nursing Facility (SNF) Consolidated Billing (CB) Common Working File (CWF) Edit Bypass Instructions for Hospital Emergency Room (ER) Services Spanning Multiple Service Dates | 04/02/2007 | 5389 |
| R1068CP | 09/27/2006 | 2007 Annual Update of HCPCS Codes for Skilled Nursing Facility (SNF) Consolidated Billing (CB) for the Common Working File (CWF), Medicare Carriers and Fiscal Intermediaries (FIs) | 01/02/2007 | 5283 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R1009CP | 07/28/2006 | Correction to Skilled Nursing Facility (SNF) Consolidated Billing (CB) Enforcement if SNF Inpatient Claims are Partially Non-Covered | 01/02/2007 | 5220 |
| R980CP | 06/14/2006 | Changes Conforming to CR 3648 Instructions for Therapy Services - Replaces Rev. 941 | 10/02/2006 | 4014 |
| R941CP | 05/05/2006 | Changes Conforming to CR 3648 Instructions for Therapy Services | 10/02/2006 | 4014 |
| R930CP | 04/28/2006 | Benefits Exhaust and No-Payment Billing Instructions for Medicare Fiscal Intermediaries (FIs) and Skilled Nursing Facilities (SNFs) | 10/02/2006 | 4292 |
| R926CP | 04/28/2006 | Common Working File (CWF) File Change for Skilled Nursing Facility (SNF) Consolidated Billing (CB) | 10/02/2006 | 4390 |
| R846CP | 02/10/2006 | New Skilled Nursing Facility Consolidated Billing Web Site Address | 03/13/2006 | 4297 |
| R767CP | 12/02/2005 | SNF PPS Revisions to IOM 100-04-Manualization | N/A | 4080 |
| R740CP | 11/01/2005 | Change to the Common Working File (CWF) Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edits for Evaluation and Management (E&M) Services Billed to Fiscal Intermediaries (FIs) by Hospitals | 04/03/2006 | 3910 |
| R696CP | 10/07/2005 | 2006 Annual Update of HCPCS Codes for Skilled Nursing Facility (SNF) Consolidated Billing (CB) for the Common Working File (CWF), Medicare Carriers and Fiscal Intermediaries (FIs) | 01/03/2006 | 4086 |
| R685CP | 09/23/2005 | Discontinuation of the Skilled Nursing Facility (SNF) HCPCS Help | 12/27/2005 | 4044 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| | | File and Notification to Fiscal Intermediaries (FIs) and Providers of the Redesigned SNF Consolidated Billing (CB) Annual Update File Posted on CMS Web Site | | |
| R630CP | 07/29/2005 | Medicare Part A Skilled Nursing Facility (SNF) Prospective Payment System (PPS) Pricer Update and Health Insurance Prospective Payment System (HIPPS) Coding Update Effective January 1, 2006 | 01/03/2006 | 3962 |
| R540CP | 04/29/2005 | Addition to Chapter 6 of the Claims Processing Manual - Skilled Nursing Facility (SNF) Inpatient Part A Billing: SNF Prospective Payment System (PPS) Pricer Software | 08/01/2005 | 3774 |
| R459CP | 02/04/2005 | Full Replacement of Change Request (CR) 3427, Transmittal 342, Issued on October 29, 2004- Change to the Common Working File (CWF) Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edits for Ambulance Transports to or from a Diagnostic or Therapeutic Site | 04/05/2005 | 3676 |
| R437CP | 01/21/2005 | Revisions and Corrections to the Medicare Claims Processing Manual, Chapter 6, Section 30 and Various Sections in Chapter 15 | 02/22/2005 | 3664 |
| R429CP | 01/14/2005 | Change to the Common Working File (CWF) Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edits for Critical Access Hospitals (CAHs) that have Elected Method II Payment Option and Bill Physician Services to their Fiscal Intermediaries (FIs) | 07/05/2005 | 3561 |
| R413CP | 12/23/2004 | Medicare Part A Skilled Nursing Facility (SNF) Prospective Payment System (PPS) Pricer Update FY 2005 for 9 Metropolitan Statistical Areas | 01/17/2005 | 3651 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| | | (MSAs) with New Wage Index Values Effective January 1, 2005 | | |
| R412CP | 12/23/2004 | Skilled Nursing Facility (SNF) Consolidated Billing Service Furnished under an "Arrangement" with an Outside Entity | 01/24/2005 | 3592 |
| R378CP | 11/26/2004 | Liability Days on Skilled Nursing Facility (SNF) and Swing Bed Facility Inpatient Bills | 01/03/2005 | 3568 |
| R342CP | 10/29/2004 | Change to the Common Working File (CWF) Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edits for Ambulance Transports to or from a Diagnostic or Therapeutic Site | 04/04/2005 | 3427 |
| R268CP | 07/30/2004 | Medicare Part A Skilled Nursing Facility (SNF) Prospective Payment System (PPS) Pricer Update FY 2005 | 10/04/2004 | 3368 |
| R253CP | 07/23/2004 | Fiscal Intermediary Shared System (FISS) Changes to Allow for Provider Liability Days on Skilled Nursing Facility (SNF) and Swing Bed Facility Inpatient Bills | 01/03/2005 | 3308 |
| R229CP | 07/20/2004 | Additional Clarification of Bill Types 22x and 23x Submitted by Skilled Nursing Facilities (SNFs) With Instructions for Involuntarily Moving a Beneficiary Out of the SNF and Ending a Benefit Period | 08/19/2004 | 3323 |
| R215CP | 06/25/2004 | Implementation of Skilled Nursing Facility Consolidated Billing CWF Edit for Therapy Codes Considered Separately Payable Physician Services | 07/06/2004 | 2944 |
| R209CP | 06/18/2004 | Correction to CR 2944, Transmittal 90, Issued on February 6, 2004 | 07/06/2004 | 3333 |

| Rev# | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R200CP | 06/10/2004 | Update to the Common Working File Edits for Skilled Nursing Facility (SNF) Consolidated Billing (CB) to Expand the Bypass for Pharmacy Services. | 10/04/2004 | 3277 |
| R183CP | 05/21/2004 | Skilled Nursing Facility (SNF) Consolidated Billing: Services Furnished Under an "Arrangement" With an Outside Entity | 07/01/2004 | 3248 |
| R163CP | 04/30/2004 | Change to the Common Working File (CWF) Skilled Nursing Facility (SNF) Consolidated Billing (CB) Edits for Ambulance Transports to or from a Diagnostic or Therapeutic Site Other than a Physician's Office or Hospital | 10/04/2004 | 3196 |
| R133CP | 04/02/2004 | Billing NonCovered Charges to Fiscal Intermediaries - Summary and New Instructions - Clarification | 04/16/2004 | 3115 |
| R094CP | 02/06/2004 | Additional Information in Medicare Summary Notices (MSNs) to Beneficiaries about Skilled Nursing Facility (SNF) Benefits | 07/06/2004 | 3098 |
| R092CP | 02/06/2004 | Updates to the January 2004 Annual Update of HCPCS Codes Used for Skilled Nursing Facility Consolidated Billing Enforcement | 04/05/2004 | 3070 |
| R090CP | 02/06/2004 | Implementation of Skilled Nursing Facility Consolidated Billing CWF Edit for Therapy Codes Considered Separately Payable Physician Services | 07/06/2004 | 2944 |
| R076CP | 02/06/2004 | SNF Inpatient Part A Billing | N/A | 3133 |
| R001CP | 10/01/2003 | Initial Publication of Manual | NA | NA |

Back to top of Chapter

<u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned certifies that this pleading was prepared using Book Antiqua 13-point font in accordance with Local Rule 5.1(C).

This 6th day of July, 2022.

<u>*/s/ W. Jerad Rissler*</u>
W. Jerad Rissler
Georgia Bar No. 142024

18348916v4

## CERTIFICATE OF SERVICE

I hereby certify that on July 6th, 2022, I electronically filed the foregoing **Brief in Support of Motion to Dismiss Relator's Second Amended Complaint** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all Counsel of Record.

*/s/ W. Jerad Rissler*
W. Jerad Rissler
Georgia Bar No. 142024

ARNALL GOLDEN GREGORY LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501

18348916v1