## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America and the
State of Georgia, ex rel. Betty
Riner,

        Plaintiff-Relator,

                    Case No. 1:19-cv-4316-MLB

v.

Community Primary Care of
Georgia, LLC,

        Defendant.

_____/

## OPINION & ORDER

This is a qui tam action under the False Claims Act ("FCA") and

the Georgia False Medicaid Claims Act ("GFMCA") in which the United

States and the State of Georgia declined to intervene.  (Dkts. 24; 25; 44.)

Plaintiff-Relator asks the Court to reconsider its prior ruling dismissing

her first amended complaint with leave to amend two of four claims.

(Dkt. 66.)  Defendant moves to dismiss the second amended complaint

and for judicial notice of documents.  (Dkts. 72, 73.)  Relator also moves

for leave to file a surreply.  (Dkt. 80.)

## I.  Background

Relator Betty Riner initiated this lawsuit against Defendant Community Primary Care of Georgia, LLC and four other entities.  (Dkt. 1.)  Relator voluntarily dismissed without prejudice her claims against the four entities and filed her first amended complaint against only Defendant, alleging FCA and GFMCA violations.  (Dkt. 44.)  The Court dismissed Relator's first amended complaint as a shotgun pleading but gave Relator an opportunity to amend her FCA and GFMCA claims. (Dkt. 65.)

In her second amended complaint, Relator alleges Defendant owns, operates, and controls 56 healthcare service entities.  (Dkt. 68 ¶¶ 10–11.) She says Defendant manages, submits, and receives payment for claims for all physician and medical services at the facilities where Defendant and its related entities provide or refer healthcare services across Georgia.  (Dkt. 68 ¶ 32.)  Relator is an advanced practice registered nurse who worked for Defendant from October 2014 to May 2021.  (Dkt. 68 ¶¶ 36, 39.)  She claims Defendant violated the FCA and GFMCA by (a) billing the government for services provided without physician oversight to ensure such services were medically necessary; (b) categorizing

patients as requiring "skilled" care and billing the government for associated services when that categorization was inappropriate; and (c) documenting and billing the government for patient visits that never occurred or occurred in a deficient manner relative to the claims made to the government.  (Dkt. 68 ¶ 3.)  Defendant moves to dismiss all claims. (Dkt. 73.)

## II.   Standard of Review

### A.   Motion for Reconsideration

"The Court does not reconsider its orders as a matter of routine practice." *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1223 (N.D. Ga. 2012) (citing LR 7.2(E), NDGa).  Under the Local Rules of this Court, "[m]otions for reconsideration shall not be filed as a matter of routine practice," but only when "absolutely necessary."  LR 7.2(E), NDGa.  Such absolute necessity arises only when there is "(1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003).  A motion for reconsideration may not be used "to present the court with arguments already heard and dismissed or to repackage familiar arguments to test

whether the court will change its mind." *Id.* at 1259. Nor may it be used "to offer new legal theories or evidence that could have been presented in conjunction with the previously filed motion or response, unless a reason is given for failing to raise the issue at an earlier stage in the litigation." *Adler v. Wallace Comput. Servs., Inc.*, 202 F.R.D. 666, 675 (N.D. Ga. 2001). Finally, "[a] motion for reconsideration is not an opportunity for the moving party . . . to instruct the court on how the court 'could have done it better' the first time." *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), *aff'd*, 87 F.3d 1242 (11th Cir. 1996). "Motions for reconsideration are left to the sound discretion of the district court and are to be decided 'as justice requires.'" *Belmont*, 896 F. Supp. 2d at 1223.

## B.   Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility

4

of misconduct." *Id.* at 679.   A plaintiff's well-pled allegations must "nudge[] [his] claims across the line from conceivable to plausible*." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.   Discussion

### A.   Motion for Reconsideration

Relator asks the Court to reconsider its order dismissing the first amended complaint as a shotgun pleading and dismissing her retaliation claims with prejudice.   (Dkts. 65; 66 at 1.)   The Court declines to reconsider either ruling.

#### 1.   Shotgun Pleading

The Court dismissed Relator's first amended complaint as a shotgun pleading because "the first 168 paragraphs are general allegations not tied to any cause of action.   Each cause of action then realleges and incorporates the allegations alleged in the first 168 paragraphs.   That obscures what may be important contentions.   And large swaths of the complaint are improper irrespective of their relevance, consisting of explanations of the law and citations to statutes and regulations."   (Dkt. 65 at 5–6.)   So, Relator's first amended complaint made it "difficult to distill the subject of her FCA and GFMCA violation

claims." (Dkt. 65 at 6.)

Relator argues the Court's ruling was contrary to established Eleventh Circuit law because *Weiland v. Palm Beach Cnty. Sheriff's Off.* held incorporating preceding counts, but not preceding allegations, constitutes a shotgun pleading. (Dkt. 66 at 5–6 (citing 792 F.3d 1313, 1324 (11th Cir. 2015)).) The Court is not convinced. First, the Court did not dismiss the first amended complaint solely because it incorporated prior allegations. It found "large swaths" of the amended complaint were improper (including explanations of the law and citations to statutes and regulations), which made it "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." (Dkt. 65 at 4–6.)

Second, as stated in the Court's order, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." (Dkt. 65 at 5 (quoting *Weiland*, 792 F.3d at 1323).) And Relator's first amended complaint required Defendant and the Court "to sift through many immaterial facts (and lots of law) to figure out which allegations support

her FCA and GFMCA violation claims." (Dkt. 65 at 7.)  Contrary to Relator's assertion, the Court's prior acknowledgment that her retaliation claims were distillable does not mean her federal and state false claim ones were as well.  (Dkt. 66 at 7.)  As stated in the Court's order, many allegations contained facts and law immaterial to any count. (Dkt. 65 at 7.)  So, an allegation material to the retaliation claims was not necessarily material to the violation claims.

Finally, *Weiland* does not hold that incorporating all factual allegations *cannot* render a complaint a shotgun pleading.  It merely holds that it does not necessarily do so.  *Weiland*, 792 F.3d at 1324 ("[T]he groupings [of shotgun pleadings] cannot be too finely drawn.").  While *Weiland* acknowledged "the allegations of each count are not rolled into every successive count on down the line," the court found "[m]ore importantly, this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count."  *Id.*  As already discussed, Relator's pleading in the first amended complaint, and specifically its incorporation of the *long* and *confusing* factual section, burdened both Defendant and the Court in that

regard.  (Dkt. 65 at 7.)  And cases from both the Eleventh Circuit and its district courts have called complaints incorporating long, factual sections "shotgun pleadings."  *See, e.g., Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (shotgun pleadings "invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief.  The general allegations are incorporated by reference into each count of the complaint . . . .");  *Bardelas v. City of Doral, Fla.*, 2021 WL 2531074, at *4 (S.D. Fla. Apr. 15, 2021) ("Each cause of action begins with the statement 'Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1–99, as if fully set forth herein,' and thus violates Rule 8 of the Federal Rules of Civil Procedure.").

The Court declines to reconsider its dismissal of the first amended complaint as a shotgun pleading.

### 2.    Retaliation Claims

The Court dismissed Relator's retaliation claims because the FCA's anti-retaliation provision does not apply to former employees.  (Dkt. 65 at 23–24.)  Relator points to *Smith v. Athena Constr. Grp., Inc.*, which reached the opposite conclusion.  (Dkt. 66 at 3 (citing 2022 WL 888188,

at *18 (D.D.C. Mar. 25, 2022).)  The Court will reconsider its ruling based only on "an *intervening* development or change in *controlling* law," and *Smith* is neither.  *See Bryan*, 246 F. Supp. 2d at 1258–59 (emphasis added).  An opinion from the United States District Court for the District of Columbia is not binding on this Court. (Dkt. 66 at 3.)  And *Smith* was decided in March 2022, before this Court's order in May 2022.  (Dkt. 65.)  But even assuming *Smith* was new case law, it would not change the Court's mind.  The Court acknowledged a split in opinion between federal circuit courts regarding the applicability of the FCA's anti-retaliation provision to former employees.  (Dkt. 65 at 22.)  It considered both the Tenth and Sixth Circuit approaches and, on the merits, determined that the anti-retaliation provision does not apply to former employees.  (Dkt. 65 at 22–25.)  That the district court in *Smith* disagreed does not sway the Court.  Relator's motion for reconsideration is denied.

## B.    Motion to Dismiss

### 1.    Ownership and Control

At the heart of Relator's FCA and GFMCA claims is her allegation that Defendant owns, operates, and controls 56 patient facilities across Georgia (or did during the relevant time).  (Dkt. 68 at ¶ 11.)  Defendant

says these claims fail because it does not own, operate, or manage the facilities named in the complaint (and did not during the relevant time). (Dkt. 73-1 at 6–10.)  In support, Defendant asks the Court to take judicial notice of documents from Medicare.gov that contain ownership and management information for all but one of the facilities.  It also asks the Court to take judicial notice of an IRS 990 form for the remaining facility. (Dkt. 72.)

### a)    Medicare.gov Documents

Defendant submits Medicare.gov documents showing Defendant does not own or manage the relevant facilities.  (Dkt. 72 at 19–20, 22–23, 25–26, 28–29, 31–32, 34–35, 42–43, 45–46, 48–49.)  As stated in the Court's prior order, "the ownership and management of those facilities is 'capable of accurate and ready determination' by resort to www.medicare.gov, whose accuracy cannot reasonably be questioned. Accordingly, the ownership and management disclosure pages on www.medicare.gov for each of the seven facilities are proper subjects for judicial notice."  (Dkt. 65 at 11–12 (citing *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015)).  But the Court declined to take judicial notice for two reasons.  First, the ownership and

management disclosure pages did not shed light on historical ownership and management, so it was unclear who owned, operated, and managed the facilities at the time of the allegations in the complaint. (Dkt. 65 at 12–13.) Second, it was unclear at which facilities the alleged violations occurred. So, the Court gave Relator the opportunity to "identify—with specificity—the facilities at which she alleges Defendant submitted false claims" in the second amended complaint. (Dkt. 65 at 13.)

Neither of these issues persist. Defendant correctly points out that the Medicare.gov documents provide a timeline for ownership and management. (Dkt. 72 at 4.) And, given the Court's direction that Relator specify the facilities at which the alleged FCA violations occurred, the Court concludes only the nine facilities listed in Relator's actual claims, as opposed to the long list included in Paragraph 11 of the complaint, are at issue in this case.[1] (Dkt. 65 at 13.) But Relator alleges

_____

[1] Relator also alleges she "directly observed Defendant's conduct as to making claims, staffing, and other operations, and she also participated in conversations with colleagues and superiors about Defendant's operations" at those nine facilities. (Dkt. 68 ¶ 40.) These nine facilities are Eagle Health & Rehabilitation Center, Azalea Health & Rehabilitation Center, Camellia Health & Rehabilitation Center, Heritage Inn Health & Rehabilitation of Statesboro, Orchard Health & Rehabilitation Center, Meadows Park Health & Rehabilitation Center,

Defendant owns Clinical Services Inc. (d/b/a "Ethica"), an entity listed as having "operational/managerial control" of eight of the nine facilities at issue in Relator's second amended complaint: Eagle, Azalea, Camellia, Heritage, Orchard, Meadows, Oxley, and Scott.  (Dkt. 68 ¶ 10.)  (The Medicare.gov documents do not provide ownership information for the Riverview facility.)  So, even if the Court were to take judicial notice of the Medicare.gov documents, the Court must—at this stage—accept Relator's allegation that Defendant owns Clinical Services.  (Dkt. 68 ¶ 10.)

But Relator did not sue Clinical Services.  Defendant argues that, even if it owns Clinical Services, that company remains a separate corporate entity for which it is not responsible. (Dkt. 73-1 at 9.)  Relator disagrees, arguing she has alleged Defendant controlled its "partners" like Clinical Services and that "such control allowed Defendant to promote the injustice and fraud alleged in the complaint, including abuse of the corporate form and by commingling purportedly separate and independent entities." (Dkt. 76 at 9.)  Her amended complaint, however,

---

Oxley Park Health & Rehabilitation Center, Scott Health & Rehabilitation Center, and Riverview Health & Rehabilitation Center.

has limited allegations in this regard.  Relator alleges Clinical Services does business as Ethica Health & Retirement Communities.  (Dkt. 68 ¶ 10.)  She says Defendant's website links to Ethica's website; that both websites use the same layout and stock photographs; that the entities "share principal office addresses, other office addresses, officers, and/or agents"; that someone at her orientation described Defendant as operating an "umbrella" of interrelated companies; and that Relator's benefits were managed through Ethica, despite being employed by Defendant.  (Dkt. 68 ¶¶ 12, 14, 21, 26.)  Relator also alleges the same individuals control Defendant and various other entities under Defendant's umbrella, and that several entities under the umbrella instructed other entities to support them in increasing profits.  (Dkt. 68 ¶¶ 23, 28–29.)  So, Relator says, Defendant (one corporation) can be held liable for the acts of Clinical Services (another corporation) in operating or managing the clinics at issue.

"Only in unusual circumstances will courts disregard the separate identities of a parent and its subsidiaries, even a wholly-owned subsidiary."  *United States ex rel. Lawson v. Aegis Therapies, Inc.,* 2013 WL 5816501, at *4 (S.D. Ga. Oct. 29, 2013).  "Because [R]elator's claims

are brought under the False Claims Act and relate to the federal Medicare program, federal law controls the veil-piercing question."[2]  *Id.* Under federal law, to survive a motion to dismiss, Relator must allege "facts suggesting: (1) that there is a unit of interest and ownership among [different corporate entities] that makes their separate personalities no longer exist and (2) that an inequitable result would flow from treating [the entities] separately."  *United States v. Genesis Glob. Healthcare*, 2021 WL 4268279, at *9 (S.D. Ga. Sept. 20, 2021).  "The first element looks to which formalities have been followed to maintain separate corporate identities, and the second element looks to the basic issue of fairness under the facts."  *United States v. Universal Health Servs., Inc.*, 2010 WL 4323082, at *4 (W.D. Va. Oct. 31, 2010) (citing *Labadie Coal Co.*

---

[2] By contrast, Georgia law controls the corporate veil question on the GFMCA counts.  *United States v. Genesis Glob. Healthcare*, 2021 WL 4268279, at *9 (S.D. Ga. Sept. 20, 2021).  Under Georgia law, courts may pierce the corporate veil when a party shows "the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs, that the corporation and its owners have such unity of interest and ownership that they lack separate personalities, and that to observe the corporate form would work an injustice or promote fraud."  *Id.* (citing *United States v. Fid. Cap. Corp.*, 920 F.2d 827, 837 (11th Cir. 1991)).  Relator has not plausibly alleged Clinical Services is "a mere instrumentality" of Defendant, that the entities lack separate personalities, or that injustice would result from treating them separately.

*v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982)).  "In the context of an action brought under the FCA, the complaint must include allegations that Defendants abused their corporate forms to insulate themselves from FCA violations committed by subsidiaries."  *Genesis Glob. Healthcare*, 2021 WL 4268279, at *9.

Relator's allegations fall short of this standard.  Though Relator claims to have pled abuse of corporate form, the Court does not see such allegations in the complaint.  (Dkt. 76 at 9.)  Relator alleges no facts showing Defendant failed to follow corporate formalities with Clinical Services (or any related entity) such that Defendant has not maintained a separate corporate identity.  At best, her claims of corporate formalities establish that Defendant and its related entities share officers, facilities and agents; that, when she was hired by Defendant, an administrator from the Riverview facility had to approve her involvement with patients; that an employee of another affiliated company (System Administrative Services) provided her orientation at the Ethica management offices; that she was told Defendant was "in charge of the facilities" and she should follow instructions from managers at those facilities; that representatives of several different entities spoke at a company-wide

15

meeting; that Defendant issued her paychecks while Ethica managed her benefits; and that a supervisor with Defendant emailed her to visit patients in her region. (Dkt. 68 ¶¶ 17, 20, 21, 23, 25, 26, 27.)

Relator's allegations do not demonstrate that Defendant and *Clinical Services specifically* (as opposed to other allegedly related entities) lack separate identities. That aside, it is well established that common officers, agents, and facilities do not justify piercing the corporate veil. *See, e.g., SICK, Inc. v. Motion Control Corp.*, 2003 WL 21448864, at *9 (D. Minn. June 19, 2003) ("showing that the two companies share employees, offices, and equipment" is insufficient to pierce the corporate veil). And Relator's other allegations, at most, show that several related entities provide services to each other and to employees who work in related facilities. That related entities consolidate orientation, payroll, or benefits does not plausibly allege a failure to maintain corporate formalities. *See Bridge v. New Holland Logansport*, Inc., 815 F.3d 356, 364 (7th Cir. 2016) (centralized health insurance benefits and common employee reviewers among entities insufficient to pierce the corporate veil). That related entities emphasize cooperation to maximize overall profits also does not plausibly allege

16

abuse of the corporate form. *See Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029, 1037 (S.D.N.Y. 1980) (parent company reporting subsidiary's profits as its own insufficient to pierce the corporate veil.) So, Relator has not plausibly alleged Defendant and its related entities failed to maintain separate corporate identities. *See Universal Health Servs., Inc.*, 2010 WL 4323082, at *4 ("Although the Government's allegations include facts suggesting some overlap between the activities and affairs of [various entities], the type of overlap the plaintiffs allege is hardly unusual in corporate structure, and courts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be considered as a whole.").

Even assuming Defendant (and its other entities) exercised significant control over Clinical Services's activities so as to establish a lack of separate identities, Relator would still have to allege Defendant did that either to assist Clinical Services in violating the FCA or to insulate itself from liability for Clinical Services's misconduct. *Genesis Glob. Healthcare*, 2021 WL 4268279, at *9; *Lawson,* 2013 WL 5816501 at

17

*4 (plaintiff "failed to allege facts creating a plausible conclusion that Defendants' forms were used to violate the FCA").  Relator includes no allegations in this regard.

Relator has also not alleged it would be inequitable to treat Defendant and Clinical Services separately.  She could have done so by, for example, alleging inadequate capitalization or insolvency of Clinical Services, diversion of profits from Clinical Services to avoid debts, or that Defendant uses Clinical Services "as a sham to perpetrate a fraud or avoid personal liability."  *Id.; see also U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856, at *13 (S.D. Ga. Dec. 8, 2014).  She does no such thing here.

Accepting that Defendant does own Clinical Services and that Clinical Services manages eight of the relevant facilities, Relator has still not pleaded sufficient facts to pierce the corporate veil and hold Defendant accountable for the acts of Clinical Services.

### b)    IRS 990 Forms

Since the Medicare.gov documents do not address Riverview's ownership, Defendant asks the Court to take judicial notice of IRS Form 990s regarding that facility. (Dkt. 72 at 4–6.)  Defendant argues the IRS

990 forms for the relevant years show Riverview had no members or stockholders, and the Medicare.gov site shows it is managed by Riverview Health & Rehabilitation Center, Inc. (Dkts. 72 at 5; 79 at 6.) So, it says these documents together establish it neither owned nor operated the Riverview facility.

IRS 990 forms are publicly available documents accessible from a government website that are subject to judicial notice. *See Flaa v. Hollywood Foreign Press Ass'n*, 2020 WL 8256191, at *2 (C.D. Cal. Nov. 20, 2020). ("The two [IRS 990] forms are publicly available documents, and their accuracy cannot be reasonably questioned.") But the Court declines to take notice of the IRS 990 documents because they do not preclude Defendant's involvement with Riverview. The IRS 990 forms state Riverview delegates control over management, specifically that Riverview "is managed by an unrelated third party." (Dkt. 72 at 197, 217, 225, 245.) This appears to contradict that Riverview manages itself and leaves open the possibility of Defendant's involvement. (Dkt. 79 at 6.) The Court thus accepts Relator's allegation that Defendant controls Riverview. (Dkt. 68 at 11.)

**c)**  **Conclusion**

Defendant's motion for judicial notice is granted as to the Medicare.gov documents and denied as to the IRS documents. So, for the purposes of this opinion, the Court accepts that Defendant does not own or operate, either directly or through Clinical Health Services, eight of the nine facilities: Eagle, Azalea, Camellia, Heritage, Orchard, Meadows, Oxley Park, and Scott. The Court also accepts Relator's allegation that Defendant owns or operates Riverview. So, to the extent Relator's claim requires Defendant to own or control the facilities (which Counts I and II require), she must allege misconduct at Riverview. But to the extent Relator's claim only requires that Defendant submitted claims for work at the facilities (which Count III requires), she may allege misconduct at any of the nine facilities.

**2.**  **Sufficiency of the Allegations**

To state a claim under the FCA or GFMCA, a relator must show (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. 31 U.S.C. § 3729(a)(1)(A); *United States v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d

1349, 1355 (11th Cir. 2005); *Hill v. Bd. of Regents of the Univ. Sys. of Ga.*,
829 S.E.2d 193, 198 (Ga. Ct. App. 2019) (observing courts generally look
to federal case law to decide issues under the GFMCA); *Cade v.
Progressive Cmty. Healthcare, Inc.*, 2011 WL 2837648, at *3 (N.D. Ga.
July 14, 2011) (analyzing GFMCA claims by applying FCA case law).
Defendants argue Relator has not pleaded a claim in any count.

### a)    Submission of False Claims

### (1)    Counts I and II

Residents of long-term care facilities must be "seen by a physician
at least once every 30 days for the first 90 days after admission, and at
least once every 60 days thereafter."  42 C.F.R. § 483.30(c).  In Counts I
and II, Relator alleges Defendant submitted false claims because it failed
to provide patients with the physician oversight required by 42 C.F.R. §
483.30.  (Dkt. 68 ¶¶ 88, 102, 151, 152, 155.)[3]  As a result, Defendant

---

[3] Count I also contains hints of a "worthless services" claim.  (Dkt. 68
¶¶ 128, 131.)  Relator does not bolster this claim with other allegations,
nor does she otherwise develop it in her complaint.  But to the extent
Relator attempts to plead unnecessary services under a "worthless
services" theory, she fails to state a claim.  Under a worthless services
theory, Relator must show "the performance of the service [was] so
deficient that for all practical purposes it is the equivalent of no
performance at all."  *U.S. ex rel. Absher v. Momence Meadows Nursing
Ctr., Inc.,* 764 F.3d 699, 710 (7th Cir. 2014).  But Relator only alleges the

allegedly (a) billed for services not medically necessary, and (b) improperly classified patients as needing "skilled care" and submitted bills for those services. (Dkt. 68 ¶¶ 85–189.)[4]

Defendant argues Counts I and II fail because 42 C.F.R. § 483.30 applies only to nursing homes, not groups of physicians like Defendant. (Dkt. 73-1 at 12.) It is correct. *See* 42 C.F.R. § 483.1(b) ("The provisions of this part contain the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility in the Medicare program, and as a nursing facility in the Medicaid program."). And "aside from baseless assertions that [Defendant] owns and operates nursing homes, Relator offers no reasons to hold [Defendant] responsible for nursing homes' regulatory compliance." (Dkt. 73-1 at 11.) Given the Court's refusal to take judicial notice of the IRS 990 documents, however, the Court must accept as true Relator's allegation that Defendant "owns, manages or controls" Riverview. (Dkt. 68 ¶ 11.) So, the Court accepts

---

services were worthless because they—in hindsight—were of no help to the patients. (Dkt. 68 ¶¶ 128, 131.) This is plainly insufficient to state a claim under a worthless service theory.

[4] Defendant combines the falsity and submission analysis for Count III, so the Court handles falsity for Count III in the particularity discussion.

that 42 C.F.R. § 483.30 applies to Defendant *in respect to Riverview only*.

Defendant next argues 42 C.F.R. § 483.30 contains two exceptions to the requirement that physicians visit patients every 30 or 90 days. The first applies to so-called "skilled nursing facilities." It states that, at such a facility, "a physician may delegate tasks to a physician assistant, nurse practitioner, or clinical nurse specialist who [among other things] . . . is under the supervision of the physician." 42 U.S.C. § 483.30(e). The second exception applies at so-called "nursing facilities." It states that "at the option of the State, a required physician task in any [nursing facility] . . . may also be satisfied when performed by a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician." 42 C.F.R. § 483.30(f). Defendant thus argues 42 C.F.R. § 483.30 does not actually require regular, personal services by physicians. (Dkt. 73-1 at 12–13.) So, unless Relator pleads Defendant's conduct did not comply with the requirements of 42 C.F.R. §§ 483.30(e) and (f), Relator has failed to plead a violation of 42 C.F.R. § 483.30 (and a false claim arising from it). The Court previously ordered Relator to address these exceptions

with particularity.  (Dkt. 65 at 14–15.)[5]

Both parties' discussions of 42 C.F.R. §§ 483.30(e) and (f) are confusing, in part because Relator's complaint does not specify whether the alleged misconduct took place at skilled nursing facilities or nursing facilities.  For the sake of clarity, the Court discusses the two provisions separately.  Relator argues the exception applicable to nursing facilities (that are not skilled nursing facilities) does not apply because she and the other non-physicians were employees of the facilities.  (Dkt. 68 ¶ 91.) This argument is inconsistent with Relator's allegation in her second amended complaint that she "worked for Defendant" in treating patients. (Dkt. 68 ¶¶ 39, 103–120.)  Relator never alleges she "worked for" any

---

[5] Relator argues the Court should not dismiss the complaint based on an exception.  (Dkt. 76 at 11.)  This statement mischaracterizes what the Court asked of Relator.  42 C.F.R. § 483.30 gives long-term care facilities multiple options for regulatory compliance.  One option is personal physician visits at prescribed intervals.  Another option is delegation of those visits to non-physicians subject to certain conditions.  Unless Relator alleges that Defendant has not done either of those things, she cannot state a claim based on a violation of § 483.30.  And given the Court ordered Relator to address the exceptions with particularity, she was on notice of this exact issue.  (Dkt. 65 at 14-15.)

specific facility.[6]  So, she has not alleged this element of the exception is inapplicable.  She also has a problem regarding the exception's requirement that non-physicians work in collaboration with a physician. Relator argues she and the other non-physicians did not work in collaboration with physicians.  But as Defendant points out, collaboration between physicians and non-physicians is a question of state law and, in Georgia, requires a nurse protocol agreement pursuant to O.C.G.A. § 43-34-25.  42 U.S.C. § 1861(s)(2)(K)(i).[7]  Relator does not cite the relevant Georgia law, let alone attempt to plead that Defendant violated it. Relator's pleading, in fact, demonstrates she did not have Georgia law in mind.  (Dkt. 69 ¶ 92 ("non-physicians were not working in collaboration with a physician because the physicians did not provide . . . oversight [or] assistance").)  Her conclusory legal assertion of collaboration is therefore

---

[6] Of course, this still leaves the possibility that Relator, or any other non-employee non-physician, visited patients less frequently than the regulations require.  But Relator does not allege this.

[7] The Social Security Act defines "collaboration" as a process in which a nurse practitioner works with a physician to deliver health care services within the scope of the practitioner's professional expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms as defined by the law of the State in which the services are performed.  42 U.S.C. § 1861(s)(2)(K)(i) (adopting the language of 42 U.S.C. § 1861(aa)(6)).

insufficient.  For these two reasons, Relator has not plausibly alleged violations of the regulation at the heart of her false claim assertion in respect to conduct at a nursing facility.

As for the other exception, Relator alleges she and the other non-physicians were not acting under the supervision of physicians.  (Dkt. 68 at ¶¶ 90, 153.)  So, to the extent Relator alleges misconduct at a skilled nursing facility, she has plausibly pleaded a violation of 42 C.F.R. § 483.30.

All of this means that, to the extent Relator is alleging the submission of false claims for nursing facilities through Medicaid, she has failed to state a false claim.  To the extent Relator alleges false submissions for skilled nursing facilities through Medicare, she has pleaded the submission of a false claim.[8]  But this is Relator's precise

---

[8] Medicare Part A covers services in skilled nursing facilities, while Medicaid covers services in nursing facilities.  This distinction between Medicare and Medicaid is taken from a CMS memorandum (clarifying the delegation of physician tasks to non-physicians) that Defendant asks the Court to take judicial notice of.  (Dkt. 73-1 at 15.)  Relator objects because the memorandum is a "policy interpretation" and "lacks the force of law."  (Dkt. 77 at 7-9.)  But other federal courts have taken judicial notice of CMS documents, and documents need not have the force of law for courts to take judicial notice of them.  *See U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381–82 (C.D. Cal. 2014) (taking judicial notice of documents from CMS websites because courts "can take judicial

problem: the only way she has alleged a false claim is *if* Riverview is a skilled nursing facility. And the complaint does not allege that. Indeed, Relator fails to specify whether any of the facilities are skilled nursing facilities or nursing facilities. Since Relator has failed to allege this essential fact, the Court cannot find that she has plausibly alleged the submission of a false claim in Counts I and II.[9]

### b) Particularity

An FCA complaint must satisfy Rule 9(b)'s heightened pleading requirement for claims alleging fraud. *United States v. HPC Healthcare,*

_____

notice of [p]ublic records and government documents available from reliable sources on the Internet"); *Epic Tech, LLC v. Penn-Tech Assocs., Inc.*, 2022 WL 3212728, at *10 n.3 (N.D. Ga. June 3, 2022) ("The [Trademark Office's Manual of Patent examining procedure] [is] commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters. [] While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith.") (internal quotation marks and citation omitted). So, the Court will take judicial notice of the CMS memorandum as representing CMS's position on physician delegation—not as the law. While Relator points out the memorandum is not entitled to *Chevron* deference, she does not explain why that prevents the Court from taking judicial notice. (Dkt. 77 at 8.) Nor does she give the Court any reason to doubt its contents.

[9] For Count III, Defendant combines its false claims discussion with its discussion of Rule 9(b)'s particularity requirements. (Dkt. 73-1 at 22–25.) For this reason, the Court addresses the sufficiency of Relator's Count III allegations in the particularity section.

*Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018). Under Rule 9(b), the plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud," including "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* (citing *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). And "[b]ecause it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). "So, unless a relator alleges with particularity that false claims were actually submitted to the government, [Eleventh Circuit] precedent holds that dismissal is proper." *HPC Healthcare, Inc.*, 723 F. App'x at 789. The key inquiry is whether the complaint includes "some indicia of reliability" to support the allegation that an actual false claim was submitted. *Id.*

### (1)   Counts I and II[10]

"One way to satisfy this requirement is by alleging the details of

---

[10] The Court combines Counts I and II because they contain overlapping allegations in respect to the submission of false claims. To the extent the allegations do not overlap, they suffer from the same deficiencies.

false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills." *Id.* (citing *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009)). Relator attaches copies of two allegedly false claims to Counts I and II, the first involving the Eagle facility and the second involving the Heritage facility. (Dkts. 68 at ¶¶ 170–71; 68-1; 68-2.) But, as previously explained, Defendant does not own or operate those facilities. So, the sample claims do not establish the submission of false claims with particularity at the Riverview facility.

Absent specific billing information, the Eleventh Circuit "has deemed indicia of reliability sufficient where the relator alleged direct knowledge of the defendant['s] submission of false claims based on her own experiences and on information she learned in the course of her employment." *HPC Healthcare, Inc.*, 723 F. App'x at 789 (citing *R&F Props.*, 433 F.3d at 1360). The basis of this direct knowledge must be pleaded with particularity. *See id.* (citing *United States ex rel. Sanchez*, 596 F.3d at 1300, 1302–03 & n.4 (11th Cir. 2010)). Here, Relator makes numerous allegations of personal knowledge of false claims in Counts I and II. In respect to Count I, she says she "attended annual meetings,

where physicians and other providers complained to Defendant about affirming medical services as necessary without providing the required physician visits." (Dkt. 68 ¶95.) She also alleges, at meetings, non-physicians discussed billing the government for "skilled" services when that categorization was not supported.[11] (Dkt. 68 ¶ 94.) In respect to Count II, she claims that she "discussed the mischaracterization of patients with physicians, non-physician providers, and others at [the facilities at which she worked] but she was told to ignore the issue so that Defendant could bill the government for the services," (Dkt. 68 ¶ 156); that "at meetings, non-physician providers discussed Defendant's billing for and accepting payment from the government for 'skilled' services when that categorization was not supported," (Dkt. 68 ¶ 157); and that an employee "who manages billing at Heritage . . . discussed Defendant's billing for and accepting payment from the government for 'skilled' services for a patient, when Defendant knew the patient was too sick to qualify for such services." (Dkt. 68 ¶ 160.)[12]

---

[11] Though alleged in Count One, this claim appears to go to Count Two.

[12] Relator also pleads personal knowledge of Defendant's misclassifying patients and billing for services given without sufficient oversight. (Dkt. 68 ¶¶ 95, 161–162.) However, none of those allegations plead an actual

None of these allegations meet Rule 9(b)'s heightened standard. Relator does not provide information as to when or where these meetings occurred or who told her about the billing practices. She also does not allege when or for whom the claims were submitted. *Sanchez*, 596 F.3d at 1300, 1302–03 & n.4. And the cases Relator cites in support of her personal knowledge are readily distinguishable. In *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, the relator was vice president of the defendant, and later CEO of a relevant hospital, "with direct information about [the defendant's] billings, revenues and payor mix, and [] was in the very meetings where Medicare patients and the submission of claims to Medicare were discussed." 591 F. App'x 693, 708 (11th Cir. 2014). And, critical to the court's finding, the fraud allegations related to referrals, so "the type of fraud alleged [] [did] not depend as much on the particularized medical or billing content of any given claim form." *Id.* Relator's claims are not the type of fraud for which medical or billing details do not matter (quite the opposite actually). Nor is Relator a high-ranking corporate official.

---

claim submission. Similarly, Relator's allegations about signing forms and certifications to procure payments does not plead *submission* of *false* claims. (Dkt. 68 ¶¶ 158–159.)

In *United States ex rel. Matheny v. Medco Health Sols., Inc.*, the complaint properly alleged "what statement was false, . . . in what documents, when it was submitted, . . . to whom it was submitted, . . . what the statement did and did not contain, . . . who approved the process, and who was responsible for developing the [materials containing false statements]." 671 F.3d 1217, 1230 (11th Cir. 2012). The only thing the complaint did not specify was "the name or title of the person who actually pushed the send button and transmitted [the false document]." *Id.* The court forgave this omission based on the relator's personal knowledge stemming from the relator's direct involvement in the creation of the false document. *Id.* The relator was also privy to relevant meetings discussing false claims, which he described by date and relevant participants. *Id.* at 1126. Relator's complaint, outside of the claims submitted for H.B. and C.A. (and even those allegations are not as specific), contains no such details. She was not involved in the creation of false claims. And, while she participated in meetings, she did not identify the meetings—or the relevant participants—with the level of detail found in *Matheny*.

In *United States v. R&F Props. of Lake Cnty., Inc.*, the relator—a

nurse practitioner—alleged that during her employment, she never had her own Medicare provider number but was also told to bill her services under a doctor's number.  433 F.3d at 1360.  The relator also alleged she "had at least one personal discussion with [the facility's] office administrator (identified in the complaint by name)" who revealed the facility "billed all nurse practitioner and physician assistant services as rendered 'incident to the service of a physician,' [and that the facility] had 'never' billed nurse practitioner or physician assistant services in another manner."  *Id.*  Here, Relator's alleged meeting occurred with a billing manager at Heritage, not Riverview.  (Dkt. 68 ¶ 160.)  But, even if the alleged illegal billing practices at Heritage indicated similar practices at Riverview, the allegations in *R&F Properties* are qualitatively different from Relator's allegations here.  For one, Relator's allegations are less specific.  She does not identify the billing or describe the content of the meetings with the same detail.  (Dkt. 68 ¶ 160.)  Further, while the relator in *R&F Properties* alleged a systemic practice of always billing nurse practitioner services as incident to physician services, Relator alleges a single misclassification without any details as to patient or claim.  (Dkt. 68 ¶ 160.)

33

Finally, in *Hill v. Morehouse Med. Assocs., Inc.*, the relator "worked in the very department where she alleged the fraudulent billing schemes occurred—[defendant's] billing and coding department," and thus "was privy to [defendant's] files, computer systems, and internal billing practices that [were] vital to her legal theory." 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003). Relator does not work in Defendant's billing department and does not allege the same level of detailed knowledge. *Id.* (relator "identified the confidential documents within [defendant's] exclusive possession that contain additional evidence of the fraud," named "the specific CPT and diagnosis codes that were altered for each of [] five billing schemes, and the frequency of submission of each type of claim," and "provided the names of the employees and physicians who were responsible for making the fraudulent changes and the clinics where the codes were altered").

All four cases Relator cites contain greater indicia of reliability than Relator included in her complaint. Counts I and II do not allege the submission of a false claim with particularity.

### (2)   Count III

Count III alleges Defendant submitted claims for services that were

either deficiently performed or were not performed at all. (Dkt. 68 ¶¶ 190–215.) Since Count III does not require that Defendant own or operate the facilities, submission of a false claim from any of the nine facilities would satisfy Relator's pleading burden here. Relator provides six examples, but none state the submission of a false claim with particularity. (Dkt. 68 ¶¶ 198–207.) Relator's first example—her most detailed by far—alleges Dr. Paul Hawkins used an improper billing code for a cursory patient examination and misdated his notes. (Dkt. 68 ¶ 198–200.) Relator then alleges Dr. Hawkins engaged in this fraud "to charge Medicare for this visit . . . so that Defendant would receive a higher reimbursement from Medicare." (Dkt. 68 ¶ 199.) It is not clear to the Court whether this statement alleges the submission of a claim. But to the extent it does, Relator does not provide "specific billing information—such as dates, times, and amounts of actual false claims" that resulted from this misbilling. Nor does she attach copies of bills. *See Hopper*, 588 F.3d at 1326. *United States ex rel. Atkins v. McInteer*, is instructive on this matter:

> [Relator's] complaint went into such detail as to identify specific long-term care facilities, patients, dates of testing, and testing procedures. Although the relator stated with particularity the circumstances comprising the elements of

the alleged scheme to defraud, his complaint "failed to meet the minimum pleading requirements for the *actual presentment of any false claims*." "No amounts of charges were identified. No actual dates were alleged. No policies about billing or even second-hand information about billing practices were described, . . . [and not one] copy of a single bill or payment was provided."

470 F.3d 1350, 1358 (11th Cir. 2006) (emphasis and modification in original; internal citations omitted).

Relator's other allegations fare no better.  Her allegations in respect to Dr. Ralph Warnock, Dr. Ronald Summers, and Dr. Christen Weber likewise do not identify specifics of the alleged false claims.  (Dkt. 68 ¶¶ 201, 204–207.)  The first allegation regarding Dr. Summers does not even claim Medicare was billed.  (Dkt. 68 ¶ 204.)  And Relator does not allege any personal knowledge that could provide "indicia of reliability" that false claims were submitted.  *Id.*  She even concedes that she never worked in the same facility as Dr. Warnock.  (Dkt. 68 ¶ 202.)  So, Relator did not plead the submission of a false claim with particularity in Count III.

### c)    Materiality

A billing misrepresentation does not violate the FCA unless it was "material to the Government's payment decision."  *Universal Health*

*Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016). A misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "While no single factor is dispositive, some factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior." *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021). Defendant argues Relator has not pleaded materiality.

### (1)   Counts I and II

Relator does not discuss any of the materiality factors in her first two counts. In fact, the only references to materiality are conclusory allegations—often tracking statutory language—that the various allegedly false claims were material. (Dkt. 68 ¶¶ 123–124, 134–135, 139, 182–183, 187.) Relator cites *Ruckh v. Salus Rehab., LLC*, for the proposition that "affirmative misrepresentations [are] material because, like Defendant's frauds, [they] go to the essence of the parties' economic

37

relationship." (Dkt. 76 at 24 (citing 963 F.3d 1089, 1105 (11th Cir. 2020).) But *Ruckh* concerned misrepresentation of the types and length of services provided, not implicit certification of compliance with regulations. *Id.* It is also well established that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a . . . requirement as a condition of payment." *United States ex rel. Salters v. Am. Fam. Care, Inc.*, 262 F. Supp. 3d 1266, 1275 (N.D. Ala. 2017). A plaintiff can prove materiality by providing "evidence that the defendant knows that the Government consistently refuses to pay claims in . . . cases based on noncompliance with the . . . requirement." *Id.* Because Relator only alleges Defendant swore what "the government required it to swear," Relator fails to plead materiality for Counts I and II. (Dkt. 76 at 23.)[13]

### (2)   Count III

While Relator's citation to *Ruckh* does not help her claims in Counts I and II, it does demonstrate materiality in Count III. Like in *Ruckh*, Relator's Count III alleges Defendant billed the government for services

---

[13] This analysis would apply even if the Court declined to take judicial notice of the Medicare.gov documents.

that were either not performed or deficiently performed. *Id.* So, like in *Ruckh*, Defendant allegedly "indicated they had provided more services—in quantity and quality—than they, in fact, provided. Therefore, [the government] paid [Defendant] higher amounts than they were truly owed. This plain and obvious materiality went to the heart of [Defendant's] ability to obtain reimbursement from [the government]." *Id.* So, as to Count III, Relator establishes materiality.

## IV.  Conclusion

The Court **DENIES** Relator's Motion for Reconsideration (Dkt. 66), **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Judicial Notice (Dkt. 72), **DENIES** Relator's Motion for Leave to File Surreply[14] (Dkt. 80), and **GRANTS** Defendant's Motion to Dismiss (Dkt. 73).

**SO ORDERED** this 17th day of March, 2023.



MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

[14] As the Court's holding does not turn on the issue raised in Relator's proposed surreply, the Court denies this motion.